IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re: | ) | |
| | ) | |
| GLOBAL HOME PRODUCTS, LLC, *et al.*,[1] | ) | Case No. 06-10340 (KG) |
| | ) | (Jointly Administered) |
| Debtors. | ) | |
| | ) | Chapter 11 |
| | ) | |

## NOTICE OF APPEAL

Regal Ware, Inc. ("Regal Ware"), Movant, by and through its undersigned counsel, appeals under 28 U.S.C. § 158(a) from the final judgment of the Bankruptcy Court entered in the above captioned bankruptcy case on August 14, 2006 [Docket No. 664], approving the *Motion of Debtors for the Entry of an Order (I) Approving Sale by the Wearever Debtors of Substantially all of Wearever Debtors' Assets Free and Clear of all Liens, Claims, Enbumbrances and Other Interests, (II) Assuming and Assigning Certain Executory Contracts and Unexpired Leases, and (III) Granting Related Relief* (the "Sale Motion") and denying Regal Ware's Objection to the Sale Motion [Docket No. 618].

The parties to the Judgment appealed from and the names and addresses of their respective attorneys are as follows:

---

[1] The Debtors are the following entities:  Global Home Products LLC; GHP Holding Company LLC; GHP Operating Company LLC; Anchor Hocking Acquisition Inc.; Anchor Hocking Inc.; AH Acquisition Puerto Rico, Inc.; Anchor Hocking Consumer Glass Corporation; Anchor Hocking CG Operating Company LLC; Anchor Hocking Operating Company LLC; Burnes Acquisition Inc.; Intercraft Company; Burnes Puerto Rico, Inc.; Picture LLC; Burnes Operating Company LLC; Mirro Acquisition Inc.; Mirro Puerto Rico, Inc.; Mirro Operating Company LLC.

*Counsel for Regal Ware, Inc.:*

Morton R. Branzburg, Esq.
Steven K. Kortanek, Esq.
KLEHR, HARRISON, HARVEY,
BRANZBURG & ELLERS LLP
919 N. Market Street, Suite 1000
Wilmington, Delaware 19801-3062

Daniel R. Johnson, Esq.
Joseph A. Kromholz, Esq.
RYAN KROMHOLZ & MANION, S.C.
P. O. Box 26618
Milwaukee, Wisconsin 53226-0618

*Counsel to the Global Home Products:*

Laura Davis Jones, Esq.
Bruce Grohsgal, Esq.
Sandra G. M. Selzer, Esq.
Pachulski Stang Ziehl Young Jones &
   Weintraub LLP
919 N. Market St., 17th Flr.
Wilmington, DE  19899-8705

David M. Bertenthal, Esq.
Joshua M. Fried, Esq.
Pachulski Stang Ziehl Young Jones &
   Weintraub LLP
150 California St., 15th Flr.
San Francisco, CA  94111

*Counsel for SEB, SA:*

Gregg M. Galardi, Esq.
Matthew Paul Ward, Esq.
Skadden Arps Slate Meagher &
   Flom LLP
One Rodney Square
P.O. Box 636
Wilmington, DE  19899

*Counsel for Wachovia Bank, National Association:*

Joseph H. Huston, Jr., Esq.
Thomas G. Whalen, Jr., Esq.
Stevens & Lee, P.C.
1105 N. Market Street, 7th Flr.
Wilmington, DE 19801

Steven B. Soll, Esq.
Jonathan Helfat, Esq.
Otterbourg, Steindler, Houston &
   Rosen, P.C.
230 Park Avenue
New York, NY  10169

*Counsel for Citigroup:*

Joseph H. Smolinsky, Esq.
Thomas J. Hall, Esq.
Chadbourne & Parke LLP
30 Rockefeller Plaza
New York, NY  10112

*United States Trustee*

Mark Kenney, Esq.
Office of the U.S. Trustee
J. Caleb Boggs Federal Building
844 N. King Street, Suite 2207
Lockbox 35
Wilmington, DE  19801

*Local Counsel to the Official Committee of Unsecured Creditors:*
David M. Fournier, Esq.
Pepper Hamilton LLP
1313 Market Street, Suite 5100
Wilmington, DE  19801

Sharon Levine, Esq.
Bruce Buechler, Esq.
Lowenstein Sandler PC
65 Livingston Avenue
Roseland, NJ  07068-1791

2

DEL1 64394-1

Date:  August 14, 2006                 Respectfully submitted,

                                       KLEHR HARRISON HARVEY BRANZBURG
                                         & ELLERS LLP


                                        /s/ Jennifer L. Scoliard
                                       Morton R. Branzburg, Esq.
                                       Steven K. Kortanek (Del. Bar No. 3106)
                                       Jennifer L. Scoliard (Del Bar No. 4147)
                                       919 N. Market Street, Suite 1000
                                       Wilmington, Delaware 19801
                                       (302) 552-5503 – telephone
                                       (302) 426-9193 - facsimile

                                                       -and-

                                       RYAN KROMHOLZ & MANION, S.C.
                                       Daniel R. Johnson, Esq.
                                       Joseph A. Kromholz, Esq.
                                       P. O. Box 26618
                                       Milwaukee, Wisconsin 53226-0618

                                       *Attorneys for Regal Ware, Inc.*

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re: | : | **Chapter 11** |
| | : | |
| Global Home Products LLC, et al.,[1] | : | **Case No. 06-10340 (KG)** |
| | : | **(Jointly Administered)** |
| Debtors. | | Related Docket No. 549, 604, 618, 631, 633, 641 |

**ORDER APPROVING MOTION OF DEBTORS FOR THE ENTRY OF AN ORDER (I)
APPROVING SALE BY THE WEAREVER DEBTORS OF SUBSTANTIALLY ALL OF
WEAREVER DEBTORS' ASSETS FREE AND CLEAR OF ALL LIENS, CLAIMS,
ENCUMBRANCES AND OTHER INTERESTS PURSUANT TO SECTIONS 363(B),(F)
AND (M) OF THE BANKRUPTCY CODE, (II) ASSUMING AND ASSIGNING
CERTAIN EXECUTORY CONTRACTS AND UNEXPIRED LEASES,
AND (III) GRANTING RELATED RELIEF**

Upon the motion, dated July 14, 2006 (the "Sale Motion")[2] of the above-

captioned debtors and debtors-in-possession (the "Debtors"), for entry of an order authorizing

and approving (i) the sale (the "Sale") of certain of the Debtors' assets free and clear of any and

all liens, claims, interests and encumbrances under Sections 363(b), (f) and (m) of the

Bankruptcy Code, pursuant to the terms of that certain Asset Purchase Agreement dated as of

July 7, 2006 (as amended, including as amended by that certain First Amendment dated as of

August 3, 2006, the "Agreement") between SEB S.A. and Groupe SEB USA (the "Buyer") and

Mirro Acquisition Inc., Mirro Operating Company, LLC, Mirro Puerto Rico, Inc. (collectively,

---

[1] The Debtors are the following entities: Global Home Products LLC; GHP Holding Company LLC; GHP
Operating Company LLC; Anchor Hocking Acquisition Inc.; Anchor Hocking Inc.; AH Acquisition Puerto Rico,
Inc.; Anchor Hocking Consumer Glass Corporation; Anchor Hocking CG Operating Company LLC; Anchor
Hocking Operating Company LLC; Burnes Acquisition Inc.; Intercraft Company; Burnes Puerto Rico, Inc.; Picture
LLC; Burnes Operating Company LLC; Mirro Acquisition Inc.; Mirro Puerto Rico, Inc.; Mirro Operating Company
LLC.

[2] Unless otherwise defined, capitalized terms used herein shall have the meanings ascribed to them in the Sale
Motion or the Agreement, as the case may be; as to any conflicts with respect to such terms, the meanings contained
in the Agreement shall control over the meanings contained in the Sale Motion.

the "WearEver Debtors") and 690649 BC Ltd. (together with the WearEver Debtors, the

"Sellers") (substantially in the form attached hereto as Exhibit A, exclusive of exhibits and

schedules, except for those certain exhibits and/or schedules attached to the Agreement), (ii) the

assumption and assignment of certain executory contracts and unexpired leases to the Buyer, as

described in the Agreement and a list of which is attached hereto as Exhibit B, (the "Designated

Contracts"), and (iii) the assumption by the Buyer of certain liabilities of the Sellers, as described

in the Agreement; and the Court having previously entered an order on July 14, 2006 (the

"Procedures Order") approving the Procedures Motion with respect to the use of bidding

procedures in connection with, and conducting an auction for, the Sale of the Property; and an

auction having been held on August 7, 2006 in accordance with the Procedures Order (the

"Auction"); and a hearing on the Sale Motion having been held on August 8, 2006 (the "Sale

Hearing"), at which time all interested parties were offered a fair and reasonable opportunity to

be heard and object with respect to the Auction, Sale Motion and Sale; and the Court having

reviewed and considered (i) the transcript of the Auction; (ii) the Sale Motion, (iii) the objections

thereto, (iv) the arguments and evidence of Lifetime with respect to the "bona fides" of the

Auction; (v) the arguments and the evidence regarding the WearEver Debtors ability to assume

and assign the Sublicense Agreement (as defined below) to the Buyer; and (vi) the arguments of

counsel made, and the evidence proffered or adduced, at the Sale Hearing; and it appearing that

the relief requested in the Sale Motion is in the best interests of the WearEver Debtors, their

estates and creditors and other parties in interest, and upon the record of the Auction and Sale

Hearing and these cases and after due deliberation thereon and good cause appearing therefor,

**IT IS HEREBY FOUND, CONCLUDED AND DETERMINED THAT:**

A.      The findings and conclusions on the record of the Sale Hearing including, without

limitation, the findings and conclusions set forth herein constitute the Court's findings of fact

and conclusions of law pursuant to Rule 7052 of the Federal Rules of Bankruptcy Procedure (the

"Bankruptcy Rules"), made applicable to this proceeding pursuant to Bankruptcy Rule 9014.

B.      This Court has jurisdiction to hear and determine the Sale Motion and the

transactions contemplated by the Agreement in accordance with the Procedures Order pursuant

to 28 U.S.C. §§157 and 1334.

C.      Venue of these cases and the Sale Motion in this district is proper pursuant to 28

U.S.C. §§ 1408 and 1409.

D.      Determination of the Sale Motion is a core proceeding under 28 U.S.C. §

157(b)(2)(A) and (N).  The statutory predicates for the relief requested herein are Sections 105,

363 and 365 of the Bankruptcy Code, 11 U.S.C. §§ 101 et seq., as amended (the "Bankruptcy

Code") and Bankruptcy Rules 2002, 6004, 6006, 9007 and 9014.

E.      The Debtors have demonstrated a sound business purpose for the Sale and have

followed the terms of the Procedures Order and such additional procedures for notices of the

Sale Motion, the Sale Hearing, the Sale, and the assumption and assignment of the Designated

Contracts, which procedures were fair and reasonable, to provide notice of the Sale Motion, the

Sale Hearing, the Sale, and the assumption and assignment of the Designated Contracts to all

creditors and other parties in interest.

F.      Pursuant to the Procedures Order, proper, timely, adequate and sufficient notice of

the Sale Motion, the Auction, the Sale Hearing, the Sale, and the assumption and assignment of

the Designated Contracts has been provided in accordance with all applicable law, including

without limitation, § 102(1) of the Bankruptcy Code and Bankruptcy Rules 2002 and 6004, and

no other or further notice of the Sale Motion, the Auction, the Sale Hearing, the Sale or the

assumption and assignment of the Designated Contracts was or is required.

G.    A reasonable opportunity to object and to be heard regarding the relief requested

in the Sale Motion has been afforded to all creditors and parties in interest.

H.    On or about July 7, 2006, the Sellers entered into an Asset Purchase Agreement,

as amended (the "Lifetime Agreement") with Lifetime Brands, Inc. ("Lifetime") for the sale of

the Property, subject to Competing Bids.

I.    On August 3, 2006, the Buyer timely submitted a Competing Bid in accordance

with, and subject to the terms of, the Procedures Order (the "SEB Bid").

J.    At the Auction, the Buyer presented the highest and best Competing Bid for the

Property in the amount of $35.75 million (thirty-five million seven-hundred-fifty thousand

dollars), inclusive of the Break Up Fee, plus satisfaction of any and all obligations of the Debtors

and the non-debtor Sellers with respect to Inventory Advances and certain other liabilities as set

forth in the Agreement.  At the conclusion of the Auction, the Sellers determined that the Buyer

was the Successful Bidder.

K.    At the Auction, Lifetime was approved as the back-up bidder as provided in the

Lifetime Agreement and the Procedures Order.

L.    The Auction was duly noticed and conducted in a non-collusive, fair and good

faith manner in accordance with the procedures set forth in the Procedures Order, and the

Debtors, the Debtors' prepetition secured lenders, the Committee and Sellers reported to the

Court their recommendation of the Successful Bidder and any back-up bidder(s) and the amounts of their respective bids for approval by the Court at the Sale Hearing. A transcript of the record of the Auction has been submitted to the Court.

M.    At the Auction, the Buyer also offered to purchase from one of the Sellers' non-debtor affiliates all of the assets listed on Schedule 1.2 attached to the Agreement for the purchase price of $750,000 (the "Nuevo Laredo Assets") which Assets were Excluded Assets under the Lifetime Agreement. The Debtors attributed no value to the proposed purchase of the Nuevo Laredo Assets in connection with the Auction.

N.    Subject to the applicable provisions of bankruptcy law and other applicable law, upon entry of this Order, each of the Sellers will have the power and authority to execute, deliver and perform the Agreement and all writings related thereto.

O.    Each of the Sellers has all of the corporate power and authority necessary to consummate the transactions contemplated by the Agreement and has taken all corporate action necessary to authorize and approve the Agreement and the consummation by such WearEver Debtor of the transactions contemplated thereby.

P.    With respect to that certain *Trademark Sublicense Agreement* (the "Sublicense Agreement"), dated as of April 13, 2004, by and between Newell Operating Company ("Newell") and Mirro Operating Company, LLC ("Mirro"), in 1999 Regal Ware, Inc. ("Regal") had licensed the use of certain of its trademarks to Newell in connection with a transaction for the sale of assets, and thereafter Newell under the Sublicense Agreement licensed the use of the REGAL WARE trademarks to Mirro. The initial license to Newell was an exclusive worldwide royalty free trademark license as was the Sublicense Agreement from Newell to Mirro in 2004.

Thereafter, effective August 1, 2006, Regal took an assignment of the Sublicense Agreement and the Trademark License from Newell and thereafter objected to the assignment of the Sublicense Agreement. The Court determines as a matter of law that the Sublicense Agreement is assignable. First, the license to Newell and the Sublicense Agreement to Mitro were exclusive and did not restrict assignment to any particular entity. The cases cited by Regal in support of its objection involve non-exclusive licenses and/or special circumstances not present here. The Court relies in its conclusion that the license is assignable on the decision of the United States District Court for the District of Delaware in *In re Golden Books*, in which, with respect to a copyright license, the Court held that an exclusive licensee does acquire property rights and may freely transfer its rights. The Sublicense Agreement does not prohibit an assignment, Regal having given up control of the trademark license and has not regained that control. The case of *In re Rooster Inc.* also supports the Court's conclusion, wherein the Court held that an exclusive license for trademarks is freely assignable in that it does not constitute a personal services contract. Accordingly, the Sublicense Agreement is not subject to the limitations of Section 365(c)(1) of the Bankruptcy Code, and as such may be assumed and assigned to the Buyer pursuant to Section 365(b) and (f) of the Bankruptcy Code.

      Q.     The Court does not need to decide the issue of whether Regal's consent to the assumption and assignment of the Sublicense Agreement (as defined below) was unreasonably withheld, but the testimony on the record of the Sale Hearing provides that Regal's refusal to consent to the assumption and assignment of the Sublicense Agreement, under the circumstances, may have been unreasonable.

R.      No consents or approvals, other than those expressly provided for in the

Agreement, are required for the Sellers to consummate the Sale or with respect to the Nuevo

Laredo Assets.

S.      The Agreement and the transactions contemplated thereby were negotiated,

proposed and entered into by the WearEver Debtors and the Buyer in good faith and without

collusion.  Neither the Debtors nor the Buyer have engaged in any conduct that would cause or

permit the Agreement or the Sale to be avoided under Section 363(n) of the Bankruptcy Code.

