**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF DELAWARE**

In re:

GLOBAL HOME PRODUCTS, LLC, et al.,[1]

                    Debtors.

Chapter 11
Case No. 06-10340 (KG)
(Jointly Administered)

REGAL WARE, INC.,

                    Appellant,

            v.

GLOBAL HOME PRODUCTS LLC, et al.,

                    Appellees.

Civil Action No. 06-588 (JJF)

---

**OPENING BRIEF OF APPELLANT REGAL WARE, INC.**

---

November 9, 2006

KLEHR, HARRISON, HARVEY,
BRANZBURG & ELLERS, LLP
Steven K. Kortanek, Eq. (Bar No. 3106)
919 Market Street, Suite 1000
Wilmington, Delaware 19801
(302) 426-1189

RYAN KROMHOLZ & MANION, S.C.
Daniel R. Johnson   (State Bar No.
1033981)
Joseph A. Kromholz (State Bar No.
1002464)
P. O. Box 26618
Milwaukee, Wisconsin 53226-0618

Attorneys for Regal Ware, Inc.

Date:  November 9, 2006

---

[1] The Debtors are the following entities:  Global Home Products LLC; GHP Holding Company LLC; GHP Operating Company LLC; Anchor Hocking Acquisition Inc.; Anchor Hocking Inc.; AH Acquisition Puerto Rico, Inc.; Anchor Hocking Consumer Glass Corporation; Anchor Hocking CG Operating Company LLC; Anchor Hocking Operating Company LLC; Burnes Acquisition Inc.; Intercraft Company; Burnes Puerto Rico, Inc.; Picture LLC; Burnes Operating Company LLC; Mirro Acquisition Inc.; Mirro Puerto Rico, Inc.; Mirro Operating Company LLC.

## I. NATURE AND STAGE OF THE PROCEEDINGS

This is an appeal from an order of the Bankruptcy Court in which, among other things, an assignment of Regal Ware's Trademark Sublicense Agreement was authorized, overruling Regal Ware's objection.

## II. SUMMARY OF ARGUMENT

Regal Ware's appeal is not moot. Under the conflicting Third Circuit reasoning of the interplay between section 365 and 363 of the Bankruptcy Code, this Court should consider a functional test to determine whether the true character of the assumption and assignment of the Trademark Sublicense Agreement is a "sale" covered by section 363, versus simply the pure assumption and assignment transaction that it is. Under such a functional test, there is no automatic applicability of the section 363(m) stay here.

The Bankruptcy Court erred when it held, as a matter of law, that the Trademark Sublicense Agreement was freely assignable, despite its restriction on assignment, simply because it was exclusive. Trademark law is materially different from other intellectual property law, and specifically does not permit the assignment restriction in the Trademark Sublicense Agreement to be stricken as unenforceable.

## III.    STATEMENT OF FACTS

Other than the procedural history of the Debtors' bankruptcy cases, the primary facts relevant to this appeal are the terms of the Sublicense Agreement, within its four corners, Regal Ware's status as the non-debtor party to the Sublicense Agreement, and the fact that Regal did not consent to its assignment.

On October 29, 1999, Regal Ware, Inc. ("Regal Ware") and Newell Operating Company ("Newell") entered into a Trademark License Agreement (the "Licensing Agreement").  App. 31, Ex. A.[2]  The Licensing Agreement provided Newell with an exclusive license to use, directly and through its Affiliates, a number of REGAL, REGAL & DESIGN, and CORONET REGAL trademarks, for which Regal Ware has trademark registrations throughout the world.  Id.

The Licensing Agreement provided Newell with the "right to sublicense others, including its Affiliates, to use the Licensed Trademarks" in the "Defined Field," which is "all non-electric cookware, bakeware and other accessories and products in International class 21."[3]  Id.  § 1.3.

Newell did sublicense the Licensing Agreement to Mirro Operating Company, LLC ("Mirro") on April 13, 2004.  App. 31, Ex. B, (the "Trademark Sublicense Agreement"), in connection with a Stock and Asset Purchase Agreement dated March 12, 2004 between Newell and Global Home Products LLC (the "Purchase Agreement").

---

[2] References to "App. ___" refer to the appendix of binders, by tab number, which contain the joint compilation of the records as designated by the Appellant and Appellees and provided to the Court.

[3] The United States Patent & Trademark Office identifies the class(es) assigned to a mark under the International Classification of Goods and Services (Nice Agreement) based upon the goods or services on which the mark is used. The International Classification has been the primary classification for marks in the United States since September 1, 1973, and includes International Class 21, which is broadly recited as "Housewares and Glass."

The Sublicense Agreement provides that Mirro "shall not have the right to sublicense others to use the Licensed Trademarks without the written consent of [Newell].… [Mirro] may not assign or transfer this [Sublicense Agreement] by operation of law or otherwise without the written consent of [Newell]." Id. § 1.3.

Subsequently, Newell assigned all of its rights to the Trademark Sublicense Agreement to Regal Ware, and Newell also assigned all of its rights under the License Agreement to Regal Ware.  App. 31, Ex. C.  As a result, Regal Ware became the non-debtor party to the Trademark Sublicense Agreement with Mirro.  By operation of the Sublicense Agreement and the subsequent Newell -> Regal Ware assignment, Mirro could not assign or transfer the Sublicense Agreement by operation of law or otherwIse without the written consent of Regal Ware.