T.      The Buyer is acting as a good faith purchaser, as that term is used in the

Bankruptcy Code and is, accordingly, entitled to the protections set forth in Section 363(m) of

the Bankruptcy Code.  In that regard, the Court finds that:

1.      That bidding at the Auction was if not entirely, almost entirely, about the

price to be paid for the Assets, which bidding continued for over 70 rounds and yielded a price in

amount in excess of $14 million above the price provided in the Lifetime Agreement.

2.      Lifetime reserved its rights regarding the "bona fides" of the Auction as a

result of Citigroup being Buyer's financial advisor and a client of Lifetime, and did so at both the

beginning and end of the Auction.  Nonetheless Lifetime participated in the Auction and

concluded its bidding at the price of $35 million, which Lifetime asserted was the maximum

Purchase Price it was prepared to pay for the Property.  In addition, although the Court and SEB

offered to reopen the Auction if Lifetime withdrew its objection to the bona fides of the Auction,

Lifetime would not waive such objection.

3.      Although Citigroup has advised Lifetime on certain matters, no evidence

was presented to show or otherwise indicate that Buyer was provided with confidential

nonpublic information regarding Lifetime, its interests in the Property or its preparedness to bid at the Auction.

        4.     The testimony of the Citigroup representative, the Buyer's witnesses, and the testimony of Mr. Lowrey presented at the Sale Hearing, demonstrated that SEB had not been provided with confidential nonpublic information, that Buyer independently determined its bidding strategy, that SEB was prepared to bid in excess of the amount it was actually required to bid at the Auction and that SEB's analysis of the potential purchase of the Property was based upon financial and other analysis performed by persons at SEB.

        U.     The transfer of the Property to the Buyer will be a legal, valid and effective transfer, authorized pursuant to the Bankruptcy Code, and other applicable law and will vest the Buyer with all right, title, and interest of the WearEver Debtors in and to the Property free and clear of all interests, liens, claims and encumbrances of any kind or nature whatsoever which have arisen or accrued, or otherwise exist, as of the Closing Date (as such term is defined in the Agreement).

        V.     Except as expressly set forth in the Agreement, the Buyer shall have no liability for any interests, liens, claims and encumbrances of any kind or nature whatsoever, or other obligation of or against the Debtors, related to the Property by reason of the transfer of the Property to the Buyer. The Buyer is not acquiring or assuming any liability, warranty or other obligation of the Debtors, except as expressly set forth in the Agreement with respect to assumed liabilities.

        W.     The Debtors have adequately marketed the Property for sale, and the consideration committed to by the Buyer pursuant to the Agreement (i) is fair and reasonable, (ii)

is the highest and best offer for the Property; (iii) will provide a greater recovery for the Debtors' creditors than would be provided by any other practical available alternative, and (iv) constitutes reasonably equivalent value and fair and reasonable consideration under the Bankruptcy Code and under the laws of the United States, any state, territory, or possession thereof, and the District of Columbia. The Sale is proper, necessary and serves the best interests of the WearEver Debtors, their estates, creditors and all parties in interest.

X.      The WearEver Debtors may sell the Property free and clear of all interests, liens, claims and encumbrances of any kind or nature whatsoever because, in each case, one or more of the standards set forth in 11 U.S.C. § 363(f)(1)-(5) has been satisfied. Those non-Debtor parties who assert interests in the Property who did not object, or who withdrew their objections to the Sale or the Sale Motion are deemed to have consented pursuant to 11 U.S.C. § 363(f)(2). Those parties who assert interests in the Property who did object, fall within one or more of the other subsections of § 363(f) and either are not entitled to adequate protection or are adequately protected by having their asserted interests, if any, attach to the cash proceeds of the Sale ultimately attributable to that respective asset against or in which they claim an interest, to the extent, if any, and in the same priority as such interests attached to that asset prior to the closing of the Sale.

Y.      The Debtors have demonstrated that it is an exercise of their sound business judgment to assume and assign the Designated Contracts to the Buyer in connection with the closing of the Sale, and the assumption and assignment of the Designated Contracts is in the best interests of the Debtors, their estates, and their creditors. The Designated Contracts being assigned to the Buyer as set forth in the Agreement (a list of which is attached hereto as Exhibit

                                    9

B) are an integral part of the Property and, accordingly, such assumption and assignment of Designated Contracts is reasonable and enhances the value of the Debtors' estates.

Z.    Pursuant to and in accordance with the Agreement, the WearEver Debtors and Buyer, as applicable, have (i) cured, or have provided adequate assurance of cure, of any default existing or occurring prior to the Closing Date under any of the Designated Contracts, within the meaning of 11 U.S.C. § 365(b)(1)(A) and (ii) provided compensation or adequate assurance of compensation to any party for any actual pecuniary loss to such party resulting from a default existing or occurring prior to the Closing Date under any of the Designated Contracts, within the meaning of 11 U.S.C. § 365(b)(1)(B), and the Buyer has provided adequate assurance of their future performance of and under the Designated Contracts within the meaning of 11 U.S.C. § 365(b)(1)(C).

AA.    The Sale does not constitute a de facto plan of reorganization or liquidation or an element of such a plan for any of the Debtors, as it does not and does not propose to: (i) impair or restructure existing debt of, or equity interests in, the Debtors; (ii) impair or circumvent voting rights with respect to any future plan proposed by the Debtors; (iii) circumvent chapter 11 plan safeguards, such as those set forth in sections 1125 and 1129 of the Bankruptcy Code; or (iv) classify claims or equity interests, compromise controversies or extend debt maturities.

BB.    Approval of the Agreement and assumption and assignment of the Designated Contracts and closing of the Sale of the Property at this time are in the best interests of the WearEver Debtors, their creditors, their estates and other parties in interest.

**NOW, THEREFORE, IT IS HEREBY ORDERED, ADJUDGED AND DECREED THAT:**

1.    The Sale Motion is granted in its entirety.

2.    Except as provided on the record of the Sale Hearing, all objections to the Sale Motion or the relief requested therein that have not been withdrawn, waived, or settled, and all reservations of rights included therein, are hereby denied and overruled on the merits.  The objections to the Sale Motion filed by Regal Ware, Inc. (the "Regal Objection") and Lifetime Brands, Inc. are hereby overruled for the reasons set forth on the record of the Sale Hearing.

3.    The Agreement and all of the terms and conditions thereof, substantially in the form attached hereto as Exhibit A, are approved.

4.    With respect to the SEB Bid, section 10.26 of the Agreement was reinstated on the record of the Auction and, for the avoidance of doubt, the representations and warranties set forth in sections 5.3 and 5.4 of the Agreement expired on July 20, 2006 and are of no further force or effect.

5.    Pursuant to Section 363(b) of the Bankruptcy Code and by the issuance of this Order, the WearEver Debtors are authorized to perform their obligations under and comply with the terms of the Agreement, and consummate the Sale, pursuant to and in accordance with the terms and conditions of the Agreement.

6.    The Buyer shall not be required to seek or obtain relief from the automatic stay under Section 362 of the Bankruptcy Code to enforce any of its remedies under the Agreement or any other Sale-related document.  The automatic stay imposed by Section 362 of the Bankruptcy Code is modified solely to the extent necessary to implement the preceding sentence, provided, however, that this Court shall retain exclusive jurisdiction over any and all disputes with respect thereto.

7.    This Order and the Agreement shall be binding in all respects upon all creditors and other interested parties of any of the WearEver Debtors. Nothing contained in any chapter 11 plan confirmed in these bankruptcy cases or the confirmation order confirming any such chapter 11 plan shall conflict with or derogate from the provisions of the Agreement or this Order, and the Agreement and this Order shall control to the extent of such conflict or derogation.

8.    Except as expressly permitted or otherwise specifically provided by the Agreement or this Order, all persons and entities, including, but not limited to, all debt security holders, equity security holders, governmental, tax, and regulatory authorities, lenders, trade and other creditors, holding interests of any kind or nature whatsoever against or in the WearEver Debtors or any of the Property (whether legal or equitable, secured or unsecured, matured or unmatured, contingent or non-contingent, senior or subordinated), arising under or out of, in connection with, or in any way relating to, the WearEver Debtors, the Property, the operation of the WearEver Debtors' business prior to the Closing, or the transfer of the Property to the Buyer are hereby forever barred, estopped, and permanently enjoined from asserting against the Buyer, its successors or assigns, its property, or the Property, such persons' or entities' interests.

9.    Except as expressly provided in the Agreement or this Order with respect to assumed liabilities, pursuant to Sections 105(a) and 363(f) of the Bankruptcy Code, the WearEver Debtors are authorized to transfer the Property to the Buyer, and upon closing of the Sale, the transfer of the Property to the Buyer shall constitute legal, valid and effective transfers of the Property, shall vest the Buyer with all right, title, and interest of the Sellers in and to the Property and shall be free and clear of all interests, liens, claims and encumbrances of any kind

or nature whatsoever with all such interests, liens, claims and encumbrances of any kind or

nature whatsoever to attach to the net proceeds of the Sale in the order of their priority, with the

same validity, force and effect which they now have as against the Property, subject to any

claims and defenses the Debtors may possess with respect thereto provided that the net proceeds

of Sale shall be remitted at closing to Wachovia Bank, N.A., ("Wachovia") on account of their

liens and security interests for application to the Obligations owed to Wachovia in accordance

with and subject to the Final DIP Financing Order entered by this Court on May 4, 2006 at

Docket No. 184.

          10.     Except as expressly provided in the Agreement or this Order, this Order (i)

shall be effective as a determination that, on the Closing Date, all interests of any kind or nature

whatsoever existing with respect to the Property prior to the day of the closing have been

unconditionally released, discharged and terminated, and that the conveyances described herein

have been effected, and (ii) shall be binding upon and shall govern the acts of all entities

including without limitation, all filing agents, filing officers, title agents, title companies,

recorders of mortgages, recorders of deeds, registrars of deeds, administrative agencies,

governmental departments, secretaries of state, federal, state, and local officials, and all other

persons and entities who may be required by operation of law, the duties of their office, or

contract, to accept, file, register or otherwise record or release any documents or instruments, or

who may be required to report or insure any title or state of title in or to any part of the Property.

          11.     If any person or entity that has filed financing statements, mortgages,

mechanics; liens, lis pendens, or other documents or agreements evidencing interests with

respect to the Property shall not have delivered to the Sellers prior to the Closing Date, in proper

31604-001\DOCS_DE:119757.10          13

form for filing and executed by the appropriate parties, termination statements, instruments of satisfaction, releases of all interests which the person or entity has with respect to the Property, then the Buyer hereby is authorized to execute and file such statements, instruments, releases and other documents on behalf of the person or entity with respect to the Property; provided, however, that regardless of whether such persons or entities or the Buyer execute and file any releases, the Buyer hereby is authorized to file, register, or otherwise record a certified copy of this Order, which, once filed, registered, or otherwise recorded, shall constitute conclusive evidence of the release of all such interests of any kind or nature whatsoever in the specific property transferred under this Order.

12.     The transactions contemplated by the Agreement and the Auction pursuant to the Procedures Order are undertaken by the Buyer in good faith, as that term is used in Section 363(m) of the Bankruptcy Code. Accordingly, the Buyer is entitled to all of the protections afforded by Section 363(m) of the Bankruptcy Code, including but not limited to the provision that the reversal or modification on appeal of the authorization provided herein to consummate the transactions shall not affect the validity of the transactions to the Buyer, unless such authorization is duly stayed pending such appeal.

13.     The consideration committed to by the Buyer pursuant to the Agreement (i) constitutes, and shall be deemed to constitute, reasonably equivalent value and fair consideration, and (ii) is fair and reasonable and may not be avoided under Section 363(n) or any other provision of the Bankruptcy Code, or otherwise.

14.     The failure specifically to include any particular provision of the Agreement in this Order shall not diminish or impair the effectiveness of such provision, it being the intent of the Court that the Agreement be authorized and approved in its entirety.

15.     The Agreement and any related agreements, documents or other instruments may be modified, amended or supplemented by the parties thereto, in a writing signed by both parties, and in accordance with the terms thereof, without further order of the Court, provided that any such modification, amendment or supplement does not have a material adverse effect on the Debtors' estates, and the Debtors' representatives are hereby authorized to execute such modifications, amendments or supplements.

16.     Except as expressly set forth in the Agreement with respect to assumed liabilities and except as otherwise provided in the Agreement, the Buyer shall have no liability for any interests, liens, claims and encumbrances of any kind or nature whatsoever, or other obligation of or against the Debtors, related to the Property by reason of the transfer of the Property to the Buyer.

17.     Neither the Buyer nor its affiliates, successors or assigns shall be deemed, as a result of any action taken in connection with the purchase of the Property, to: (i) be a successor (or other such similarly situated party) to any of the Debtors; (b) have, de facto or otherwise, merged with or into any of the Debtors; or (c) be a continuation or substantial continuation of any of the Debtors or any enterprise of any of the Debtors.

18.     Pursuant to Sections 105(a) and 365 of the Bankruptcy Code, and subject to and conditioned upon the Closing of the Sale, the WearEver Debtors' assumption and assignment to the Buyer, and the Buyer's assumption on the terms set forth in the Agreement, of

the Designated Contracts (including, but without limitation, the WearEver Debtors' interests in the Sublicense Agreement) is approved, and the requirements of Section 365(b)(1) of the Bankruptcy Code with respect thereto are deemed satisfied. All objections, to the assumption and assignment of the Sublicense Agreement (and to the assignment of all other Designated Contracts) are hereby overruled with prejudice for the reasons set forth on the record of the Sale Hearing.

19.     The WearEver Debtors are authorized in accordance with Sections 105(a) and 365 of the Bankruptcy Code to (i) assume and assign to the Buyer, effective upon the closing of the Sale, the Designated Contracts (including, but without limitation, the WearEver Debtors' interests in the Sublicense Agreement) free and clear of all claims and interests of any kind or nature whatsoever and (b) execute and deliver to the Buyer such documents or other instruments as may be reasonably necessary to assign and transfer the Designated Contracts to the Buyer.

20.     The Designated Contracts shall be transferred and assigned to, and following the closing of the Sale remain in full force and effect for the benefit of, the Buyer in accordance with their respective terms, notwithstanding any provision in any such Designated Contract that prohibits, restricts, or conditions such assignment or transfer or purports to terminate or alter any term of such Designated Contracts as a result of an assignment. Pursuant to section 365(k) of the Bankruptcy Code, the Debtors shall be relieved from any further liability with respect to the Designated Contracts after such assignment to and assumption by the Buyer.

21.     Each Designated Contract is an executory contract of the WearEver Debtors, subject to the WearEver Debtors' right to assert, prior to the assumption by the

applicable WearEver Debtor and assignment to the Buyer thereof, that any such Designated

Contract is not an executory contract or lease and/or to recharacterize such Designated Contract.

       22.     The WearEver Debtors may assume each Designated Contract in

accordance with Section 365 of the Bankruptcy Code and may assign each Designated Contract

in accordance with Sections 363 and 365 of the Bankruptcy Code. The Buyer may designate

contracts to be assumed and assigned through the ninetieth (90th) day following entry of this

Order, and such deadline may be extended by further Court Order.

       23.     Upon the closing of the Sale, in accordance with Sections 363 and 365 of

the Bankruptcy Code, the Buyer shall be fully and irrevocably vested in all right, title and

interest of each Designated Contract (including, but without limitation, the WearEver Debtors'

interests in the Sublicense Agreement), and each non-Debtor party to a Designated Contract that

has not objected to the assumption and assignment of such Designated Contract to Buyer is

deemed to have consented to the assumption and assignment by the WearEver Debtors to the

Buyer of the Designated Contracts. As of the closing of the Sale, each Designated Contract will

be in full force and effect and not subject to termination or cancellation by the non-Debtor party

thereto based upon any act, omission or failure that my have occurred or arisen prior to thereto.

       24.     In accordance with the Agreement, the WearEver Debtors shall be

responsible for and pay in the aggregate, up to the initial \$150,000 of cure costs (the "Cure Cap")

in respect of Designated Contracts subject to assumption and assignment by the WearEver

Debtors, and Buyer shall bear and pay any excess over such amount.

       25.     All defaults, breaches or other obligations of the WearEver Debtors under

any Designated Contract incurred, arising or accruing prior to the Closing Date (without giving

effect to any acceleration clauses or any default provisions of the kind specified in section

365(b)(2) of the Bankruptcy Code) shall be deemed and considered cured in full by the

WearEver Debtors and the Buyer, as applicable and in accordance with the Agreement, by the

payment of the cure amount associated with such Designated Contract (as to each Designated

Contract, the "Cure Amount" and collectively, the "Cure Amounts") at the closing of the Sale or

as soon thereafter as practicable, and the Buyer shall have no liability or obligation with respect

to defaults, breaches or other obligations incurred, arising or accruing prior to the Closing Date,

except as otherwise expressly provided herein or in the Agreement.