On April 10, 2006, (the "Petition Date"), Global Home Products LLC and several affiliated entities (collectively the "Debtors") commenced the above-captioned bankruptcy cases by filing voluntary petitions under Chapter 11 of Tile 11 of the United States Code.

On July 7, 2006, the Debtors filed the *Motion of the Debtors for an Order (i) Approving Sale by the Wearever Debtors of Substantially All of the Wearever Debtors Operating Assets Free and Clear of All Liens, Claims, Encumbrances and Other Interests Pursuant to Sections 363(b), (f) and (m) of the Bankruptcy Code, (ii) Assuming and Assigning Certain Executory Contracts and Unexpired Leases, and (iii) Granting Related Relief*, (the "Sale Motion").  App. 1. Attached to the Sale Motion was the Asset Purchase Agreement dated as of July 7, 2006 (the "APA").  Id.

On July 14, 2006, the Debtors filed a First Amendment to the Asset Purchase Agreement (the "First Amendment")(App. 16), which among other things added an entirely new set of

provisions to carve out the Trademark Sublicense Agreement from the overall transaction in the event that it was not assignable to the buyer.  See App. 16, First Amendment at sections 2.5.4 and 4.2.17.  The language of new section 4.2.17 was at first agreed to by the original stalking horse bidder, Lifetime Brands, but was later fully adopted by SEB when it submitted its qualified overbid.  This language shows a well-thought-out plan to execute if the Trademark Sublicense Agreement was held to be unassignable.

On July 25, 2006, the Debtors filed a *Notice of Filing of Schedule of Executory Contracts and Unexpired Leases That May Be Assumed or Assigned Under The Agreement Or Any Competing Agreement*, (the "Contract Notice", Docket No. 584)(App. 23).

However, Mirro proposed that the Sublicense Agreement was subject to assumption and assignment under the *Notice of Sale Procedures, Auction Date and Sale Hearing*, Docket No. 550.  App. 18.   Regal Ware timely objected to any assumption or assignment of the Trademark Sublicense Agreement dated 4/13/04 between Mirro Operating Company LLC and Newell Operating Company, identified in Exhibit A to the *Notice Of Filing Of Schedule Of Executory Contracts And Unexpired Leases That May Be Assumed Or Assigned Under The Agreement Or Any Competing Agreement*, Docket No. 584, Filed by Global Home Products LLC on 07/25/2006.  App. 23.

This objection was based on the fact that Regal Ware never consented to any assumption or assignment of the Trademark Sublicense Agreement.  The Bankruptcy Court overruled Regal Ware's objection, and held that the Trademark Sublicense Agreement was freely assignable under applicable trademark law.  App. 52 at 5-6.

## IV.    STANDARD OF REVIEW

The Bankruptcy Court's determination that the Trademark Sublicense Agreement was freely assignable is a legal conclusion that is reviewed de novo.

## V.    ARGUMENT

### A.    Regal's Appeal is Not Moot

As a threshold matter, despite indicating that they intended to do so, the Appellees have failed to move to dismiss this appeal as is required under Bankruptcy Rule 8011. Nearly two months have elapsed since the parties completed the filing of their respective designations of the record. As it is incumbent upon the Appellees to seek such relief by motion, Regal Ware reserves its rights to respond fully to any such motion that the Appellees may file.

This Court has subject matter jurisdiction over this appeal and can grant effective appellate relief. While reserving its rights to argue the mootness issue in response to any motion under Bankruptcy Rule 8011, Regal Ware nonetheless sets forth below a brief analysis demonstrating the weakness in any mootness arguments here.

### 1.    Section 363(m) Does Not Apply to A Section 365 Assumption and Assignment Transaction

In In re Joshua Slocum Ltd., 922 F.2d 1081 (3d Cir. 1990), the court of appeals held that a transaction in which a lease was assumed and assigned to a third party under section 365 was not subject to section 363(m) of the Bankruptcy Code. The Court noted the undisputable proposition that section 365 was not covered by section 363(m), based upon the plain meaning of the two sections:

DEL1 65032-2

> We note that only two provisions of the Bankruptcy Code, 11 U.S.C. §§ 363(m) and 364(e), specifically require that a party seek a stay pending appeal. Appellee concedes that § 363(m) of the Bankruptcy Code does not apply to assignments of leases under § 365. We decline to interpret the mootness principles in such a way that would, in effect, create a third situation where parties are required to seek a stay, i.e., the assignment of leases under § 365. While § 363(m) contains a provision requiring a stay, the section that applies in this case, § 365, does not.

Id. at 1097. Joshua Slocum is still good law. The rule of Joshua Slocum does not depend on whether any consideration is paid for an assignment of a lease. Nor does the holding of Joshua Slocum posit any rule or principle that any section 365 assignment must necessarily be a "sale" of "estate property" so as to bring it under section 363(m).

It is clear, and Regal Ware certainly recognizes, that subsequent decisions of the Third Circuit have applied section 363(m) to transactions denominated as "sales" of executory contracts that have been assumed and assigned under section 365. See Cinicola v. Scharffenberger, 248 F.3d 110, 128 (3d Cir 2001), In re Rickel Home Centers, Inc., 209 F.3d 291 (3d Cir.2000), and Krebs Chrysler-Plymouth v. Valley Motors, Inc., 141 F.3d 490 (3d Cir.1998).