26.    Upon payment of the Cure Amounts under the terms of the Agreement,

each non-Debtor party to a Designated Contract is forever barred, estopped and permanently

enjoined from asserting against the Debtors or the Buyer, or the property of either of them, any

default or breach existing as of the Closing Date of the Sale, or, as against the Buyer, any

counterclaim, defense, setoff or any other claim asserted or which may be asserted against the

Debtors. The Buyer has provided adequate assurance of future performance of the Designated

Contracts, as required by Sections 365(b)(1) and (f)(2) of the Bankruptcy Code.

27.    Upon assignment of the Designated Contracts to the Buyer at or

subsequent to the closing of the Sale, no default shall exist under any Designated Contract and

no non-Debtor party to any Designated Contract shall be permitted to declare a default by or

against the Buyer under such Designated Contract or otherwise take action against the Buyer as a

result of any Debtor's financial condition, bankruptcy or failure to perform any obligation under

the Designated Contract. Upon entry of this Order and assumption and assignment of the

Designated Contracts, the Buyer shall be deemed in compliance with all terms and provisions of the Designated Contracts.

28.     Subject to the Cure Cap, the Buyer may designate additional executory contracts and unexpired leases to be assumed and assigned by the WearEver Debtors to the Buyer after the Closing Date in accordance with the provisions of the Agreement. Upon receipt of such designation, the Debtors shall promptly take all reasonable actions in an effort to cause the assumption by the Debtors and assignment to and assumption by the Buyer pursuant to Section 365 of the Bankruptcy Code of each such executory contract or unexpired lease and otherwise cooperate in reasonable respects with the Buyer in respect of each assignment.

29.     Subject to Sellers' obligation with respect to air freight charges, the Buyer will be responsible for and shall pay all shipping, handling, freight and similar fees and charges related to the Designated Inventory (as defined in the Agreement) ordered by the Sellers pursuant to the terms and provision of Section 2.4 of the Agreement.

30.     The Court hereby approves, on a final basis pursuant to Bankruptcy Rule 4001(c)(2), the following:

a.      The Inventory Advance Provisions set forth in Section 2.4 of the Lifetime Agreement are hereby approved.

b.      Lifetime is granted (x) to the extent of Inventory Advances advanced by Lifetime utilized for the acquisition of Designated Finished Goods an allowed super-priority claim (junior to and only to the claims with respect to the DIP Agreement and the claims of Madeleine with respect to the obligations of the Sellers and various affiliates of the Sellers and to Carve-Out Expenses and related financing entered in the Debtors' chapter 11 cases on May 4,

2006) under 364(c)(1), 503(b)(1) and 507(a)(2) of the Bankruptcy Code (the "Superpriority Administrative Claim"), and which Superpriority Administrative Expense Claim shall, in all events, exclude any claim in or to any Avoidance Actions and shall be conditioned upon the Lifetime Agreement not being terminated by reason of Lifetime's default thereunder), (y) to the extent of Inventory Advances advanced by Lifetime utilized for the acquisition of Designated Finished Goods, a perfected first priority security interest in the Designated Finished Goods pursuant to section 364(c)(2) of the Bankruptcy Code, and the proceeds thereof (including all accounts receivable created upon the Sale or other disposition of any Designated Finished Goods), and (z) to the extent of Inventory Advances advanced by Lifetime utilized for the acquisition of Designated Raw Materials, a first priority security interest in the Designated Raw Materials pursuant to section 364(c)(2) of the Bankruptcy Code, and the proceeds thereof (including the products created therefrom) and a perfected security interest in the Designated Finished Goods (junior only to the lien in favor of Lifetime as referred to in the foregoing clause (y)) pursuant to section 364(c)(2) of the Bankruptcy Code, provided that Lifetime shall have used its best efforts to satisfy the obligations referred to in this clause (z) from the Designated Raw Materials and the proceeds thereof prior to seeking to satisfy such obligations from the Designated Finished Goods and the proceeds thereof as collateral security for the Inventory Advances advanced by Lifetime. The first priority security interests granted pursuant to this paragraph 30(b)(y) and (z) are collectively referred to as the "Lien".

     c.     The Sellers shall reimburse Lifetime for the Inventory Advances advanced by Lifetime promptly following receipt, and to the extent, of payment for the Inventory Collateral and, in any event, shall repay Lifetime in Good Funds an amount equal to all

Inventory Advances advanced by Lifetime less the undrawn amount of each Letter of Credit Sellers cause to be returned to Lifetime on the earlier to occur of (x) the closing of the Sale to the Buyer, and (y) the Outside Date if the Closing shall have not previously occurred and a transaction or transaction with parties other than Lifetime and involving substantially all of the Property shall have closed. Pursuant to section 2.2 of the Agreement, effective on the Closing Date, Buyer shall assume all liabilities and obligations for the Inventory Advances.

        d.     Subject to the Sellers' obligations with respect to air freight charges, upon the closing of the transaction with the Buyer, the Buyer shall assume the shipping, handling, freight and similar fees and charges related to the Designated Inventory ordered by the Sellers pursuant to the terms and provisions of section 2.4 of the Agreement and to the extent such inventory is included in the Property.

        e.     The Lien shall be effective and perfected upon the date of this Sale Order and without the necessity of the execution, recordation of filing of security agreements, financing statements or other similar documents.

        f.     The Inventory Advances advanced by Lifetime shall constitute valid and binding obligations of the WearEver Debtors, enforceable against each WearEver Debtor. No obligation, payment, transfer or grant of security shall be stayed, restrained, voidable, or recoverable under the Bankruptcy Code or under any applicable law.

        g.     Lifetime is hereby authorized, but not required, to file or record financing statements, notices of lien or similar instruments in any jurisdiction or take any other action in order to validate and perfect the liens and security interests granted to it hereunder. Whether or not Lifetime shall, in its sole discretion, choose to file such financing statements, notices of lien

or similar instruments or otherwise confirm perfection of the liens and security interests granted to it hereunder, such liens and security interests shall be deemed valid, perfected, allowed, enforceable, non-avoidable and not subject to challenge dispute or subordination, at the time and on the date of entry of this Sale Order. Upon the request of Lifetime, without any further consent of any party, Lifetime is authorized to take, execute and deliver such instruments (in each case without representation or warranty of any kind) to enable Lifetime to further validate, perfect, preserve and enforce its liens, in all instances subject to the terms of the Lifetime Agreement.

h.    If any or all of the provisions of this Sale Order are hereafter reversed, modified, vacated or stayed, such reversal, stay, modification or vacation shall not affect (i) the validity of any of the obligations incurred prior to the actual receipt of written notice by Lifetime of the effective date of such reversal, stay, modification or vacation or (ii) the validity or enforceability of any lien or priority authorized or created hereby or pursuant with respect to any of the obligations.

i.    Except as expressly provided in this Sale Order, the Lien and the Superpriority Administrative Claim and all other rights and remedies of Lifetime granted by the provisions of this Sale Order shall survive, and shall not be modified, impaired or discharged by (i) the entry of an order converting any of the Debtors' chapter 11 cases to a case(s) under chapter 7, dismissing any of the Debtors' chapter 11 cases, terminating the joint administration of the Debtors' chapter 11 cases or by any other act or omission, or (ii) the entry of an order confirming a plan of reorganization in any of the Debtors' chapter 11 cases. The terms and provisions of this Sale Order shall continue in these chapter 11 cases, in any successor cases if these chapter 11 cases cease to be jointly administered, or in any superseding chapter 7 cases

under the Bankruptcy Code, and the Lien, the Superpriority Administrative Claim and all other rights and remedies of Lifetime granted by the provisions of this Sale Order shall continue in full force and effect until the Inventory Advances advanced by Lifetime are either paid in full or otherwise satisfied, and in all instances, subject to the terms and conditions of the Lifetime Agreement.

      j.     Lifetime shall be deemed to have extended credit to the Sellers in good faith, as that term is used in Section 364(e) of the Bankruptcy Code and in express reliance upon the protections offered by Section 364(e) of the Bankruptcy Code, and shall be entitled to the full protection of Section 364(e) of the Bankruptcy Code in the event that this Sale Order or any provision hereof is vacated, reversed or modified, on appeal or otherwise.

      k.     Upon (i) the full repayment of all Inventory Advances advanced by Lifetime for any Designated Finished Goods or Designated Raw Materials described in section 2.4 of the Lifetime Agreement and this Sale Order, and (ii) the satisfaction of the Sellers' obligations with respect to the return to Lifetime of Letters of Credit issued by Lifetime to the extent undrawn, any all security interests granted to Lifetime pursuant to the Procedures Order and this Sale Order, including but not limited to the Lien, shall be deemed terminated and of no further force or effect without any further action required on the part of the Debtors. Upon repayment of all amounts owed to Lifetime used for the acquisition of Designated Finished Goods, or other satisfaction of the Inventory Advances as provided in section 2.4 of the Lifetime Agreement, the Procedures Order and this Sale Order, the Superpriority Administrative Claim shall be deemed fully satisfied.

31.    The non-debtor Sellers, and to the extent applicable, the WearEver

Debtors, are authorized to sell the Neuvo Laredo Assets to the Buyer or one of its subsidiaries or

affiliates for the amount of $750,000, subject to such additional terms and conditions as the

Sellers and Buyer might agree and provided that all costs of removal and transport of such assets

shall be the sole and exclusive responsibility of the Buyer. To the extent the automatic stay

under section 362 of the Bankruptcy Code would preclude, prohibit or otherwise limit such sale,

the automatic stay under section 362 is hereby modified to the extent necessary to permit Sellers

and Buyer to consummate such sale and transfer and convey the Nuevo Laredo Assets.

32.    Subject to the occurrence of the closing of the Sale, Sellers shall pay

Lifetime the Breakup Fee in accordance with the terms of the Lifetime Agreement, and the

Procedures Order.

33.    Entry of this Sale Order shall not authorize the granting of any security

interest in any property allegedly subject to the IMASA Reclamation Claim defined below. Prior

to the Closing, the Debtors shall account for any purchased Designated Raw Materials and

ensure that any property allegedly subject to the IMASA Reclamation Claim, if any, is not

commingled with such Designated Raw Materials.

34.    Each of the Debtors' creditors is authorized, as of the Closing Date, to

execute such documents and take all other actions as may be necessary to release and terminate

its interests in the Property, if any, as such interests may have been recorded or may otherwise

exist, with such Interests to attach to the proceeds of the Sale.

35. Each federal, state and local governmental agency or department is authorized to accept for filing and/or recording any and all documents and instruments necessary and appropriate to consummate the transactions contemplated by the Agreement.

36. All entities which presently are, or on or after the Closing Date may be, in possession of some or all of the Property is authorized to provide access to, and surrender possession of, the Property to the Buyer on and after the Closing Date, with the interests of such entity to be satisfied solely from the proceeds of the Sale.

37. This Court retains exclusive jurisdiction to enforce and implement the terms and provisions of the Agreement, all amendments thereto, any waivers and consents thereunder, and of each of the agreements executed in connection therewith, if any, in all respects.

38. The terms and provisions of the Agreement and this Order shall be binding in all respects upon, and shall inure to the benefit of, the Debtors, their estates, and their creditors, the Buyer, and its respective affiliates, successors and assigns, and shall be binding in all respects upon any affected third parties and any subsequent examiners or trustees appointed in the Debtors' chapter 11 cases or upon a conversion of any of the Debtors' chapter 11 cases to chapter 7 under the Bankruptcy Code.

39. Any lien, claim or interest asserted by the PBGC in the Property shall attach with the same priority, amount, and validity (or invalidity) to the Sale Proceeds as existed prior to the Sale. All parties reserve their respective rights with respect to the allowance of any claims, lien or interest that may be asserted by the PBGC against either the Sale Proceeds, the Debtors or their estates. To the extent that (i) the Sale Proceeds are applied to repay amounts

owed to Wachovia under the Debtors' debtor in possession loan agreement and (ii) the PBGC is adjudicated to have a superior lien, claim or interest in Wachovia in the Sale Proceeds (an "Allowed PBGC Lien"), then Wachovia shall be obligated to disgorge such amounts required to satisfy any allowed claim secured by the Allowed PBGC Lien.

      40.    Industria Mexicana Del Aluminio, S.A. de CV ("IMASA") has asserted a reclamation demand for goods allegedly delivered to the Debtors prior to the Petition Date (the "IMASA Reclamation Claim"). The IMASA Reclamation Claim shall attach with the same priority, amount, and validity (or invalidity) to the proceeds of the Sale of those goods and/or materials that are the subject of the IMASA Reclamation Claim as existed prior to the Sale with all parties reserving their respective rights with respect to the IMASA Reclamation Claim. Nothing herein shall be deemed an admission that the IMASA Reclamation Claim, to the extent allowed, is for goods or materials that are included in the Property. Nothing in this Sale Order shall prejudice the rights of IMASA with respect to its asserted reclamation rights, provided however, that such claim shall not entitle IMASA to reclaim goods sold to the Buyer pursuant to the Sale, the rights of the Debtors or other parties in interest to object to such reclamation rights on any grounds, including, but to limited to, the assertion of any defenses to any asserted reclamation claims, or the Debtors' right to assert that the Bankruptcy Court had the authority to authorize the sale of the Property and enter the Sale Order free and clear of any IMASA Reclamation Claim in such property, notwithstanding any objection IMASA could have filed or the right of IMASA to contend that the sale of any Property on such terms to the Buyer has no effect on IMASA's reclamation rights. Nothing herein shall be deemed to affect any

administrative expense claims under section 503(b) of the Bankruptcy Code asserted by IMASA, or the rights of the Debtors or other parties in interest to object thereto.

41.    Novelis Do Brasil LTDA ("Novelis") has asserted a reclamation demand for goods allegedly delivered to the Debtors prior to the Petition Date (the "Novelis Reclamation Claim"). The Novelis Reclamation Claim shall attach with the same priority, amount, and validity (or invalidity) to the proceeds of the Sale of those goods and/or materials that are the subject of the Novelis Reclamation Claim as existed prior to the Sale with all parties reserving their respective rights with respect to the Novelis Reclamation Claim. Nothing herein shall be deemed an admission that the Novelis Reclamation Claim, to the extent allowed, is for goods or materials that are included in the Property. Nothing herein shall be deemed to affect any administrative claims under section 503(b) of the Bankruptcy Code asserted by Novelis, or the rights of the Debtors or other parties in interest to object thereto.

42.    Perot Systems has withdrawn its objection to the Sale Motion.

a.    Perot Systems will continue to provide service to Global Home Products (GHP) under the terms of the MSA, for which GHP may use such service for the benefit of the Buyer of the Property.

b.    Perot Systems and GHP will negotiate in good faith to right size the charges under the MSA in conjunction with business plans of GHP as they evolve and to deal with other MSA related matters including Perot Systems' current balance sheet exposures and to execute an amended MSA by August 31, 2006. Upon the closing of the sale of substantially all of the operating assets of the Sellers, GHP shall pay Perot Systems, in three equal installments, due respectively 30, 60 and 90 days from the closing date of the Sale, an amount equal to the

unamortized license fees paid to Oracle Corporation for software used at GHP ($528,193.77 as

of July 31, 2006).

        c.      Perot Systems will provide Transition Services to GHP for the benefit of

the Buyer of the Property (without requiring termination of the MSA and without requiring

payment of the Termination Fee or the payment required by § 10.10(c ), provided  the Buyer of

the Property must pay in advance for any such transition services as set forth in the MSA);

provided, GHP and the Buyer are in compliance at all times with any requirements of third-

parties from whom Perot Systems is a licensee for the benefit of GHP.  The Buyer will make all

its payments directly to Perot Systems; the Debtors remain responsible for timely payment to

Perot Systems for all amounts due under the MSA that the Buyer fails to make.

        d.      Perot Systems and GHP reserve all other rights.

        e.      Perot Systems will continue to receive payments for services under the

MSA at the rates set forth in the MSA (until the MSA is either renegotiated or rejected) and will

retain all payments that have been or will be made.

        f.      Nothing in this Sale Order vacates or modifies the relief granted in the

*Order (I) Approving Sale by the Burnes Group Debtors of Substantially All of the Burnes Group*

*Debtors' Operating Assets Free and Clear of All Liens, Claims, Encumbrances And Other*

*Interests Pursuant to Sections 363(b), (f) and (m) of the Bankruptcy Code, (II) Assuming and*

*Assigning Certain Executory Contracts And Unexpired Leases; and (III) Granting Related Relief*

[Docket No. 353] to Perot and the Debtors.