Starting with Krebs, the Third Circuit took a significant step away from Joshua Slocum, while at the same time leaving Joshua Slocum intact. The step away from the simple and undeniable rule of Joshua Slocum was that any assignment of an executory contract was also a "sale" of "estate property". Specifically, the court of appeals in Krebs determined that

> assignments of franchises under section 365 are also sales of estate property subject to section 363(m).... Therefore, section 363(m) governs the sale of the franchises here, notwithstanding that section 365 applies to the particular mechanics of conveyance.

Id., 141 F.3d at 497-98. The court in Krebs stated that its case was distinguishable from Joshua Slocum, inasmuch as no "sale" took place in Joshua Slocum. Id. at 498 ("Slocum does not

control our decision here.   There, the Trustee requested and received 'authorization to assume and assign the Lease pursuant to 11 U.S.C. § 365.'  However, the Trustee never attempted to sell the Lease under section 363").  The distinction between a section 365 assignment and a 363 assignment-and-sale, as set forth in <u>Krebs</u>, is not a true distinction.  Indeed, <u>Krebs</u> is internally inconsistent: on the one hand, it does not criticize <u>Joshua Slocum</u> (which of course could invite criticism given there was a dissent from Judge Sloviter), while on the other hand it states that all assignments *are* sales of estate property.  The assignee in <u>Joshua Slocum</u> was acquiring estate property every bit as much as was the buyer in <u>Krebs</u>.  <u>Joshua Slocum</u> still stands for the correct proposition that a section 365 assignment of an executory contract is absolutely all that is necessary to convey to the assignee all rights under the contract.  No separate or additional "sale" is needed to grant the rights or improve the transaction.

This clear and correct principle counters the notion in <u>Krebs</u> that any and all section 365 assignments are also by definition section 363(b) dispositions.  The <u>Krebs</u> interpretation of these two statutes blurs the plain meaning of the two separate and distinct provisions.  It superimposes section 363 upon all section 365 assignments, even though <u>Joshua Slocum</u> still demonstrates that the imposition is both unwelcome and unnecessary.  Regal Ware respectfully submits that the Third Circuit case law, given the conflict among these decisions, allows this court the flexibility to use a functional test for 363(m) mootness that takes into account the true character of a transaction, rather than instrumentalist labels.  A functional approach is clearly called for given the very important policies embodied in section 365(c)(1) that have no parallel in section 363. Specifically, section 363 has no protection for the important policies embodied in the Third Circuit's line of cases in which restrictions on assignment are enforced using the "hypothetical test".  If by simply labeling as a "sale" a transaction that at its core is purely a section 365

transaction subject to these protections, one can categorically thwart appellate review, such an outcome impermissibly converts section 365 into a subsection of section 363.  A functional test, like so many other instances in which courts must go beyond mere labels to the true legal character of a transaction, will prevent the divestiture of appeal rights that flows from a rigid approach that is blindly based on the "sale" label.

In the present case, the true character of the transaction respecting the Trademark Sublicense Agreement is that of a completely severable, assumption and assignment transaction, which was indistinguishable from the assignment in <u>Joshua Slocum</u>.  Regal Ware cannot justly be deprived of its appeal rights because the APA states, in a self-serving and manufactured way, that it is a "sale".  Since a "sale" is absolutely *not* necessary to convey all rights in the Trademark Sublicense Agreement to SEB as an assignee, this Court should recognize through a functional test that the "sale" moniker here was for the sole purpose of invoking section 363(m) and had no other legitimate purpose.

This Court may rely upon <u>Joshua Slocum</u>, and is not constrained to follow the <u>Krebs</u> line of cases, to hold that 363(m) does not apply here based upon the true character of the transaction.

> 2.    **To the Extent That Section 363(m) Applies, Regal Ware's Appeal is Not Automatically Moot**

Even assuming that section 363(m) applies here, the Third Circuit has "rejected a <u>per se</u> rule which would moot every appeal not accompanied by a stay under § 363", and instead has "formulated a two-prong test for mootness:  (1) whether the underlying sale was stayed pending appeal, and (2) whether a reversal or modification of the authorization to sell would affect the validity of the sale."  <u>Cinicola v. Scharffenberger</u>, 248 F.3d 110, 128 (3d Cir 2001).

First, the reversal sought by Regal Ware would not affect the overall sale of the WearEver Business, as the APA plainly provides a carve-out for the Trademark Sublicense Agreement if it is held to be non-assignable. Therefore, the overall "sale" would not be effected at all.

Second, reversal would only affect the assignability of the Trademark Sublicense Agreement under section 365. If the <u>Krebs</u> line of cases is followed, then section 365 is relegated to a mere mechanism of transfer, while section 363(b) presumably does the real work of transferring rights to SEB here. As such, the Bankruptcy Court would have to make further determinations of what impact, if any, a reversal of its assignability ruling would have on the asserted closing of a "sale" of the Trademark Sublicense Agreement. Stated another way, if the sale of the Trademark Sublicense Agreement was in fact a necessary additional legal step as suggested the <u>Krebs</u> line of cases, then it must be determined what effect if any the reversal of only the first step (under section 365) would have on the "sale" of the Trademark Sublicense Agreement.