43.    As provided by Bankruptcy Rules 7062 and 9014, this Order shall be

effective and enforceable immediately upon signing and shall not be subject to the 10-day stay

provisions contained in Bankruptcy Rules 6004(g) and 6006(d).

Dated: August 11, 2006
        Wilmington, Delaware

THE HONORABLE KEVIN GROSS
UNITED STATES BANKRUPTCY JUDGE

# EXHIBIT A

CONFORMED TO REFLECT MODIFICATIONS SET FORTH IN THAT CERTAIN
FIRST AMENDMENT TO ASSET PURCHASE AGREEMENT DATED AS OF JULY 14, 2006

## ASSET PURCHASE AGREEMENT

**THIS ASSET PURCHASE AGREEMENT** (the "Agreement") is made and entered into as of this 7th day of August, 2006, by and between SEB S.A., a company incorporated under the laws of France, and Groupe SEB USA, a Delaware corporation (collectively, the "Buyer"), and Mirro Acquisition Inc., a Delaware corporation, Mirro Operating Company, LLC, a Delaware limited liability company and Mirro Puerto Rico, Inc., a corporation organized under the laws of the Commonwealth of Puerto Rico (collectively, the "Debtor Sellers") and 690649 BC Ltd., a British Columbia company (the "Non-Debtor Seller"; together with the Debtor Sellers, each a "Seller" and collectively, the "Sellers" and, together with Buyer, the "Parties"), each of the Debtor Sellers being a Debtor and Debtor in Possession under Case No. 06-10340 (the "Bankruptcy Case") in the United States Bankruptcy Court for the District of Delaware (the "Bankruptcy Court").

## RECITALS

A.    Sellers are engaged in the business of manufacturing and distributing cookware and bake ware products and related accessories under the "Mirro", "Regal", "AirBake Ultra", "Cushion Air" and "WearEver" brand names (such business is referred to herein as the "Business").

B.    Sellers wish to sell to Buyer, pursuant to Sections 363 of Chapter 11 of Title 11 of the United States Code (the "Bankruptcy Code"), substantially all of the assets used in connection with and arising out of the operation of the Business at the price and on the other terms and conditions specified in detail below and Buyer wishes to so purchase and acquire such assets from Sellers.

**NOW, THEREFORE**, for good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, the Parties agree as follows:

1.    Transfer of Assets.

1.1    Purchase and Sale of Assets. On the Closing Date, as hereinafter defined, in consideration of the covenants, representations and obligations of Buyer hereunder, and subject to the conditions hereinafter set forth, Sellers shall sell, assign, transfer, convey and deliver to Buyer, and Buyer shall purchase from Sellers the following assets, wherever located, whether or not identified or disclosed on Sellers' books and records (collectively, the "Property"):

1.1.1    Contracts. Seller's right, title and interest in and to (i) those equipment, personal property and intangible property leases, rental agreements, licenses, contracts, agreements and similar arrangements described on **Exhibit "A-1"** to this Agreement and incorporated herein by this reference (collectively, the "Equipment Agreements"), and (ii) those other contracts, orders, purchase orders, licenses, contracts, agreements and similar arrangements

described on **Exhibit "A-2"** (collectively, the **"Other Contracts"** and together with the Equipment Agreements, the **"Contracts"**).

      1.1.2  <u>Personal Property</u>. All of the equipment and tangible personal property owned by any Seller and all other equipment and tangible personal property now or hereafter owned by any Seller and used in connection with the Business, including, without limitation, all such furniture, vehicles, machinery, equipment, tools, dies, spare parts, computers, fixtures and furnishings wherever located other than such items listed in **Exhibit "B"** attached to this Agreement (collectively, the **"Personal Property"**). As used in this Agreement, the Personal Property shall not include the Inventory. The Personal Property shall also expressly exclude any equipment or other tangible property held by any Seller pursuant to a Contract where Buyer does not assume the underlying Contract relating to such personal property at the Closing.

      1.1.3  <u>Intangible Property</u>. All patents, patent applications and manufacturing know-how owned or held by any Seller and used exclusively in connection with the Business, and all other intangible personal property owned or held by any Seller and used exclusively in connection with the Business, but in all cases only to the extent of such Seller's interest and only to the extent transferable, together with all books, records and like items pertaining to the Business, including, without limitation, the names, patents, and patent applications set forth on **Schedule 1.1.3** attached hereto and incorporated herein by this reference, the goodwill of the Business, processes, trademarks, trademark applications and registrations, trade names, copyrights, copyright applications, service marks, licenses to use or for the use of any intellectual property, catalogues, customer lists and other customer data bases, logos and registrations or applications therefor, domain names and registrations and applications therefor, correspondence with present or prospective customers and suppliers, advertising materials, software programs and source codes and object codes, data, databases, trade secrets, "know-how" and other confidential information and all other intellectual property (in whatever form or medium) and all intangible embodiments thereof, and telephone exchange numbers identified with the Business (collectively, the **"Intangible Property"**). As used in this Agreement, Intangible Property shall in all events exclude, (i) any materials containing privileged communications or information about employees, disclosure of which would violate an employee's reasonable expectation of privacy and any other materials which are subject to attorney-client or any other privilege, and (ii) any software or other item of intangible property held by any Seller pursuant to a license or other Contract where Buyer does not assume the underlying Contract relating to such intangible personal property at the Closing.

      1.1.4  <u>Receivables</u>. All instruments, receivables, accounts receivable and unbilled costs and fees attributable to the Business and, prepayments and prepaid expenses (subject to the proration provisions of Section 3.5) and security deposits and other deposits received from or held by third parties and subject to Section 1.2, all causes of action relating or pertaining to the foregoing, the right to bill and receive payment for product shipped and/or services rendered but unbilled or unpaid as of the Closing and all rights to receive and retain mail related to the foregoing (collectively, the **"Receivables"**).

      1.1.5  <u>Claims</u>. Subject to Section 1.2, all of each Seller's interest in all rights, suits, claims, choses in action, causes of action, judgments, damages, rights to payment and

litigation rights of any kind or nature whatsoever (whether arising in contract, tort or otherwise, or any equitable remedy for breach of performance, whether or not such breach gives rise to a right to payment, but as to each of the foregoing, only to the extent the same relates directly to or arises under any property otherwise included in the Property (collectively, "**Claims**").

   **1.1.6** <u>Insurance Policies</u>. Except as may be otherwise provided in Section 1.2(iv) of this Agreement, all Claims arising under insurance policies with respect to the Property and only to the extent the Purchase Price has not been adjusted pursuant to Section 10.1 of this Agreement on account of the damage(s) to which such Claim(s) relate.

   **1.1.7** <u>Inventory</u>. All supplies, goods, materials, work in process, inventory and stock in trade owned and held by any Seller and at any location (including those assets located at the facility whose address is Avenue New York 202, Parque Industrial Park Oradel, Nuevo Laredo, Tam 88000 Mexico (the "**Nuevo Laredo Facility**")) for use in connection with the operation of the Business (collectively, the "**Inventory**").

   **1.1.8** Nuevo Laredo Equipment All of the equipment and tangible personal property located at the Nuevo Laredo Facility and described on Schedule 1.1.8 attached hereto and incorporated herein by this reference (the "**Nuevo Laredo Equipment**") [Note _ Relabel Schedule 1.2 and attach as Schedule 1.1.8.]

   **1.2** <u>Excluded Assets</u>. Notwithstanding anything to the contrary in this Agreement, the Property shall be limited to the items identified or described in Section 1.1 above and shall in any event exclude all of the following (collectively, the "**Excluded Assets**"): (i) those items excluded pursuant to the provisions of Section 1.1 above; (ii) all cash or cash equivalents; (iii) Sellers' rights under this Agreement and all cash and non-cash consideration payable or deliverable to the Sellers pursuant to the terms and provisions hereof; (iv) insurance proceeds, claims and causes of action with respect to or arising in connection with (A) any Contract which is not assigned to Buyer at the Closing, or (B) any item of tangible or intangible property not acquired by Buyer at the Closing; (v) any fee, license, leasehold or other interests in any real property held or occupied by any Seller; (vi) all securities, whether capital stock or debt, and equity of any Seller or any other entity; (vii) all rights and claims in or to any refunds or credits of or with respect to any taxes, assessments or similar charges paid by or on behalf of any Seller, in each case to the extent applicable to any period prior to the Closing; (viii) tax records, minute books, stock transfer books and corporate seals of any Seller; (ix) any letters of credit or similar financial accommodations issued to any third party(ies) for the account of any Seller; (x) all deposits, security and collateral associated with the Property, including cash deposits, Seller L/Cs (as defined in Section 2.5 below) and any collateral therefor; (xi) all rights, claims and causes of action of any Seller against Perot Systems Corporation, former or current officers, directors, employees, members, interest holders, principals, agents, lenders, lienholders, representatives of such Seller and any party asserting rights, suits, claims, choses in action, causes of action, judgments, damages, rights to payment and litigation rights of any kind or nature whatsoever (whether arising in contract, tort or otherwise, or any equitable remedy for breach of performance), whether or not such breach gives rights to a right to payment, against any debtor or debtor estate in the Bankruptcy

Case; and (xii) all preference or avoidance claims and actions of any Seller, including, without limitation, any such claims and actions arising under Sections 544, 547, 548, 549, and 550 of the Bankruptcy Code (collectively, the "**Avoidance Actions**")

    1.3    Instruments of Transfer. The sale, assignment, transfer, conveyance and delivery of the Property to Buyer shall be made by assignments, bills of sale, and other instruments of assignment, transfer and conveyance provided for in Section 3 below and such other instruments as may reasonably be requested by Buyer to transfer, convey, assign and deliver the Property to Buyer, but in all events only to the extent that the same do not impose any monetary obligations upon Sellers or in any other respect increase in any material way the burdens imposed by the other provisions of this Agreement upon Sellers.

2.    Consideration.

    2.1    Purchase Price and Other Consideration..

    2.1.1    The cash consideration to be paid by Buyer to Sellers for the Property shall be $35,750,000 plus an amount equal to the Inventory Advances (as defined in Section 2.4 of that certain Asset Purchase Agreement dated July __, 2006, among Sellers, as sellers, and Lifetime Brands, Inc., as buyer, as amended (the "**Lifetime Purchase Agreement**") (the "**Purchase Price**"), subject to Section 2.5 of this Agreement.

    2.1.2    The Purchase Price shall be paid as follows:

    (a)    Concurrently with the execution and delivery of this Agreement by Buyer, Buyer has deposited into an escrow account directed by Sellers (the "**Escrow**") an amount equal to $2,000,000 in immediately available, good funds (funds delivered in this manner are referred to herein as "**Good Funds**") (the "**Deposit**"). The Deposit shall become nonrefundable upon the termination of the transaction contemplated by this Agreement by reason of Buyer's default of its material obligations hereunder (a "**Buyer Default Termination**"), it being agreed that Sellers shall not have the right to so terminate this Agreement and retain any portion of the Deposit unless Buyer has failed to cure the applicable default within five (5) days following its receipt of written notice thereof from Sellers, and, at such time, Sellers shall not be in material default of their obligations under this Agreement. At the Closing, the Deposit (and any interest accrued thereon) shall be credited and applied toward payment of the Purchase Price (with such portion of the Purchase Price deposited into Escrow in accordance with the Supply Agreement (as defined in Section 3.3.5 below). In the event the Deposit becomes nonrefundable by reason of a Buyer Default Termination, subject to the qualifications set forth above, Escrow Holder shall immediately disburse the Deposit and all interest accrued thereon to Sellers to be retained by Sellers for their own account. If the transactions contemplated herein terminate by reason of (A) Sellers' material default under this Agreement, it being agreed that Buyer shall not have the right to so terminate this Agreement unless Sellers have failed to cure the applicable default within five (5) days following their receipt of written notice thereof from Buyer, or (B) the failure of a condition to Buyer's obligations hereunder (including the condition set forth in Section 4.2.7, below), the Escrow Holder shall return to Buyer the Deposit (together with all interest accrued thereon) but less Buyer's one-half share of the Escrow Holder's escrow fees and

charges, and provided that, notwithstanding anything to the contrary herein, if Buyer is required to remain the "back-up bidder" pursuant to Section 8.1(a) below, Buyer shall not be entitled to the refund of the Deposit until the earlier of (i) the consummation in all material respects of the sale the Property to the Upset Purchaser (as defined in Section 8.1(a) hereof) or (ii) the Outside Date, if the Closing has not occurred on or prior thereto.

(b)     On the Closing Date, Buyer shall (A) cause the Escrow Holder to deliver the Deposit (together with all accrued interest thereon) to Sellers, and (B) pay and deliver, in Good Funds, the balance of the Purchase Price to Sellers.

2.2     Assumed Liabilities.  Buyer shall, effective as of the Closing Date, be assigned the applicable Sellers' interests under the Designated Contracts (as defined in Section 8.1(c), below) to be assigned by Sellers under this Agreement and shall assume all liabilities and obligations (i) of Sellers accruing under the Designated Contracts on and after the Closing Date or, if assigned subsequently in accordance with the provisions of Section 8.1(c), below, from the effective date of such later assignment by the applicable Sellers, (ii) all obligations arising in connection with the use and operation of the Property from and after the Closing Date; (iii) all liability with respect only to accrued vacation benefits of those employees of Sellers employed by Buyer following the Closing, (iv) the Inventory Advances, and (v) any such additional liabilities and obligations as may be set forth or described on **Schedule 2.2** hereto.  Other than the liabilities and obligations of Sellers expressly assumed by Buyer hereunder, Buyer is not assuming and shall not be liable for any liabilities or obligations of Sellers including any such liabilities or obligations arising out of or related to (w) any breach by any Seller of any Contract, (x) the ownership, operation or control of the Property or the Business prior to the Closing (other than the obligations undertaken by Buyer pursuant to Section 2.4 of this Agreement and such other obligations as may be expressly assumed pursuant to this Agreement) or (y) other than as expressly assumed pursuant to clause (iii) of this Section 2.2, any liability or obligation or Claim of any employee including with respect to pension and severance obligation.

2.3     Purchase Price Allocation.  Not later than fifteen (15) days prior to the Closing Date, Buyer shall prepare and deliver to Sellers for their review and consideration a schedule (the **"Allocation Schedule"**) allocating the Purchase Price among the various assets comprising the Property in accordance with Treasury Regulation 1.1060-1 (or any comparable provisions of state or local tax law) or any successor provision. If Sellers disagree with or raise objections to the Allocation Schedule, Buyer and Sellers will negotiate in good faith to resolve such objections. If the Parties are able to agree upon the allocation of the Purchase Price, Buyer and Sellers shall report and file all tax returns (including any amended tax returns and claims for refund) consistent with such mutually agreed Purchase Price allocation, and shall take no position contrary thereto or inconsistent therewith (including in any audits or examinations by any taxing authority or any other proceedings). Buyer and Sellers shall file or cause to be filed any and all forms (including U.S. Internal Revenue Service Form 8594), statements and schedules with respect to such allocation, including any required amendments to such forms. If, on the other hand, the Parties are unable mutually to agree upon the manner in which the Purchase Price should be allocated, Buyer and Sellers shall be free to make their own respective allocations of the

Purchase Price for tax purposes. Notwithstanding any other provisions of this Agreement, in the event the Parties mutually agree upon the allocation of the Purchase Price, the provisions of this Section 2.3 shall survive the Closing.

2.4     Buyer's Obligation With Respect to "Inventory Advances" Reference is made to the Lifetime Purchase Agreement. Concurrently with the Closing, Buyer shall satisfy and discharge in full Sellers' obligations to Lifetime Brands, Inc., pursuant to Section 2.4(ii) of the Lifetime Purchase Agreement.