### B. The Bankruptcy Court's Sale Order Must Be Vacated If This Court Opts To Dismiss The Pending Appeal As Being Moot

In the event that this Court holds that Regal Ware's appeals should not be heard, Regal Ware requests that this Court direct the Bankruptcy Court to vacate that portion of the Bankruptcy Court's Sale Order that authorized assignment of the Trademark Sublicense Agreement. Vacation of the underlying orders is required because it is the deliberate actions of the Appellees in consummating the assignment of the Trademark Sublicense Agreement in order to assert that this appeal is moot. Specifically, the First Amendment, filed one week after the original Sale Motion, evidences an inequitable strategy to manipulate 363(m) in an unfair

manner.  On the one hand, the First Amendment clearly segregated the Trademark Sublicense Agreement from the larger sale transaction: if the assignment restriction in the Trademark Sublicense Agreement was held to be enforceable, it was out of the transaction and the buyer was still bound to close.  On the other hand, the Appellees now falsely argue that the Trademark Sublicense Agreement was integral to, and an indispensable part of, the sale of the WearEver business.  The assignability of the Trademark Sublicense Agreement, or not, was at all relevant times only about the $2 million purchase price adjustment, and the Debtors failed to put on any evidence that they would forever lose the $2 million – as they would have to concede, they would be obligated as fiduciaries to seek to re-sell the Trademark Sublicense Agreement with the consent of Regal Ware.

As set forth by the United States Supreme Court in United States v. Munsingwear, Inc., 340 U.S. 36 (1950), "[t]he established practice of the Court in dealing with a civil case from a court in the federal system which has become moot while on its way here or pending our decision on the merits is to reverse or vacate the judgment below and remand with a direction to dismiss." Id. at 39.  See also Great Western Sugar Co. v. Nelson, 442 U.S. 92, 92-94 (1979) (per curiam) (following Munsingwear in directing that district court vacate its judgment after an appeal became moot); Duke Power Co. v. Greenwood County, 299 U.S. 259, 267 (1936) ("[w]here it appears upon appeal that the controversy has become entirely moot, it is the duty of the appellate court to set aside the decree below and to remand the cause with directions to dismiss").  Vacating the underlying orders mooted on appeal is justified to prevent these orders from later supporting a collateral estoppel attack.  Karcher v. May, 484 U.S. 72, 82 (1987).  This principle particularly applies where the mootness occurs by reason of "happenstance" or, as here,

by reason of "the unilateral action of the party who prevailed in the lower court." U.S. Bancorp Mortg. Co. v. Bonner Mall P'ship, 513 U.S. 18, 23 (1994).

This governing precedent of the United States Supreme Court is, of course, applicable to this Circuit. As the Third Circuit explained in Federal Sav. & Loan Ins. Corp. v. Hykel, 468 F.2d 1386, 1388 (3d Cir. 1972): "[Where the appeal became moot by the action of the appellee,] the duty of the appellate court is to dismiss the appeal as moot and to remand to the district court with a direction that the judgment of that court be vacated as moot." See also Nutrasweet Co. v. Vit-Mar Enters., 176 F.3d 151, 153 (3d Cir. 1999) ("whether a preliminary injunction was warranted by earlier circumstances is now moot and the preliminary injunction previously entered must be vacated."); National Iranian Oil Co. v. Mapco Int'l, Inc., 983 F.2d 485, 489 (3d Cir. 1992) ("[i]f this appeal is moot, the district court's judgment must be vacated"); Winsett v. McGinnes, 617 F.2d 996, 1003 & n.11 (3d Cir. 1980) ("because none of the exceptions to the traditional mootness doctrine is present, we will vacate the district court's disposition of plaintiff's injunctive claim and remand with a direction to dismiss"), cert. denied, 449 U.S. 1093 (1981).

Indeed, in New Rock Asset Partners, L.P. v. Preferred Entity Advancements, 101 F.3d 1492 (3d Cir. 1996), the Third Circuit expressly cautioned against the employment of the type of duplicitous tactics that SEB can seek to use here: seeking dismissal of the appeal of the bankruptcy court's order, yet preserving the option to utilize this order to collaterally estop the Regal Ware in any future litigation involving the Trademark Sublicense Agreement. The court in New Rock noted:

> [Respondent] would have us moot the propriety of the district court's granting of summary judgment while still giving collateral

> estoppel effect to that judgment.  We do not wish impliedly to give
> our stamp of approval to such a concept . . . .
>
> . . . .
>
> . . . [Respondent] cannot have a res judicata effect to assist it in the
> New York foreclosure actions and at the same time have a
> declaration that the granting of summary judgment by the district
> court, or the propriety of that judgment, is moot.  A case is either
> moot or not.

101 F.3d. at 1497 (emphasis added).

The <u>Munsingwear</u> doctrine also is applicable to, as here, appeals from bankruptcy courts.