2.5     Purchase Price Adjustment.

2.5.1     Sellers and Buyer acknowledge and agree that the Purchase Price has been based on (i) Eligible Accounts Receivable (defined below) being $5,400,000 (the "A/R Benchmark") and (ii) Eligible Inventory (defined below) being $11,930,000 (the "Inventory Benchmark"). The sum of the A/R Benchmark and Inventory Benchmark shall be referred to herein as the "Target Amount". Within 2 days prior to the Closing Date, Sellers shall deliver to Buyer a statement of Accounts Receivable and Inventory as of 11:59 p.m. on the day immediately prior to the Closing Date, prepared in accordance with generally accepted accounting principles, consistently applied, and which has been determined on a basis consistent with the methodology employed as of June 30, 2006 in the Borrowing Base Certificates prepared by Sellers and delivered to Wachovia Bank, National Association in its capacity as agent (the "DIP Agent") under the DIP Agreement (each, a "Borrowing Base Certificate") (it being agreed that notwithstanding anything to the contrary in the foregoing, in determining Eligible Accounts Receivable the Sellers shall deduct chargebacks and other credits reasonably expected to be taken by their customers and relating to events or conditions prior to the Closing (the "Chargebacks")), through the date when such statement is required to be delivered hereunder, certified by such officer(s) of the Sellers (or applicable Seller) as the DIP Agent shall accept (the "Closing Statement"). Buyer and its representatives shall be permitted to have reasonable access to the Sellers' offices and their books, records and work papers containing financial information of Sellers during the period through the Closing Date in order to, among other things, verify the accuracy and completeness of the Closing Statement (including the methodology used in calculating Eligible Accounts Receivable and Eligible Inventory). The Closing Statement shall be conclusive and binding upon Buyer and Sellers unless Buyer objects in writing to any item or items shown on the Closing Statement within 24 hours after the Buyer's receipt of the Closing Statement. Such writing shall assert that the Closing Statement is in error and specify in reasonable detail the amount in dispute and the basis for such dispute.

2.5.2     In the event that the sum of the A/R Benchmark and the Inventory Benchmark as reflected on the Closing Statement: (w) is less than the Target Amount (the amount by which such Eligible Accounts Receivable and Eligible Inventory is less than the Target Amount, the "Shortfall") by not more than $830,000, the Purchase Price shall not be adjusted; (x) is greater than the Target Amount (the amount by which such Accounts Receivable and Inventory is greater than the Target Amount, the "Excess") by not more than $830,000, the Purchase Price shall not be adjusted; (y) evidences a Shortfall of more than $830,000, then the Purchase Price shall be decreased on a dollar-for-dollar basis to the extent the Shortfall exceeds the Target Amount minus $830,000 and (z) evidences an Excess of more than $830,000, then the Purchase

Price shall be increased on a dollar-for-dollar basis to the extent the Target Amount plus $830,000 is exceeded.

      2.5.3    For the purposes of the foregoing Sections 2.5.1 and 2.5.2, the term "**Eligible Accounts Receivable**" shall refer to the amounts reflected on printed Line Item 10 of Column A of a particular Borrowing Base Certificate and the term "**Eligible Inventory**" shall mean the aggregate of the amounts reflected on printed Line Items 16, 22, 28, 35 and 40 of Column A of a particular Borrowing Base Certificate prepared by Sellers and provided to the DIP Agent as required by the agreements evidencing and securing the debtor in possession financing provided to certain Sellers by the lenders on behalf of whom the DIP Agent is acting (collectively, the "**DIP Agreement**"), but shall not include any collateral (including inventory, accounts receivable and raw materials) on which the Lifetime has a lien in respect of the Inventory Advances.

      2.5.4    Notwithstanding anything to the contrary herein, the Purchase Price (as adjusted, if at all, in accordance with the terms of this Agreement) shall be reduced by $2,000,000 at Closing if at such time the Sellers shall have failed to satisfy the condition set forth in Section 4.2.17 of this Agreement.

      2.6    <u>Replacement of Seller L/C's</u>.    At or prior to the Closing, Buyer shall obtain, at Buyer's sole cost and expense, and deliver to the parties holding letters of credit or similar financial accommodations issued for any Seller's account (collectively, "**Seller L/Cs**"), replacement letters of credit or similar financial accommodations sufficient to cause such parties to release and return to the applicable Seller(s) at or prior to the Closing the undrawn originals of the Seller L/Cs and all cash and other collateral therefor.

3.    <u>Closing Transactions</u>.

      3.1    <u>Closing Conference</u>.    The Closing of the transactions provided for herein (the "Closing") shall take place at the Wilmington, Delaware offices of the Sellers' attorneys.

      3.2    <u>Closing Date</u>.    The Closing shall be held upon the earlier to occur of (i) the business day following the satisfaction of the last of the conditions set forth in Sections 4.1 and 4.2 below, and (ii) August 18, 2006 (the "**Outside Date**").    In the event the conditions to Closing have not been satisfied or waived by the Outside Date, then the Buyer or the Sellers (if they are not in material default hereunder) may terminate this Agreement.    Alternatively, the Parties may mutually agree in writing to an extended Closing Date.    Until this Agreement is either terminated or the Parties have agreed upon an extended Closing Date, the Parties shall diligently continue to work to satisfy all conditions to Closing and the transaction contemplated herein shall close as soon as such conditions are satisfied or waived.

      3.3    <u>Sellers' Deliveries to Buyer at Closing</u>.    On the Closing Date, Sellers shall make the following deliveries to Buyer:

3.3.1    An Assignment and Assumption of Leases and Contracts substantially in the form and content attached as **Exhibit "C"** hereto, duly executed by Sellers pursuant to which each Seller shall assign to Buyer their respective interests, if any, in the Designated Contracts (the **"Assignment of Contracts"**).

3.3.2    A bill of sale, duly executed by each Seller in the form and on the terms of the bill of sale attached hereto as **Exhibit "D,"** pursuant to which each Seller transfers all of its rights, title and interests, if any, in and to the Personal Property, the Inventory and the Receivables to Buyer (the **"Bill of Sale"**).

3.3.3    A counterpart assignment of intangible property, duly executed by each Seller, in the form and content of the assignment of intangible property attached as **Exhibit "E"** hereto, pursuant to which each Seller assigns to Buyer all of its rights, titles and interests, if any, in and to the Intangible Property (the **"Assignment of Intangible Property"**).

3.3.4    A counterpart of a Transition Services Agreement in form and content satisfactory to Buyer and Sellers (the **"Transition Agreement"**), between Buyer, on the one hand, and appropriate affiliates of the Sellers (the **"Seller Transition Parties"**), on the other, providing, among other things, for (i) up to six (6) months of information technology, human resources, accounting, distribution and related services and support by the Sellers;  (ii) the Buyer to pay a monthly flat fee for the services to be rendered to Buyer thereunder, and (iii) the Buyer and its employees, representatives and agents to have reasonable access to, and use of, the Sellers' distribution centers, warehouses and manufacturing facilities for the purposes described in such agreement for such period, which Transition Agreement shall have been executed by the Seller Transition Parties.

3.3.5    The Buyer and the Seller Supply Parties (as defined below) shall have executed a supply agreement in substantially the form attached hereto to Buyer and Sellers (the **"Supply Agreement"**), between Buyer, on the one hand, and  appropriate affiliates of the Sellers (collectively, the **"Seller Supply Parties"**), on the other, providing that, among other things: (a) the Seller Supply Parties shall supply the Buyer with such number of units of cookware product determined by SKUs as the parties shall agree (**"NL Cookware"**) and bake ware product determined by SKUs as the parties shall agree (**"NL Bake Ware"**), such amounts to be sufficient to satisfy demand for such product through November 30, 2006, in the case of NL Cookware, and December 31, 2006, in the case of NL Bake Ware, in each of the foregoing cases as set forth in projections to be mutually agreed upon in writing by Buyer and Sellers as part of the Supply Agreement (collectively, the **"Minimum Supply Amount"**); (b) the NL Cookware and the NL Bake Ware shall be supplied to the Buyer at such cost as the parties shall agree; (c) from the cash proceeds payable by the Buyer at Closing, the Buyer shall deposit into Escrow (the **"Supply Agreement Escrow"**) with the Escrow Holder, or direct the Escrow Holder to retain a portion of the Deposit in an amount equal to, $1.9 million, subject to adjustment as set forth in clause (v), below (the **"Supply Agreement Escrowed Amount"**) in Good Funds pursuant to joint escrow instructions to be delivered by the Sellers and the Buyer to the Escrow Holder on or before the Closing Date, which instructions shall provide that the Escrow Holder shall release (i) 25% of the Supply Agreement Escrowed Amount to the Sellers upon the Seller Supply Parties' having supplied the Buyer with more than 50% of the Minimum Supply Amount, (ii) a further 25% of the

Supply Agreement Escrowed Amount to the Sellers upon the Seller Supply Parties' having supplied the Buyer with more 75% of the Minimum Supply Amount, (iii) the balance of the Supply Agreement Escrowed Amount to the Sellers upon the Seller Supply Parties' having supplied the Buyer with the Minimum Supply Amount, (iv) the balance of the Supply Agreement Escrowed Amount to the Buyer on such date or dates to be agreed upon by the parties (it being understood that such dates and the return to the Buyer of the escrowed amounts shall be related to the Sellers' compliance with a production timetable to be determined by the parties to the Supply Agreement, subject to such "force majeure" exceptions as the parties shall agree, and upon the Buyer's timely providing liquidity sufficient to permit the Seller Supply Parties to acquire the raw materials reasonably necessary to reasonably manufacture, within the timeframes for such manufacture afforded by the Supply Agreement, the balance of the Minimum Supply Amount after taking into account the raw materials and "work in process" supplied by the Buyer) and (v) notwithstanding the foregoing, the Buyer shall be entitled to deduct from the Supply Agreement Escrowed Amount from time to time an amount equal to the Chargebacks taken or that will be taken (as the Buyer, acting in good faith, shall have been advised by customers, taking into account usual and customary methods for determining the appropriate scope and amount of chargebacks) to the extent (x) such Chargebacks were not deducted from the calculation of Eligible Accounts Receivable and reflected in the Closing Statement and (y) of such Chargebacks (on a dollar-for-dollar basis) which, had they been deducted from the calculation of Eligible Accounts Receivable and reflected in the Closing Statement would have resulted in a Shortfall greater than $830,000; (d) that the Seller Supply Parties agree that they will operate the Nuevo Laredo Facility as efficiently as is reasonably possible; (e) the Seller Supply Parties' obligations under the Supply Agreement shall be expressly conditioned upon the Buyer permitting the Seller Supply Parties to utilize the "work in process" and raw materials located at the Nuevo Laredo Facility to the extent such "work in process" and raw materials form part of the Property; (f) the Sellers shall agree to use their commercially reasonable efforts to assist the Buyer in removing the Property remaining at the Nuevo Laredo Facility at the end of the term of the Supply Agreement, such assistance to be at the Buyer's sole cost and expense; and (g) the parties thereto shall negotiate in good faith to grant to the Buyer a right to extend the Supply Agreement on mutually agreeable terms. For the avoidance of doubt, the Buyer's right to withdraw amounts in the Supply Agreement Escrow shall be limited to the circumstances expressly provided in this Agreement.

   3.3.6 Any such other documents, funds or other things reasonably contemplated by this Agreement to be delivered by Sellers to Buyer at the Closing.

   3.4 <u>Buyer's Deliveries to Sellers at Closing</u>.  On the Closing Date, Buyer shall make or cause the following deliveries to Sellers:

   3.4.1 That portion of the Purchase Price to be delivered by Buyer directly to Sellers at the Closing under Section 2.1, as adjusted (if at all) pursuant to Section 2.5 and reduced by the Supply Agreement Escrow Amount, and Buyer shall cause the Escrow Holder to deliver the Deposit to Sellers as contemplated in Section 2.1.2(b) hereof or re-deposit such amount of the Deposit equal to the Supply Agreement Escrow Amount into the Supply Agreement Deposit Escrow in lieu of payment thereof to the Sellers.

          3.4.2   A counterpart of the Assignment of Contracts, duly executed by Buyer.

          3.4.3   A counterpart of the Assignment of Intangible Property, duly executed by Buyer.

          3.4.4   A counterpart of the Transition Agreement, duly executed by Buyer.

          3.4.5   A counterpart of the Supply Agreement, duly executed by Buyer, together with the Supply Agreement Escrow Amount (or a direction to the Escrow Holder to establish the Supply Agreement Escrow Account with such amount on deposit therein).

          3.4.6   Any such other documents, funds or other things reasonably contemplated by this Agreement to be delivered by Buyer to Sellers at the Closing.

          3.5   <u>Prorations</u>.  Rent, current taxes and other items of expense (including, without limitation, any prepaid insurance, maintenance, tax or like payments under the Designated Contracts, or any of them) and income relating to or attributable to the Business and/or the Property shall be prorated between Sellers and Buyer as of the Closing Date. All liabilities and obligations due in respect of periods prior to or as of the Closing Date shall be paid in full or otherwise satisfied by Sellers and all liabilities and obligations due in respect of periods after the Closing Date shall be paid in full or otherwise satisfied by Buyer. Rent shall be prorated on the basis of a thirty (30) day month. Buyer shall pay to Sellers in cash on the Closing Date the amount of any security or similar deposits with contracting parties under the Designated Contracts and the amount of any other deposits made by Sellers relating to the property to which the Designated Contracts relate.

          3.6   <u>Sales, Use and Other Taxes</u>.  Any sales, purchases, transfer, stamp, documentary stamp, use or similar taxes under the laws of the states in which any portion of the Property is located, or any subdivision of any such state, which may be payable by reason of the sale of the Property under this Agreement or the transactions contemplated herein shall be borne equally by the Sellers, on the one hand, and the Buyer on the other hand, and shall be timely paid by the Buyer. At the time when the Closing Statement is delivered by Sellers, the Buyer shall deliver to the Sellers a reasonable estimate of taxes which are reasonably likely to be payable and, at Closing, the Sellers shall advance one-half of such estimated taxes to the Buyer (or reduce the Purchase Price payable at such time by the Buyer by such amount). The Buyer agrees to seek and use commercially reasonable efforts to obtain all applicable exemptions from the imposition of sales, transfer and similar taxes (collectively, the "**Transfer Taxes**") on the transactions contemplated herein. The Buyer agrees to return to the Sellers any excess of the amounts advanced and the Sellers agree to advance any shortfall in the amounts advanced (or deducted from the Purchase Price), in both cases based on the amount of taxes actually paid by the Buyer in connection with the consummation of the transactions contemplated hereby. Buyer shall pay, as and when due, all Transfer Taxes.

**3.7**   <u>Possession</u>.  Right to possession of the Property shall transfer to Buyer on the Closing Date.  Sellers shall transfer and deliver to Buyer on the Closing Date such keys, locks and safe combinations and other similar items as Buyer may reasonably require to obtain control of the Property, and shall also make available to Buyer at their then existing locations the originals of all documents in Sellers' possession that are required to be transferred to Buyer by this Agreement.

**4.**   Conditions Precedent to Closing.

**4.1**   <u>Conditions to Sellers' Obligations</u>.  Sellers' obligation to make the deliveries required of Sellers at the Closing Date and otherwise consummate the transaction contemplated herein shall be subject to the satisfaction or waiver by Sellers of each of the following conditions:

**4.1.1**   All of the representations and warranties of Buyer contained herein shall continue to be true and correct at the Closing in all material respects.

**4.1.2**   Buyer shall have executed and delivered to Sellers the Assignment of Contracts and Assignment of Intangible Property.

**4.1.3**   Buyer shall have delivered, or shall be prepared to deliver to Sellers at the Closing, all cash and other documents required of Buyer to be delivered at the Closing.

**4.1.4**   Buyer shall have delivered to Sellers appropriate evidence of all necessary corporate action by Buyer in connection with the transactions contemplated hereby, including, without limitation: (i) certified copies of resolutions duly adopted by Buyer's directors approving the transactions contemplated by this Agreement and authorizing the execution, delivery, and performance by Buyer of this Agreement; and (ii) a k-bis excerpt as to the incumbency of the representative of  SEB S.A. executing this Agreement, resolutions of the board of directors for Groupe SEB USA and a certificate of incumbency of the representative of Groupe SEB USA executing this Agreement.

**4.1.5**   **[Reserved]**

**4.1.6**   No action, suit or other proceedings shall be pending before any court, tribunal or governmental authority seeking or threatening to restrain or prohibit the consummation of the transactions contemplated by this Agreement, or seeking to obtain substantial damages in respect thereof, or involving a claim that consummation of the transactions contemplated by this Agreement would result in the violation of any law, decree or regulation of any governmental authority having appropriate jurisdiction.

**4.1.7**   Buyer shall have substantially performed or tendered performance of each and every material covenant on Buyer's part to be performed which, by its terms, is required to be performed at or before the Closing.

4.1.8    The Bankruptcy Court shall have entered the Approval Order in accordance with Section 8.1.1 below which order shall be satisfactory in form and substance to the Sellers and the order shall not have been stayed as of the Closing Date.