<u>See In re Texas Int'l Corp.</u>, 974 F.2d 1246, 1247 (10th Cir. 1992); <u>Barber v. State Farm Mut.</u>

<u>Auto. Ins. Co. (In re Smith)</u>, 964 F.2d 636, 637-38 (7th Cir. 1992); <u>In re Highway Truck Drivers</u>

<u>& Helpers Local Union # 107</u>, 888 F.2d 293, 299 (3d Cir. 1989).  <u>See also</u> <u>Monumental Life Ins.</u>

<u>Co. v. Bibo, Inc. (In re Bibo, Inc.)</u>, 139 F.3d 659 (9th Cir. 1998) (appellate court ordered district

court and bankruptcy court to vacate their respective orders after appeal had been mooted

because underlying property had been sold).

Thus, if this Court decides to dismiss Regal Ware's appeal at issue as moot, then it must

also vacate the Bankruptcy Court's order with respect to the authorization to assign the

Trademark Sublicense Agreement.

### C.    The Bankruptcy Court Erred in Holding that the Sublicense Agreement Was Freely Assignable

#### 1.    The Legal Standard Under Section 365(c)(1) of the Bankruptcy Code

In bankruptcy, a

> trustee may not assume or assign any *executory contract* or
> unexpired lease of the debtor, whether or not such contract or lease
> prohibits or restricts assignment of rights or delegation of duties, if
> *applicable law* excuses a party, other than the debtor, to such

contract or lease from accepting performance from or rendering performance to an entity other than the debtor or the debtor in possession, whether or not such contract or lease prohibits or restricts assignment of rights or delegation of duties; and such party does not consent to such assumption or assignment[.]

11 U.S.C. § 365 (c)(1) (subsection headings omitted and emphases added).

"The plain terms of § 365(c) bar a debtor in possession from assuming an executory contract if applicable law would bar assignment to a hypothetical third party."  In re Travelot Co., 286 B.R. 447, 454 (Bank. S.D. Ga. 2002).  Furthermore, U.S. trademark law, as codified by the Lanham Act (15 U.S.C.) is "applicable law" for Section 365(c)(1) purposes.  Id. at 454-55.

Subpart A of Section 365(c)(1) requires application of a "hypothetical test" under which the court must consider whether "applicable [nonbankruptcy] law precludes assignment of the contract to a third party" without the consent of the nondebtor party. Id., at 750.  If the answer to the latter inquiry is "yes," then the Chapter 11 debtor-in-possession is precluded from not only assigning the contract but also from assuming it, unless the nondebtor party to the contract provides its affirmative consent in accordance with the requirements of subpart (B) of Section 365(c)(1).  Regal Ware never did consent, and the assignment illegally took place without Regal Ware's consent.

2.    **Trademark Law Bars Assignment of the Trademark Sublicense Agreement Without Regal Ware's Consent**

Under federal law, the grant of a trademark license is personal to the assignee and thus not assignable to a third party. *See, e.g.*, <u>Tap Publ'ns, Inc. v. Chinese Yellow Pages (New York), Inc.</u>, 925 F. Supp. 212, 218 (S.D.N.Y. 1996); <u>Travelot</u>, 286 B.R. at 455. Where federal intellectual property law prohibits an assignment of a personal right such as rights to intellectual property, then a debtor has no right to either assign or assume such rights under section 365 of the Bankruptcy Code without the non-debtor party's consent, in this case, Regal Ware's. <u>In re Catapult Entm't, Inc.</u>, 165 F.3d 747, 749-50 (9th Cir. 1999). Given the foregoing, absent Regal Ware's consent, the debtors here had no right to assign or assume the Sublicense Agreement.

A debtor does not necessarily have the power to assign a trademark license. <u>See</u> Richard Leib, <u>The Interrelationship of Trademark Law and Bankruptcy Law</u>, 64 Am. Bankr. L.J. 1, 7 (1990). "While a debtor has the right under section 363(b)(1) of the Bankruptcy Code, subject to the court's approval, to sell property of the estate other than in the ordinary course of business, neither the provisions of section 541 defining 'property of the estate' nor of section 363 authorizing sale of estate property, expand the rights of the debtor in particular property beyond those conferred by applicable nonbankruptcy law." Therefore, a debtor cannot do in bankruptcy something that the debtor was contractually prevented from doing outside of bankruptcy. That is exactly what has happened in this case, the Bankruptcy Court eliminated the consent requirement from the sublicense, effectively allowing the assignment of the sublicense when, outside of this proceeding, Mirro would not have been able to do so absent Regal Ware's consent.

Federal trademark law has consistently recognized and treated trademark licenses as being personal in nature and, therefore, nonassignable by a licensee without the licensor's

consent. See, e.g., Travelot, 286 B.R. at 455 (recognizing that a non-exclusive trademark license is personal and, thus, cannot be assumed or assigned by a bankrupt licensee under 11 U.S.C. § 365(c) without the licensor's consent). Indeed, the Lanham Act (the federal trademark statute) expressly prohibits any entity from using a registered trademark in a manner likely to cause confusion or mistake without "the consent of the registrant." 15 U.S.C. § 1114(1). Pursuant to this statutory provision, it is clear that a trademark licensee cannot lawfully assign a trademark license without the authorization and consent of the trademark owner/licensor. See, e.g., Days Inns of America, Inc. v. Regency Manor, Ltd., 94 F. Supp.2d 1200, 1204 (D. Kan. 2000) (unauthorized assignee of hotel operator's trademark license was liable to operator/licensor for trademark infringement).