4.1.9    [Reserved]

4.1.10   [Reserved]

4.1.11   [Reserved]

4.1.12   The Closing Statement evidences that the sum of the Eligible Accounts Receivable and Eligible Inventory is not less than $15,000,000.

4.1.13   [Reserved]

4.2      Conditions to Buyer's Obligations.  Buyer's obligation to make the deliveries required of Buyer at the Closing, and to otherwise close the transaction contemplated herein, shall be subject to the satisfaction or waiver by Buyer of each of the following conditions:

4.2.1    Sellers shall have substantially performed or tendered performance of each and every covenant on Sellers' part to be performed which, by its terms, is capable of performance before the Closing.

4.2.2     , Other than with respect to such representations and warranties of the Sellers that cease to be effective in accordance with Section 10.26 hereof, all representations and warranties of Sellers contained herein shall continue to be true and correct at the Closing in all material respects.

4.2.3    Sellers shall have executed and be prepared to deliver to Buyer the Assignment of Contracts; the Bill of Sale; and the Assignment of Intangible Property.

4.2.4    Sellers shall have delivered, or shall be prepared to deliver to Buyer at the Closing, all other documents required of Sellers to be delivered at the Closing.

4.2.5    No action, suit or other proceedings shall be pending before any court, tribunal or governmental authority seeking or threatening to restrain or prohibit the consummation of the transactions contemplated by this Agreement, or seeking to obtain substantial damages in respect thereof, or involving a claim that consummation of the transactions contemplated by this Agreement would result in the violation of any law, decree or regulation of any governmental authority having appropriate jurisdiction.

4.2.6    The Bankruptcy Court shall have entered the Approval Order in accordance with Section 8.1.1 below which order shall be satisfactory in form and substance to the Buyer and the order shall not have been stayed as of the Closing Date.

4.2.7    [Reserved]

4.2.8  [Reserved]

4.2.9  [Reserved]

4.2.10  From July 7, 2006 to the Closing Date, Sellers shall have operated the Business in the ordinary course consistent with the manner in which the Business has been operated since the filing of the Bankruptcy Case taking into account in all events the limitations imposed by bankruptcy law on the conduct and activities of those of the Debtor Sellers.

4.2.11  [Reserved]

4.2.12  There shall have not occurred since July 7, 2006 any event, change, condition or matter that individually or in the aggregate results in or could reasonably be expected to result in, and the Sellers shall have no actual knowledge of, a planned or actual decrease by either Wal-Mart or Target that would result in more than 10% of the combined number of SKUs purchased or ordered by such customers as set forth on Exhibit "4.2.12" attached hereto and incorporated by reference.

4.2.13  The Closing Statement is provided to Buyer in accordance with Section 2.5.1 above and evidences that the sum of the Eligible Accounts Receivable and Eligible Inventory is not less than $15,000,001.

4.2.14  The Sellers shall have incurred not less than $1.4 million to satisfy air freight charges for the shipment of product used in the Business and to be shipped to Wal-Mart and Target and Buyer shall have received evidence reasonably satisfactory to it of such incurrence.

4.2.15  Since July 7, 2006, the Sellers shall have not disposed of any excess and obsolete inventory, or a material amount of any other inventory, for below the Sellers' cost therefor.

4.2.16  [Reserved].

4.2.17  The Sellers shall have obtained one of the following prior to the Closing: (i) an order (as part of the Approval Order, which shall not be stayed as of the Closing) obtained after prior notice and an opportunity to be heard by Regal Ware, Inc. ("Regal Ware") and Newell Operating Co. ("Newell") either (xx) authorizing the assignment of Sellers' interest in such intellectual property licensed by Regal Ware to Newell as is sublicensed by Newell to Mirro Operating Company pursuant to that certain Trademark Sublicense Agreement (the "Sublicense Agreement"), (yy) stating that the consents of Regal Ware and Newell are not required for the assignment of Sellers' interest in the Sublicense Agreement (or, alternatively, if Sellers have obtained the consent of only one of Regal Ware and Newell, an order providing that the consent of the other is not required in order to assign the Sellers' interest in the Sublicense Agreement), (ii) the written consents (in a form reasonably satisfactory to the Buyer) of Regal Ware and Newell to the assignment of Sellers' interest in the Sublicense Agreement to Buyer, (iii) the written consent of Newell to the assignment of Sellers' interest in the Sublicense Agreement to Buyer and Buyer's written agreement acknowledging that Regal Ware's consent to the assignment of Sellers' interest

under the Sublicense Agreement is not required, or (iv) Buyer's written agreement acknowledging that Regal Ware's and Newell's consent to the assignment of Sellers interest under the Sublicense Agreement is not required. Only upon the failure of all of the events described in clauses (i) through (iv) above to occur, at the election of Buyer, Sellers shall reasonably cooperate with Buyer in any commercially reasonable arrangement providing for the disposition of all Designated Inventory (as defined in Section 2.4 of the Lifetime Purchase Agreement) (and, in the case of Designated Raw Materials (as defined in Section 2.4 of the Lifetime Purchase Agreement) which shall become upon the manufacture thereof Designated Inventory, such additional Designated Inventory), subject to the Sublicense Agreement, pursuant to one or more "secured creditor" sales or other processes mutually agreeable to the parties, and the proceeds of all such sales and other processes, net of the actual cash costs and expenses of Sellers (as provided in the immediately following sentence) shall be for the account of the Buyer. All cash costs and expenses actually incurred by the Sellers in connection with any "secured creditor" sales or other processes described in the preceding sentence shall be the sole responsibility and obligation of the Buyer and the Buyer agrees to indemnify and hold harmless each of the Sellers with respect to any and all losses, liabilities, damages, claims, demands, causes of action, actions, costs and expenses (including, without limitation, all court costs and reasonable attorneys' fees) as Sellers (or any of them) may suffer or incur directly arising or resulting from cooperating with Buyer with respect to such "secured creditor" sales or other processes as contemplated herein

4.3    Termination. If any of the above conditions is neither satisfied nor waived on or before the date by which the condition is required to be satisfied (but in any case, no later than the Outside Date), a Party who is not then in default hereunder may terminate this Agreement by delivering to the other written notice of termination. Any waiver of a condition shall be effective only if such waiver is stated in writing and signed by the waiving party; provided, however, that the consent of a Party to the Closing shall constitute a waiver by such party of any conditions to Closing not satisfied as of the Closing Date.

5.    Sellers Representations and Warranties. Sellers hereby make the following representations and warranties to Buyer:

5.1    Organization, Standing and Power. Subject to the applicable provisions of bankruptcy law, each Seller has all requisite entity power and authority to own, lease and operate its properties, to carry on its business as now being conducted and, upon obtaining the Approval Order, will have the power and authority to execute, deliver and perform this Agreement and all writings relating hereto.

5.2    Authorization of Sellers. Subject to the Sellers' obtaining the Approval Order, the execution and delivery of this Agreement, the consummation of the transactions herein contemplated, and the performance of, fulfillment of and compliance with the terms and conditions hereof by Sellers: (A) do not and will not: (i) conflict with or result in a breach of the articles of incorporation or the by-laws of any Seller; (ii) violate any statute, law, rule or regulation, or any order, writ, injunction or decree of any court or governmental authority; or (ii) violate or conflict with or constitute a default under any agreement, instrument or writing of any nature to which any Seller is a party or by which

any Seller or any of its assets or properties may be bound and (B) (i) have been, in the cases of the Non-Debtor Sellers, duly and validly authorized and approved by all necessary corporate or limited liability company action, as applicable, of each Non-Debtor Seller and (ii) is valid and binding on each Seller, and is enforceable against such Seller in accordance with the terms hereof.

        5.3     Title to Assets. Subject to Section 10.26 of this Agreement, no Seller has knowledge of a valid claim (asserted or otherwise) that title to any of the Property is owned by a third party.

        5.4     Intellectual Property. Subject in all events to the first sentence of Section 10.26 below and except as otherwise provided on **Schedule 5.4** to this Agreement, (i) Schedule 1.1.3 lists in reasonable detail all registrations and applications for registration of all Intangible Property owned by the Sellers; (ii) the Sellers own or have the right to use all Intangible Property, and all Intangible Property is valid, subsisting and enforceable in all respects; (iii) the Intangible Property is sufficient to operate the Business as conducted as of the Execution Date, except as individually or in the aggregate have not had or would not reasonably be expected to have a material adverse effect; and (iv) except as individually or in the aggregate have not had or would not reasonably be expected to have a material adverse effect, (a) no action is pending or, to the Sellers' knowledge, threatened which challenges the validity or use of, or the ownership by, the Sellers of the Intangible Property; (b) the Sellers have no knowledge of any infringement or infringing use of any of the Intangible Property by any third party; and (c) to the Sellers' knowledge, no infringement, misappropriation or violation of any intellectual property right or other proprietary right of any third party has occurred or will result from the conduct of the Business.

        5.4.1 Subject in all events to the first sentence of Section 10.26 below, upon a breach of the representations set forth in Section 5.4 of this Agreement, Buyer shall provide Sellers with written notice of same and (a) if such breach relates to a material portion or amount of SKUs (with reference to the volume of sales attributable to such SKUs, customer demands therefor, and the likelihood and extent of anticipated Chargebacks associated with the withdrawal from sale of such SKUs), Buyer may, as its sole and exclusive remedy, terminate this Agreement in accordance with its terms, and (b) to the extent such breach relates to an immaterial portion or amount of SKUs (with reference to the volume of sales attributable to such SKUs, customer demands therefor, and the likelihood and extent of anticipated Chargebacks associated with the withdrawal from sale of such SKUs), Sellers shall have the right to elect to either (x) remove all such SKUs (or a portion thereof) from sale to or by the Sellers' customers prior to the Closing, at the Sellers' sole cost and expense (it being understood that such cost and expense may include related Chargebacks, but only to the extent that such Chargebacks, together with an amount equal to the Chargebacks taken or that will be taken pursuant to Section 3.3.5(c)(v), would cause the sum of the Eligible Receivables and Eligible Inventory to fall below $16,500,000) or (y) not take any action, it being understood that in such event, Buyer's sole remedy would be to make a claim against the Supply Agreement Escrowed Amount for the costs and expenses of removal of such goods (it being understood that such costs and expenses may include related Chargebacks, but only to the extent that such Chargebacks, together with an amount equal to the Chargebacks taken or that will be taken pursuant to Section 3.3.5(c)(v),

1-NY/2064980.1               15

would cause the sum of the Eligible Receivables and Eligible Inventory to fall below $16,500,000)

     6.    Buyer's Warranties and Representations. In addition to the representations and warranties contained elsewhere in this Agreement, Buyer hereby makes the following representations and warranties to Sellers:

     6.1    Organization, Standing and Power. Buyer is a corporation duly organized, validly existing and in good standing under the laws of the State of Delaware. Buyer has all requisite entity power and authority to own, lease and operate its properties, to carry on its business as now being conducted and to execute, deliver and perform this Agreement and all writings relating hereto.

     6.2    Authorization of Buyer. The execution, delivery and performance of this Agreement and all writings relating hereto by Buyer have been duly and validly authorized. The execution and delivery of this Agreement, the consummation of the transactions herein contemplated, and the performance of, fulfillment of and compliance with the terms and conditions hereof by Buyer do not and will not: (i) conflict with or result in a breach of the articles of incorporation or by-laws of Buyer; (ii) violate any statute, law, rule or regulation, or any order, writ, injunction or decree of any court or governmental authority; or (iii) violate or conflict with or constitute a default under any agreement, instrument or writing of any nature to which Buyer is a party or by which Buyer or any of its assets or properties may be bound.

     7.    "AS IS" Transaction. Buyer hereby acknowledges and agrees that Sellers make no representations or warranties whatsoever, express or implied, with respect to any matter relating to the Property (including, without limitation, income to be derived or expenses to be incurred in connection with the Property, the physical condition of any personal property comprising a part of the Property or which is the subject of any Contract to be assumed by Buyer at the Closing, the value of the Property (or any portion thereof), the transferability of the Property, the terms, amount, validity, collectibility or enforceability of any assumed liabilities or Contract, the title of the Property (or any portion thereof), the merchantability or fitness of the Personal Property or any other portion of the Property for any particular purpose, or any other matter or thing relating to the Property or any portion thereof). Without in any way limiting the foregoing, Sellers hereby disclaim any warranty (express or implied) of merchantability or fitness for any particular purpose as to any portion of the Property. Buyer further acknowledges that Buyer has conducted an independent inspection and investigation of the physical condition of all portions of the Property and all such other matters relating to or affecting the Property as Buyer deemed necessary or appropriate and that in proceeding with its acquisition of the Property, Buyer is doing so based solely upon such independent inspections and investigations. Accordingly, except only for such surviving representations, Buyer will accept the Property at the Closing "AS IS," "WHERE IS," and "WITH ALL FAULTS."

     8.    Bankruptcy Court Approvals.

     8.1    Bankruptcy Court Approval of Sale Matters.

(a)    Promptly following the execution of this Agreement by Buyer and Sellers (and in no event later than the second (2nd) business day), Sellers will seek approval by the Bankruptcy Court of an order in form and substance satisfactory to the Buyer and the Sellers (the "Approval Order") which, among other things, (i) approves the sale of the Property to Buyer on the terms and conditions set forth in this Agreement and authorizes the Sellers to proceed with this transaction, (ii) includes a specific finding that Buyer is a good faith purchaser (as determined under Section 363(m) of the Bankruptcy Code) of the Property, (iii) states that the sale of the Property to Buyer shall be free and clear of all liens, claims, interests and encumbrances whatsoever (other than those, if any, listed on Schedule 8.1(a)(iii) attached hereto and incorporated herein by this reference), and (iv) approves the Sellers' assumption and assignment of the Designated Contracts (collectively, the "Section 365 Contracts") pursuant to Section 365 of the Bankruptcy Code; provided that (xx) as to any cure amounts payable to the other parties to the Section 365 Contracts as a condition to such assumption and assignment, Sellers shall bear and pay, in the aggregate, up to $150,000 of such cure costs and Buyer shall bear and pay any excess over such amount, and (yy) Buyer shall be responsible for satisfying such "adequate assurance of future performance" requirements as the Bankruptcy Court may impose as a condition to approving Sellers' assumption or assignment of any Section 365 Contract. Following the filing of the Sale Motion, Sellers shall use reasonable efforts to obtain the Approval Order. Both Buyer's and Sellers' obligations to consummate the transactions contemplated in this Agreement shall be conditioned upon the Bankruptcy Court's entry of the Approval Order other than such obligations of the Sellers arising under clause (b), below, and set forth in the Procedures Order. If the Bankruptcy Court refuses to issue the Approval Order or to approve any third party purchaser at the hearing on the Sale Motion, then this transaction shall automatically terminate and the Sellers and the Buyer shall be relieved of any further liability or obligation hereunder. In the event that a third party (an "Upset Purchaser" and the underlying agreement between the Upset Purchaser and one or more of the Sellers, the "Upset Agreement") is approved by the Bankruptcy Court as the purchaser of substantially all of the Property at the hearing on the Sale Motion, however, notwithstanding anything to the contrary in this Agreement, this Agreement shall not terminate, but rather shall become a "back-up bid" which shall remain open for acceptance by Sellers at the last purchase price and on the last terms offered by Buyer at the auction until the Outside Date, but subject and subordinate in all respects to the rights of the Upset Purchaser under the Upset Agreement; provided, however, this Agreement shall automatically terminate if the Approval Order is for any reason whatsoever not entered by the Bankruptcy Court on or before August 11, 2006, or the Closing does not occur by the Outside Date. Upon entry of the Approval Order in accordance with the provisions of this Section 8.1(a) (such entry date being referred to herein as the "Sale Approval Date"), the condition set forth in this Section 8.1(a) shall conclusively be deemed satisfied.