Thus, for instance, in Tap, 925 F. Supp. at 218, a trademark licensor ("ASM") successfully asserted an infringement claim under 15 U.S.C. § 1114 against a party ("Tap") that claimed it had been assigned a trademark license from one of ASM's original licensees ("Key"). Although Tap conceded that ASM had not authorized or consented to the purported assignment, it maintained that absent language in the trademark license expressly prohibiting assignment, the trademark license granted by ASM to Key remained freely assignable and, therefore, it was unnecessary for the parties to obtain ASM's consent before the purported assignment. Rejecting this analysis, the Tap court emphatically stated that "Tap's argument that trademark rights are assignable absent express language to the contrary is incorrect." Id. at 218. Specifically, the court held that "it is clear that the rights conferred upon Key [the original licensee] to use the mark in dispute were personal to Key, and that these rights were not assignable or otherwise transferable." Id.

16

The personal and non-delegable nature of trademark licenses was also addressed in <u>In re</u> <u>Luce Industries, Inc.</u>, 14 B.R. 529 (S.D.N.Y. 1981), wherein a district court reversed a bankruptcy court order authorizing a bankrupt licensee to assume a license of the "Fruit of the Loom" trademark. In conjunction with the assumption, the debtor proposed to delegate its rights under the trademark to a third party subcontractor. Rejecting the bankruptcy court's approval of this proposed arrangement, the district court held that "[e]ssentially, what has taken place here is a court-directed assignment of a non-assignable License Agreement." *Id*., at 531. Specifically, the district court held that the proposed delegation to the third party subcontractor represented "a complete reworking of the procedures under the License Agreement…." *Id*. The same happened here – the consent provision of the Trademark Sublicense Agreement was essentially written out of the Trademark Sublicense Agreement by the Bankruptcy Court.

The foregoing holdings are fully consistent with other authorities in the area of trademark law that have consistently recognized trademark licenses as being personal in nature and, therefore, not freely assignable. As one of the leading treatise on trademark law observes:

> While the case law is sparse, it appears to be the rule that unless the license states otherwise, a licensed mark is personal and cannot be assigned. The rule as to nonexclusive licenses of patents and copyrights is the same: the license is a personal right and cannot be transferred by the licensee to another without the permission of the licensor.

4 McCarthy on Trademarks and Unfair Competition 25:33 at 25-69 (4th Ed. 2001).

Other commentators have similarly stated their agreement that trademark licenses remain nonassignable absent consent of the licensor. *See, e.g.*, J. Dratler, Licensing of Intellectual Property, 1.06[2] at 1-50.16.2, et seq. (2001); L. Brennan, Financing Intellectual Property Under

Revised Article 9: National and International Conflicts, 23 Hastings Comm. & Ent. L. J. 313, 402- 3 (Winter 2001); G. Hesse, The Risk of an Offensive Use of Catapult, 20 Am. Bankr. Inst. Journal 14, 38 (April 2001)("a trademark license...is personal and non-delegable and, therefore, the licensor is not required to accept performance from an entity other than the [licensee].").

The policy of treating trademark licenses as being personal and, thus, not freely assignable, is rooted in trademark law's fundamental requirement that in order to preserve its ongoing rights in a particular trademark, a trademark owner must control the quality of the goods sold by licensees under its mark. Star-Kist Foods, Inc. v. P.J. Rhodes & Company, 769 F.2d 1393, 1396 (9th Cir. 1985)("It is well settled that one who licenses a trademark must retain control over who licenses a trademark must retain control over the quality of goods sold by the licensee under trademark."). In the event a trademark owner fails or is unable to exercise such control, it may be deemed to have "'abandoned the trademark, in which case the owner would be estopped from asserting rights to the trademark."' Barcamerica International USA Trust v. Tyfield Importers, Inc., 289 F.3d 589, 595-6 (9th Cir. 2002) (quoting Moore Bus. Forms, Inc. v. Ryu, 960 F.2d 486, 489 (5th Cir. 1992)). Thus, in the *Barcamerica* case, the court found that a licensor had forfeited its trademark in "Leonardo Da Vinci" wines because it failed to exercise sufficient quality control over the wines being sold under the trademark by its licensees. *Id.*

In order to protect against the foregoing risks, trademark licensors must be afforded "the right to pass upon the abilities of new potential licensees" so that the licensors can prevent their trademarks from falling into the hands of parties with whom they might not otherwise allow to use the marks. McCarthy 25:33 at 25-70.

In this case, the Sublicense Agreement does not give Mirro the right to sublicense or assign the marks, absent express written consent of Newell, whose rights were assigned to Regal Ware.  Sublicense Agreement § 1.3

Trademark law required Regal Ware's consent.  None was given, and it was clear error for the Bankruptcy Court to essentially bypass the consent requirement of the Trademark Sublicense Agreement.


### 3.    The Court's Reliance on *Golden Books* Is Misplaced

The Bankruptcy Court primarily based its holding on two cases, In re Golden Books Family Entm't, Inc., 269 B.R. 311, 318 (Bankr. D. Del. 2001), and In re Rooster, Inc., 100 B.R. 228, 233 (Bankr. D. Pa. 1989).  Both are distinguishable from the facts at hand, and it was clear legal error for the Bankruptcy Court to apply those cases to the present situation, because

Golden Books focused on "*exclusive copyright licenses*" under the unique provisions of the Copyright Act which cannot be properly extrapolated to trademark licenses.  Copyright licenses bear a unique statutory arrangement far different from the trademark laws.  *Compare* 17 U.S.C. §§ 101, 106, 201(d) with 15 U.S.C. § 1060.