(b)    (i) With respect to the Contracts included on Exhibit "8.1(c)" attached hereto and incorporated by reference (the "Scheduled Contracts"), the Buyer may designate such Scheduled Contracts (collectively, "Designated Contracts" and each a "Designated Contract") to be assumed by the Sellers (or the applicable Seller, as the case may be) and assigned to the Buyer pursuant to Section 365 of the Bankruptcy Code, (ii) as to those Scheduled Contracts which the Buyer shall have designated prior to ten (10) business days before the hearing on the Sale Motion, the Sellers shall seek the entry of an order approving such

17

assumption and assignment in connection with the entry of the Approval Order, with such approved assumption and assignment occurring at the Closing, (iii) as to those Scheduled Contracts which the Buyer shall have designated after ten (10) business days before the hearing on the Sale Motion, the Sellers shall promptly take all reasonable actions in an effort to cause the assumption by the Sellers (or applicable Seller, as the case may be) and assignment to and assumption by Buyer pursuant to Section 365 of the Bankruptcy Code of each such Designated Contract and otherwise cooperate in reasonable respects with the Buyer in respect of each assignment and (iv) during the 90 day period commencing on the Execution Date, the Sellers shall not reject any Scheduled Contracts unless with the prior written consent of the Buyer, it being agreed that after July 20, 2006 the contract costs actually incurred by the Sellers under each Designated Contract and each other Scheduled Contract as to which the Buyer has not provided consent for rejection, shall be reimbursed by the Buyer until the tenth (10th) business day after such time as the Buyer shall notify the Sellers in writing that the Buyer does not intend to designate such Scheduled Contract as a Designated Contract (at such time, the costs under such Scheduled Contracts shall no longer be the Buyer's obligation). The assignment to Buyer of the Designated Contracts made to Buyer post-Closing (and Buyer's assumption of the post-assignment obligations thereunder) shall be made pursuant to an assignment and assumption instrument identical in all material respects to the Assignment of Contracts. Buyer's and Sellers' respective cure obligations with respect to any Designated Contracts assumed and assigned post-Closing shall be subject to the aggregate limitations set forth in Section 8.1(a)(iv)(xx) above and Buyer shall be responsible for satisfying such "adequate assurance of future performance" requirements as the Bankruptcy Court may impose as a condition to approving Sellers' assumption or assignment thereof.

9.    Access to Records and Properties of Sellers. From and after the date of this Agreement until the Closing Date, Sellers shall afford to Buyer's officers, independent public accountants, counsel, lenders, consultants and other representatives, reasonable access for examination at all reasonable times to the Property and all records pertaining to the Property or the Business. Buyer, however, shall not be entitled to access to any materials containing privileged communications or information about employees, disclosure of which might violate an employee's reasonable expectation of privacy. Buyer expressly acknowledges that nothing in this Section 9 is intended to give rise to any contingency to Buyer's obligations to proceed with the transactions contemplated herein.

10.    Miscellaneous.

10.1    Damage and Destruction. Sellers shall promptly notify Buyer of the occurrence of any material damage to or destruction of the Property that occurs prior to the Closing Date. In the event of any uninsured damage to or destruction of the Property prior to the Closing Date the cost of which to repair would total $315,000 or less, then such damage or destruction shall have no effect whatsoever on the Purchase Price or Buyer's or Seller's obligation to close. Should any uninsured damage or destruction to the Property occur prior to the Closing Date the cost of which to repair would total more than $315,000 but less than $550,000, then unless Sellers cause the same to be repaired and restored in all material respects prior to the Closing Date (in which case the Purchase Price shall be

unaffected and the parties shall proceed with the Closing as though such damage, destruction or proceedings had never occurred or been initiated), Buyer's sole remedy shall be to receive a dollar-for-dollar reduction in the Purchase Price in an amount equal to the sum of (i) the cost of such repairs, less (ii) the amount of any insurance proceeds with respect thereto assigned to Buyer at the Closing, and consummate the transaction contemplated herein. If any uninsured damage or destruction to the Property occurs prior to the Closing Date the cost of which to repair would total $850,000 or more, then irrespective of whether the same can be repaired and/or restored prior to the Closing Date, Buyer shall have the right and option to either (i) terminate this Agreement and the transaction contemplated herein, or (ii) elect to receive, as its sole and exclusive remedy by reason of such damage, destruction, a Purchase Price reduction in the amount of $740,000 and consummate the transaction contemplated herein as though the damage or destruction had never occurred or been initiated. In all other events or in the event that Buyer elects to consummate the purchase pursuant to clause (ii) above, (xx) all insurance proceeds, including business interruption and rental loss proceeds, collected by or paid to Sellers prior to the Closing Date, shall be credited against the Purchase Price on a dollar-for-dollar basis on Buyer's account or the Purchase Price shall be adjusted by an amount agreed between Buyer and Sellers, and (yy) all entitlement to all other insurance proceeds arising out of such damage or destruction or proceedings and not collected prior to the Closing Date shall be assigned to Buyer at the Closing. Notwithstanding anything to the contrary in this Agreement, the risk of loss or damage to the Property shall unconditionally shift to the Buyer on the Closing Date. For avoidance of doubt, Buyer and Sellers intend that the provisions of this Section 10.1 shall control over any right or remedy to which the Buyer may otherwise be entitled under this Agreement by reason of the occurrence of any event subject to this Section 10.1.

10.2    Attorneys' Fees. In the event that either party hereto brings an action or other proceeding to enforce or interpret the terms and provisions of this Agreement, the prevailing party in that action or proceeding shall be entitled to have and recover from the non-prevailing party all such fees, costs and expenses (including, without limitation, all court costs and reasonable attorneys' fees) as the prevailing party may suffer or incur in the pursuit or defense of such action or proceeding.

10.3    Reasonable Access to Records and Certain Personnel. In order to facilitate Sellers' efforts to administer and close the Bankruptcy Case (including, without limitation, the preparation of filings in the Bankruptcy Case and state, local and federal tax returns and other filings), for a period of five (5) years following the Closing, (i) the Buyer shall permit Sellers' counsel and other professionals and counsel for any successors to Sellers and their respective professionals (collectively, **"Permitted Access Parties"**) reasonable access to the financial and other books and records which comprised part of the Property acquired, which access shall include (xx) the right of such Permitted Access Parties to copy, at such Permitted Access Parties' expense, such documents and records as they may request in furtherance of the purposes described above, and (yy) Buyer's copying and delivering to the relevant Permitted Access Parties such documents or records as they may request, but only to the extent such Permitted Access Parties furnish Buyer with

reasonably detailed written descriptions of the materials to be so copied and the applicable Permitted Access Party reimburses the Buyer for the reasonable costs and expenses thereof, and (ii) Buyer shall provide the Permitted Access Parties (at no cost to the Permitted Access Parties) with reasonable access to finance, management and administrative personnel during regular business hours to assist Sellers and the other Permitted Access Parties in their post-Closing activities (including, without limitation, preparation of tax returns), provided that such access does not unreasonably interfere with the Buyer's business operations.

       10.4    Notices. Unless otherwise provided herein, any notice, tender, or delivery to be given hereunder by any Party to the other may be effected by personal delivery in writing, or by registered or certified mail, postage prepaid, return receipt requested, and shall be deemed communicated as of the date of mailing. Mailed notices shall be addressed as set forth below, but each Party may change his address by written notice in accordance with this Section 10.5.

| | |
|---|---|
| To Sellers: | Global Home Products<br>550 Polaris Parkway, Suite 500<br>Westerville, OH 43082<br>Attn: Mark Eichhorn<br>Fax: 740-681-6078<br>e-mail:meichhorn@anchorhocking.com |
| With a copy to: | Pachulski Stang Ziehl Young Jones<br>& Weintraub LLP<br>150 California Street, 15th<br>San Francisco, CA 94111<br>Attn: David M. Bertenthal, Esq.<br>Fax: 415-263-7010<br>e-mail: dbertenthal@pszyjw.com |
| | and |
| | Pachulski Stang Ziehl Young Jones<br>& Weintraub LLP<br>919 North Market Street, 17th Floor<br>Wilmington, DE 19801<br>Attn: Laura Davis Jones, Esq.<br>Fax: 302-652-4400<br>e-mail: ljones@pszyjw.com |
| To Buyer: | SEB S.A.<br>Chemin du Petit Bois<br>Les 4M - BP 172 |

69134  Ecully cedex
France
Attn:   Philippe Sumeire and Bruno Labrosse
Fax:
emails: psumeire@groupeseb.com and
           blabrosse@groupeseb.com

With a copy to:      Skadden, Arps, Slate, Meagher & Flom LLP
                    40 Bank Street
                    London E14 5DS
                    Attn:  Lynn Hiestand, Esq.
                    Fax:    (00) 44 207 072 7120
                    e-mail: lhiestan@skadden.com

                    and

                    Skadden, Arps, Slate, Meagher & Flom LLP
                    One Rodney Square
                    Wilmington, DE 19899-0636
                    Attn: Gregg M. Galardi
                    Fax: 888 329 3792
                    email: ggalardi@skadden.com

       10.5    Entire Agreement.  This instrument, that certain Confidentiality Agreement dated May 22, 2006, between Houlihan, Lokey, Howard & Zukin Capital (for The WearEver Company) and the Buyer, and the documents to be executed pursuant hereto contain the entire agreement between the parties relating to the sale of the Property.  Any oral representations or modifications concerning this Agreement or any such other document shall be of no force and effect excepting a subsequent modification in writing, signed by the Party to be charged.

       10.6    Modification.  This Agreement may be modified, amended or supplemented only by a written instrument duly executed by all the parties hereto.

       10.7    Closing Date.  All actions to be taken on the Closing Date pursuant to this Agreement shall be deemed to have occurred simultaneously, and no act, document or transaction shall be deemed to have been taken, delivered or effected until all such actions, documents and transactions have been taken, delivered or effected.

       10.8    Severability.  Should any term, provision or paragraph of this Agreement be determined to be illegal or void or of no force and effect, the balance of the Agreement shall survive.

1-NY/2064980.1                          21

10.9    Captions.  All captions and headings contained in this Agreement are for convenience of reference only and shall not be construed to limit or extend the terms or conditions of this Agreement.

10.10    Further Assurances.  Each Party hereto will execute, acknowledge and deliver any further assurance, documents and instruments reasonably requested by any other Party for the purpose of giving effect to the transactions contemplated herein or the intentions of the Parties with respect thereto; provided that nothing herein shall be deemed to require any Party to execute or deliver any such further assurance, document or instrument to the extent that the same could in any material way increase the burdens, obligations or liabilities otherwise imposed upon such Party by this Agreement.

10.11    Waiver.  No waiver of any of the provisions of this Agreement shall be deemed, or shall constitute, a waiver of other provisions, whether or not similar, nor shall any waiver constitute a continuing waiver.  No waiver shall be binding unless executed in writing by the party making the waiver.

10.12    Brokerage Obligations.  Except for Houlihan, Lokey, Howard & Zukin (the "Broker"), which Broker Sellers have engaged in connection with this transaction, Sellers and the Buyer each represent and warrant to the other that such party has incurred no liability to any real estate broker or other broker or agent with respect to the payment of any commission regarding the consummation of the transaction contemplated hereby.  It is agreed that other than the fee or commission payable to the Broker (which shall be paid to the Broker concurrently with, and out of the proceeds payable to the Sellers at, the Closing), if any claims for commissions, fees or other compensation, including, without limitation, brokerage fees, finder's fees, or commissions, are ever asserted against Buyer or the Sellers in connection with this transaction, all such claims shall be handled and paid by the party whose actions form the basis of such claim and such party shall indemnify, defend (with counsel reasonably satisfactory to the party entitled to indemnification), protect and save and hold the other harmless from and against any and all such claims or demands asserted by any person, firm or corporation in connection with the transaction contemplated hereby.

10.13    Payment of Fees and Expenses.  Except as provided in Section 10.12 above, each party to this Agreement shall be responsible for, and shall pay, all of its own fees and expenses, including those of its counsel, incurred in the negotiation, preparation and consummation of the Agreement and the transaction described herein.

10.14    Survival.  The respective representations, warranties, covenants and agreements of Sellers and Buyer herein, or in any certificates or other documents delivered prior to or at the Closing, shall not be deemed waived or otherwise affected by the Closing.

10.15    Assignments.  This Agreement shall not be assigned by any Party hereto without the prior written consent of the other party hereto, which consent the Parties may grant or withhold in their sole and absolute discretion, provided that Buyer may assign any or all of its rights and interests hereunder to one or more of its Affiliates and designate

one or more of its Affiliates to perform its obligations hereunder and provided further that, in the event that Buyer so assigns this Agreement, it shall nevertheless remain liable to perform its obligations hereunder if its assignee fails to fulfill such obligations. For the purposes of this Agreement, "Affiliate" means, with respect to any person, any other person, legal or otherwise, that directly, or indirectly through one or more intermediaries, controls or is controlled by, or is under the common control with, the first such person (control meaning the possession, direct or indirect, of the power to direct or cause the direction of management and policies of a person, whether through ownership of voting securities, by contract or otherwise) and the directors, officers, employees and agents of such other person.

10.16    Binding Effect. Subject to the provisions of Section 10.16, above, this Agreement shall bind and inure to the benefit of the respective heirs, personal representatives, successors (including, without limitation, and notwithstanding anything to the contrary in Section 10.16 above, any trustee hereafter appointed in the Bankruptcy Case), and assigns of the parties hereto.

10.17    Applicable Law. This Agreement shall be governed by and construed in accordance with the laws of Delaware.

10.18    Good Faith. All parties hereto agree to do all acts and execute all documents required to carry out the terms of this Agreement and to act in good faith with respect to the terms and conditions contained herein before and after Closing.

10.19    Construction. In the interpretation and construction of this Agreement, the parties acknowledge that the terms hereof reflect extensive negotiations between the parties and that this Agreement shall not be deemed, for the purpose of construction and interpretation, drafted by either party hereto.

10.20    Counterparts. This Agreement may be signed in counterparts. The Parties further agree that this Agreement may be executed by the exchange of facsimile signature pages or pages in portable document format (.pdf) provided that by doing so the parties agree to undertake to provide original signatures as soon thereafter as reasonable in the circumstances.

10.21    Time is of the Essence. Time is of the essence in this Agreement, and all of the terms, covenants and conditions hereof.

10.22    Bankruptcy Court Jurisdiction. **THE PARTIES AGREE THAT IF ANY DISPUTE ARISES OUT OF OR IN CONNECTION WITH THIS AGREEMENT OR ANY OF THE DOCUMENTS EXECUTED HEREUNDER OR IN CONNECTION HEREWITH, THE BANKRUPTCY COURT SHALL HAVE EXCLUSIVE PERSONAL AND SUBJECT MATTER JURISDICTION AND SHALL BE THE EXCLUSIVE VENUE TO RESOLVE ANY AND ALL DISPUTES RELATING TO THE TRANSACTION CONTEMPLATED BY THIS AGREEMENT. SUCH COURT SHALL HAVE SOLE JURISDICTION OVER**

**SUCH MATTERS AND THE PARTIES AFFECTED THEREBY AND BUYER AND SELLERS EACH HEREBY CONSENT AND SUBMIT TO SUCH JURISDICTION.**

10.23   Interpretation and Rules of Construction.  In this Agreement, except to the extent that the context otherwise requires:

10.23.1 when a reference is made in this Agreement to an Article, Section, Exhibit or Schedule, such reference is to an Article or Section of, or an Exhibit or a Schedule to, this Agreement unless otherwise indicated;

10.23.2 the headings and captions used in this Agreement are for reference purposes only and do not affect in any way the meaning or interpretation of this Agreement;

10.23.3 whenever the words "include," "includes" or "including" are used in this Agreement, they are deemed to be followed by the words "without limitation";

10.23.4 the words "hereof," "herein" and "hereunder" and works of similar import, when used in this Agreement, refer to this Agreement as a whole and not to any particular provision of this Agreement;

10.23.5 all terms defined in this Agreement have the defined meanings when used in any certificate or other document made or delivered pursuant hereto, unless otherwise defined therein;

10.23.6 the definitions contained in this Agreement are applicable to the singular as well as the plural forms of such terms;

10.23.7 any law or statute defined or referred to herein or in any agreement or instrument that is referred to herein means such law or statute as from time to time amended, modified or supplemented, including by succession of comparable successor laws;

10.23.8 references to a person are also to its permitted successors and assigns; and

10.23.9 the use of "or" is not intended to be exclusive unless expressly indicated otherwise.

10.24   Certain Limitations on Disclosure.  Except as may be required by applicable law and except for such disclosures as each Seller may make to its secured lender, the Broker and/or to the Official Committee of Unsecured Creditors in the Bankruptcy Case, prior to Sellers' filing of the Procedures Motion, neither Buyer nor Sellers shall make any public announcement of the transactions contemplated by this Agreement without first obtaining the other's prior written consent.

10.25   No Third Party Beneficiaries.  There are no third party beneficiaries to this Agreement or any of the agreements set forth herein.