Under the Copyright Act of 1909 ("1909 Act"), copyright licenses (whether exclusive or not) were "not transferable as a matter of law."  Harris v. Emus Records Corp., 734 F.2d 1329, 1333 (9th Cir. 1984).  Unlike an assignee, a licensee "had no right to resell or sublicense the rights acquired unless he had been expressly authorized so to do." 3 Melville B. Nimmer & David Nimmer, Nimmer on Copyright § 10.01[C][4] (2001).

However, The Copyright Act of 1976, redefined, and eradicated much of the doctrine of indivisibility as it applied to exclusive licenses.  Most importantly, 17 U.S.C. § 101 defines the "**transfer of copyright ownership**" as "an assignment, mortgage, *exclusive license*, or any other conveyance, alienation, or hypothecation of a copyright or of any of the exclusive rights comprised in a copyright, whether or not it is limited in time or place of effect, ***but not including a nonexclusive license***. " 17 U.S.C. § 101 (emphasis added).

Thus, The Copyright Act itself identifies that an *exclusive license* equates to a "*transfer of copyright ownership,*" but a nonexclusive license does not.  If follows that, as was the case in Golden Books, whether copyright law precludes the free assignment of licenses depends on whether a particular license is exclusive (assignable, because the exclusive licensee is actually the owner and thus the licensor retains no ownership rights) or nonexclusive (non-assignable, because the nonexclusive licensee is *not* the owner of the copyrights).

In contrast to Golden Books, trademark law contains no such statutory definition that equates an exclusive license with outright ownership of the mark.  Indeed, the only substantive trademark law regarding ownership relates to assignments.   15 U.S.C. § 1060.   Notably, substantive trademark law **does not,** like copyright law, equate an exclusive license with a transfer of ownership.  Therefore, the copyright distinction between exclusive and nonexclusive licenses simply does not apply to this trademark case.

In this case, ownership is clearly delineated, and indeed acknowledged by the Newell-Mirro sublicense agreement.  § 4.1 of the Sublicense Agreement explicitly provides that Mirro "acknowledges that Regal is the owner of all right, title and interest in and to the Licensed Trademarks and is also the owner of the goodwill attached or which shall become attached to the

Licensed Trademarks."  This fact alone removes this case from the exclusive/nonexclusive distinction drawn in copyright law, that distinction reflective more of *ownership* than status as an exclusive or nonexclusive licensee.  17 U.S.C. § 101; *see also* TMT N. Am., Inc. v. Magic Touch GmbH, 124 F.3d 876, 882 (7th Cir. 1997) (in absence of assignment of trademark rights, foreign manufacturer holds all rights to trademark even after licensing use of trademark to exclusive U.S. distributor.)

Therefore, the Court's reliance on Golden Books, which dealt solely with exclusive copyright licenses, does not apply to the present trademark sublicense, whether the sublicense be deemed exclusive or nonexclusive.

### 4.    The Court's Reliance on *Rooster* Is Misplaced

The issue in Rooster was not whether U.S. trademark law prevented the assignment of a trademark license.  Rather, "the issue [was] **narrowly** framed by the parties:  [did] the [sub-]licensing agreement constitute a contract for personal services, which applicable Pennsylvania law [held] unassignable?"  *Id.* at 232 (emphasis added).  Therefore, the issue in Rooster, as framed by the parties, was whether *Pennsylvania state law* would view the trademark sublicense as a personal services contract.  Indeed all parties in Rooster "conced[ed] the applicability of Pennsylvania law to [the] dispute."  Id. at 232, n8.  The curious lack of argument relating to Federal trademark law has been noted by at least commentator.  See Article:  Michelle Morgan Harner, Carl E. Black and Eric R. Goodman, Debtors Beware:  The Expanding Universe of Non-Assumable/Non-assignable Contracts in Bankruptcy, 13 Am. Bank. Inst. L. Rev. 187, 223 (Spring 2005).

The narrow issue in <u>Rooster</u> was "[i]n particular, … whether the licensing agreement constitutes a personal services contract which cannot be assigned or sold by the debtor." *Id.* at 229. The <u>Rooster</u> Court focused primarily on the fact that licensor's strict quality control program resulted in very little personal discretion exercised by the licensee. *Id.* at 235. This forced the Court to the conclusion that the license at issue was not a "personal services contract" and therefore could not be assumed or assigned under § 365(c)).

The bankruptcy court rejected the argument that the license in <u>Rooster</u> was one for personal services on the grounds that Pincus' control over the debtor's use of the "Bill Bass" trademark meant that the debtor's performance under the trademark license agreement did not depend upon "any special personal relationship, knowledge, unique skill or talent." <u>Rooster</u>, 100 B.R. at 233. Accordingly, the bankruptcy court determined that the sublicense was assignable because it was not for personal services.[4]

The Bankruptcy Court did not address whether the sublicense at issue here in this case is a personal services contract, and indeed it is, because *inter alia*, the manufacture of cookware *does* involve unique skill or talent. Particularly, cookware can vary from shoddy to the highest quality. In contrast to <u>Rooster</u>, Regal Ware does not establish for Mirro what its products must look like. This forms the basis for some of Regal Ware's concerns, that the putative licensee would be selling imports inferior in quality to Regal Ware's high quality goods.