10.26  . Limitation on Representations and Warranties. Notwithstanding anything herein to the contrary, the representations set forth in Sections 5.3 and 5.4 of this Agreement (including, without limitation, Section 5.4.1) lapsed on July 20, 2006 (the "Lapse Date") and have since the Lapse Date been and continue to be of no force or effect whatsoever (including as a condition to the Buyer's obligation to consummate the transaction contemplated herein) after July 20, 2006.  Further, but without in any way limiting the foregoing or in any way restoring any of the representations or provisions of Sections 5.3 and 5.4 (including, without limitation, Section 5.4.1), Buyer's sole recourse by reason of the inaccuracy of the representation or warranty set forth in Section 5.3 or (as set forth in Section 5.4.1 above) a material inaccuracy in the representations and warranties set forth in Section 5.4, shall be to terminate this Agreement and the transactions contemplated herein (which termination shall be in writing) prior to the Lapse Date and such occurrence shall cause the Sellers to cause the immediate return of the Deposit to the Buyer.

10.27  Purchase of Nuevo Laredo Equipment.    Sellers (or the applicable Sellers, if fewer than all) shall transfer the Neuvo Laredo Equipment to the Buyer or one of its subsidiaries or affiliates for the additional amount of $750,000, subject to such additional terms and conditions as the Sellers and Buyer might agree and provided that all costs of removal and transport of such assets shall be the sole and exclusive responsibility of the Buyer. However,  the transfer of the Nuevo Laredo Equipment is not a condition to the parties' obligation to close the transaction provided for in the other provisions of this Agreement.

10.28  Joint and Several Liability.  Each entity comprising Buyer shall be jointly and severally liable for all obligations of the Buyer hereunder and under any other document, agreement and instruments executed and delivered by Buyer in connection with the transaction contemplated herein

CONFORMED TO REFLECT MODIFICATIONS SET FORTH IN THAT CERTAIN
FIRST AMENDMENT TO ASSET PURCHASE AGREEMENT DATED AS OF JULY 14, 2006

In Witness Whereof, Buyer and Sellers have executed this Asset Purchase Agreement as of the day and year first above written.

**BUYER:**

**SEB S.A.,**
a company incorporated under the laws of France

By:_____
Name:
Title:

**GROUPE SEB USA**
a Delaware corporation

By:_____
Name:
Title:

**SELLERS:**

**MIRRO ACQUISITION INC.,**
a Delaware corporation and
Chapter 11 Debtor and Debtor in Possession

By:_____
Name:
Title:

**MIRRO OPERATING COMPANY, LLC,**
a Delaware limited liability company and
Chapter 11 Debtor and Debtor in Possession

By:_____
Name:
Its:

**MIRRO PUERTO RICO, INC.,**
a corporation organized under the laws of the
Commonwealth of Puerto Rico and
Chapter 11 Debtor and Debtor in Possession

By:_____
Name:

1-NY/2064980.1

Title:

**690649 BC, LTD.,**
**a British Columbia company**

By:_____
Name:
Title:

2

CONFORMED TO REFLECT MODIFICATIONS SET FORTH IN THAT CERTAIN
FIRST AMENDMENT TO ASSET PURCHASE AGREEMENT DATED AS OF JULY 14, 2006

## Exhibits and Schedules

## [TO BE ATTACHED]

[Please note that exhibits have not yet been reviewed]

### Exhibit "C"

## ASSIGNMENT AND ASSUMPTION OF CONTRACTS

This Assignment and Assumption of Contracts (this "Assignment") is entered into as of this ___ th day of August, 2006, between _____ _____,
_____,and _____, each a Debtor and Debtor in Possession under Case No. 06-10340 in the Bankruptcy Court (collectively, the "Assignor"), on the one hand, and SEB S.A., a company incorporated under the laws of France, and Groupe SEB USA, a Delaware corporation (collectively, the "Assignee"), on the other hand, with respect to the following facts and circumstances:

A.     Assignor, as Seller, and Assignee, as Buyer, have heretofore entered into that certain Asset Purchase Agreement dated July __, 2006 (the "Purchase Agreement"). Except for terms specifically defined herein, the capitalized terms used in this Assignment shall have the same meanings as capitalized terms used in the Purchase Agreement.

B.     Concurrently with the mutual execution and delivery of this Assignment, Assignor and Assignee are consummating the transactions contemplated by the Purchase Agreement. Assignor and Assignee are executing and delivering this Assignment in satisfaction of their respective obligations pursuant to Sections 3.3.1 and 3.4.2 of the Purchase Agreement.

NOW, THEREFORE, for good and valuable consideration, the receipt and adequacy of which Assignor and Assignee hereby acknowledge, Assignor and Assignee hereby agree as follows:

1.     Assignment.  Effective as of the Closing Date, to the extent of their respective interests therein, the parties comprising Assignor hereby assign to Assignee all of their right, title and interest in and to the Contracts described on Exhibit "A" attached hereto and incorporated herein by this reference (collectively, the "Assigned Contracts").

2.     Assumption.  Effective as of the Closing Date, Assignee hereby accepts the foregoing assignment and assumes and agrees to be bound by the terms and provisions of the Assigned Contracts and to faithfully perform all of Assignor's obligations thereunder to be performed from and after the Closing Date as though Assignee had been the original contracting party thereunder.

3.     Assignee's Indemnification.  Assignee shall indemnify, defend (with counsel reasonably satisfactory to Assignor) and hold Assignor free and harmless of, from and against any and all liabilities, obligations, claims, demands, actions, causes of action, losses and costs and expenses (including, without limitation, all court costs and reasonable attorneys' fees) as Assignor may suffer or incur by reason of or in connection with Assignee's breach or default or

asserted or claimed breach or default of any obligation to the counter-party under the Assigned Contracts (or any of them) to be performed thereunder from and after the Closing Date.

4.     Attorneys' Fees.  In the event that either party hereto brings an action or other proceeding to enforce or interpret the terms and provisions of this Assignment, the prevailing party in that action or proceeding shall be entitled to have and recover from the non-prevailing party therein all such fees, costs and expenses (including, without limitation, all court costs and reasonable attorneys' fees) as the prevailing party may suffer or incur in the pursuit or defense of such action or proceeding.

5.     Amendments.  This Assignment may only be amended by a writing signed by both Assignor and Assignee.

6.     Execution in Counterparts.  This Assignment may be executed in counterparts and delivered by the delivery of facsimile signatures; provided, however, that if the parties exchange facsimile signatures, each of them agrees to provide the other with a copy of this Assignment bearing their original signature as soon thereafter as possible.

7.     Delivery Pursuant to Purchase Agreement.  Notwithstanding anything to the contrary herein, Assignor and Assignee are executing and delivering this Assignment in accordance with and subject to all of the terms and provisions of the Purchase Agreement (including, without limitation, the exclusions set forth in Section 1.2 of the Purchase Agreement and the acknowledgement and disclaimer set forth in Section 7 thereof).

8.     Governing Law.  This Assignment shall be governed by and construed and enforced in accordance with the laws of Delaware

9.     Joint and Several Liability  Each entity comprising Assignee shall be jointly and severally liable for all obligations of the Assignee hereunder.

**IN WITNESS WHEREOF,** Assignor and Assignee have executed this Assignment as of the day and year first set forth above.

<u>**ASSIGNOR:**</u>

Mirro Operating Company, LLC, a
_____ limited liability company
and Debtor and Debtor in Possession

By:_____
Name: _____.
Its:  _____

_____, a
_____
and Debtor and Debtor in Possession

By:_____
Name: _____.
Its:  _____

_____, a
_____
and Debtor and Debtor in Possession

By:_____
Name: _____.
Its:  _____

<u>**ASSIGNEE:**</u>

**SEB S.A., a company incorporated under the laws of France**

By:_____
Name: _____
Its:  _____

**Groupe SEB USA, a Delaware corporation**

By:_____
Name: _____
Its:  _____

Exhibit "D"

## BILL OF SALE

Pursuant to Section 3.3.2 of that certain Asset Purchase Agreement dated as of August, 2006 (the "**Agreement**"), by and between SEB S.A., a company incorporated under the laws of France, and Groupe SEB USA, a Delaware corporation (collectively, the "**Buyer**"), on the one hand, and Mirro Operating Company, LLC, a _____ limited liability company, _____, and _____, each a Debtor and Debtor in Possession under Case No. 06-10340 in the Bankruptcy Court (collectively, the "**Sellers**"), on the other hand, and for good and valuable consideration, the receipt and sufficiency of which Sellers hereby expressly acknowledge, to the extent of their respective interests therein, each entity comprising Sellers hereby sells, transfers, assigns and delivers to Buyer all of its right, title and interest in and to (i) the Personal Property, (ii) the Receivables, and (iii) the Inventory.

Except for terms specifically defined in this Bill of Sale, all capitalized terms used in herein shall have the same meanings as such terms have when utilized in the Agreement.

Notwithstanding anything to the contrary herein, Sellers are executing and delivering this Bill of Sale in accordance with and subject to all of the terms and provisions of the Agreement (including, without limitation, the exclusions set forth in Section 1.2 of the Agreement and the acknowledgement and disclaimer set forth in Section 7 of the Agreement).

Each entity comprising Assignee shall be jointly and severally liable for all obligations of the Assignee hereunder

**IN WITNESS WHEREOF,** Sellers have caused this Bill of Sale to be executed as of the _____ day of August, 2006.

**SELLERS:**

Mirro Operating Company, LLC, a
_____ limited liability company
and Debtor and Debtor in Possession

By:_____
Name: _____
Its: _____


_____, a
_____
and Debtor and Debtor in Possession

By:_____
Name: _____
Its: _____


_____, a
_____
and Debtor and Debtor in Possession

By:_____
Name: _____
Its: _____


_____, a
_____
and Debtor and Debtor in Possession

By:_____
Name: _____
Its: _____

**Exhibit "E"**

## ASSIGNMENT OF INTANGIBLE PROPERTY

Mirro Operating Company, LLC, a _____ limited liability company
_____, _____, and _____, each a Debtor
and Debtor in Possession under Case No. 06-10340 in the Bankruptcy Court (collectively, the
"Assignor") are executing this Assignment of Intangible Property (the "Assignment") in favor
of _____, a _____ (the "Assignee"), with
respect to the following facts and circumstances:

(A)  Assignor and Assignee have heretofore entered into that certain Asset Purchase
Agreement dated  August __, 2006 (the "Agreement").  Except for terms specifically defined
in this Assignment, the capitalized terms used in this Assignment shall have the same meanings
as such terms when used in the Agreement.

(B)  Concurrently with the execution and delivery of this Assignment, Assignor and
Assignee are consummating the transactions contemplated by the Agreement.  Pursuant to
Sections 3.3.3 and 3.4.3 of the Agreement, Assignor and Assignee are required to mutually
execute and deliver this Assignment at the Closing.

NOW, THEREFORE, FOR GOOD AND VALUABLE CONSIDERATION, the
receipt and sufficiency of which Assignor hereby expressly acknowledges, to the extent of their
respective interests therein, each entity comprising Assignor hereby assigns, conveys, transfers
and sets over unto Assignee, all of its right, title and interest (including any and all goodwill), if
any, in and to all Intangible Property, including, but not limited to, its right, title and interest, if
any, in and to the Intangible Property identified on Schedule 1 attached hereto and incorporated
herein by this reference. This Assignment shall inure to the benefit of, and be binding upon, the
successors, executors, administrators, legal representatives and assigns of Assignor and
Assignee.

Notwithstanding anything to the contrary herein, the parties comprising Assignor are
executing and delivering this Assignment in accordance with and subject to all of the terms and
provisions of the Agreement (including, without limitation, the exclusions set forth in Section 1.2
of the Agreement and the acknowledgement and disclaimer set forth in Section 7 thereof).

In the event that Assignor or Assignee brings an action or other proceeding to enforce or
interpret the terms and provisions of this Assignment, the prevailing party in that action or
proceeding shall be entitled to have and recover from the non-prevailing party all such fees, costs
and expenses (including, without limitation, all court costs and reasonable attorneys' fees) as the
prevailing party may suffer or incur in the pursuit or defense of such action or proceeding.

This Assignment shall be governed by and construed and enforced in accordance with the laws of Delaware

**IN WITNESS WHEREOF**, Assignor has executed this Assignment as of the ___ of _____, 2006.

<u>**ASSIGNOR:**</u>

Mirro Operating Company, LLC, a
_____ limited liability company
and Debtor and Debtor in Possession

By:_____
Name: _____.
Its: _____

_____, a
_____
and Debtor and Debtor in Possession

By:_____
Name: _____.
Its: _____

_____, a
_____
and Debtor and Debtor in Possession

By:_____
Name: _____.
Its: _____

## Schedule

### [TO BE ATTACHED]

# <u>EXHIBIT B</u>

## EXHIBIT B

| PARTIES | ASSUMED CONTRACT |
|---|---|
| Mirro and<br>Army & Air Force Exchange Service 3911 S. Walton Walker Boulevard, Dallas, TX 75236 | Retail Agreement dated 10/30/03 |
| Mirro Operating Company LLC and<br>Calphalon Corporation 10B Glenlake Parkway, Suite 600 Atlanta, GA 30328 | Patent License Agreement dated 4/13/04 |
| Mirro Operating Company LLC and<br>Newell Operating Company, 10B Glenlake Parkway, Suite 600 Atlanta, GA 30328 | Trademark Sublicense Agreement dated 4/13/04 |
| Mirro Operating Company LLC and<br>Newell Rubbermaid Inc.<br>10B Glenlake Parkway, Suite 600,<br>Atlanta, GA 30328 | Patent License Agreement dated 4/13/04 |
| Mirro Operating Company LLC and<br>Wal-Mart Stores, Inc. (United States),<br>702 Southwest 8th Street<br>Bentonville, AR 72716 | Supplier Agreement dated 4/22/06 |
| Mirro Operating Company LLC and<br>Wal-Mart Stores, Inc. (Sam's Mexico),<br>702 Southwest 8th Street<br>Bentonville, AR 72716 | Supplier Agreement dated 9/1/05 |
| Mirro Puerto Rico, Inc. and<br>Wal-Mart Stores, Inc. (Puerto Rico)<br>Invoice Control Department<br>702 Southwest 8th Street, Bentonville, AR 72716 | Supplier Agreement dated 11/3/04 |
| Mirro Puerto Rico, Inc. and<br>Wal-Mart Stores, Inc. (Puerto Rico)<br>Invoice Control Department<br>702 Southwest 8th Street<br>Bentonville, AR 72716 | Supplier Agreement dated 12/20/04 |

# UNITED STATES BANKRUPTCY COURT
## DISTRICT OF DELAWARE

Clerk of Court                                     824 Market Street
David D. Bird                                      Wilmington, DE 19801
                                                   (302) 252-2900

Date:   September 21, 2006

To:     U.S. District Court
        District of Delaware
        U.S. Courthouse - 844 King Street
        Wilmington, DE 19801

Re:

      Enclosed is the bankruptcy Record on **Appeal #BAP-06-50.**   Please acknowledge receipt
on the copy provided.

**Enclosed Items: Yes**
**Notice of Appeal: BAP-06-50**
**Appealable Orders: Yes**
**Statement of Issues on Appeal: Yes**
**Appellants Designations: Yes**
**Appellee Designations: Yes**

                                          Sincerely,

                                           Monique Edwards
                                          Deputy Clerk

___X_  Filing fee paid on__8/14/2006_____
_____ Filing fee not paid


I hereby acknowledge receipt of the above record on appeal this _____ day of _____,
2005.

By: _____          C.A. No.: _____
        Deputy Clerk, U.S. District Court

## TRANSMITTAL SHEET FOR APPEAL SUBMITTED TO U.S. DISTRICT COURT

Bankruptcy Case Number: 06-10340 (KG)
Deputy Clerk Transferring Case: Monique Edwards (302) 252-2900 ext 5123
Appeal #: BAP-06-50

## Order, Date Entered and Issues

| | |
|---|---|
| **Debtors:** | Global Home Products, LLC |
| **Counsel:** | Sandra G.M. Selzer |
| | Pachulski Stang Ziehl Jones & Weintraub LLP |
| | 919 North Market Street, 17th Floor |
| | P.O. Box 8705 |
| | Wilmington, DE 19899-8705 |
| **Telephone:** | (302) 652-4400 |
| | |
| **Appellant:** | **Regal Ware, Inc.** |
| **Counsel:** | Jennifer L. Scoliard |
| | Klehr Harrison Harvey Branzburg & Ellers LLP |
| | 919 N. Market Street, Suite 1000 |
| | Wilmington, DE 19801 |
| **Telephone:** | (302) 552-5503 |
| | |
| **Appellee:** | Global Home Products, LLC |
| **Counsel:** | **Sandra G.M. Selzer** |
| **Telephone:** | **(302) 652-4400** |