---

[4] Even if the sublicense here was not a personal services contract, it would still be non-assignable. <u>In re Pioneer Ford Sales, Inc.</u>, 729 F.2d 27, 28-29 (1st Cir. 1984). (District Court erred out by its "belief that 11 U.S.C. § 365(c)(1)(A) refers only to traditional personal service contracts…. The language of the section does not limit its effect to personal service contracts. It refers generally to contracts that are not assignable under nonbankruptcy law. State laws typically make contracts for personal services nonassignable (where the contract itself is silent); but they make other sorts of contracts nonassignable as well.")

Indeed, <u>Rooster</u> did not address the consent provision present in the present license, namely that Newell (and now Regal Ware) had to consent to the assumption or assignment of the sublicense. "The right of a licensee to sub-license to others must be determined by whether the license clearly grants such a power. Similarly, the general rule is that unless the license states otherwise, the licensee's right to use the licensed mark is personal and cannot be assigned to another." <u>Tap</u>, 925 F. Supp. at 218.

Regarding the consent issue, straight contract law should have prohibited the present Mirro sublicense without Regal Ware's consent. *See* <u>In re Access Beyond Tech., Inc.</u>, 237 B.R. 32, 48 (Bankr. D. Del. 1999) (stating that "a debtor in possession may not assume an executory contract over the non debtor's objection if applicable law would bar assignment to a hypothetical third party"). This Court effectively wrote the consent issue out of the Trademark Sublicense Agreement, contrary to the law. "Under applicable *trademark* law, trademarks are personal and non-assignable without the consent of the licensor." <u>In re N.C.P. Mktg. Group, Inc.</u>, 337 B.R. 230, 237 (D. Nev. 2005) (emphasis added). Therefore, trademark licenses are not assumable in bankruptcy. *Id.* "[T]he Third Circuit adheres to the majority view . . . that § 365(c) is applicable to any contract subject to a legal prohibition against assignment," not just personal service contracts. *Id.*

As recently recognized, because a trademark owner has an affirmative duty to supervise and control the licensee's use of its mark, "[c]ommon sense suggests that if a trademark licensee could unilaterally sub-license a mark without notifying or obtaining consent from the licensor, then a trademark licensor would lose his ability to police his mark, thereby becoming estopped from enforcing his ownership rights [and imposed duties] vis-à-vis the licensee. Such a result is

illogical, undesirable, and at odds with the nature of intellectual property rights." <u>Miller v. Glenn Miller Prods.</u>, 318 F. Supp. 2d 923, 937 (C.D. Cal. 2004).

Other courts are in agreement that a trademark licensor can refuse consent to an assignment of a trademark license. *See* <u>In re Pioneer Ford Sales, Inc.</u>, 729 F.2d 27, 30 (1st Cir. 1984) (refusing to approve transfer because Ford had a reasonable basis for objecting to proposed transferee); <u>Ford Motor Co. v. Claremont Acquisition Corp., Inc.</u>, 186 B.R. 977, 991 (Bankr. C.D. Cal. 1995) (reversing order compelling assignment of GM franchise but affirming order compelling assignment of Ford franchise), *aff'd*, 113 F.3d 1029 (9th Cir. 1997); <u>In re Van Ness Auto Plaza, Inc.</u>, 120 B.R. 545, 551 (Bankr. N.D. Cal. 1990) (upholding manufacturer's withholding of consent to transfer dealership); <u>In re Van Ness Auto Plaza</u>, 120 B.R. at 549-50 (finding manufacturer's withholding of consent to assignment of PORSCHE dealership reasonable in view of its new less desirable location, and the low rank of the proposed transferee in customer satisfaction index); *see also* <u>In re W. Elecs., Inc.</u>, 852 F.2d 79, 82-84 (3d Cir. 1988) (assumption by bankrupt contractor as debtor-in-possession was not permitted, due to contractor's changed circumstances).

Regal Ware's consent was required but never granted.


## IV.    CONCLUSION

This Court has jurisdiction and the ability to grant effective appellate relief with respect to the enforceability of the assignment restriction in the Trademark Sublicense Agreement. Because Mirro did not have the right to sublicense or assign the marks absent consent, under applicable trademark law, the Bankruptcy Court committed reversible legal error.

Respectfully submitted:                    KLEHR, HARRISON, HARVEY,
                                           BRANZBURG & ELLERS, LLP


                                           *Steven K. Kortanek*.
                                           Steven K. Kortanek, Eq. (Bar No. 3106)
                                           919 Market Street, Suite 1000
                                           Wilmington, Delaware  19801
                                           (302) 426-1189
Date:  November 9, 2006                    Ryan, Kromholz & Manion, S.C.
                                           Daniel R. Johnson   (State Bar No.   1033981)
                                           Joseph A. Kromholz (State Bar No. 1002464)
                                           RYAN KROMHOLZ & MANION, S.C.
                                           P. O. Box 26618
                                           Milwaukee, Wisconsin 53226-0618

                                           Attorneys for Regal Ware, Inc.

25