IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE

In re:                                          Chapter 11

Global Home Products LLC, et al.,[1]            Case No. 06-10340 (KG)
                                                (Jointly Administered)

                          Debtors.

Regal Ware, Inc.,

                  Appellant,

            v.

Global Home Products LLC, et al.,               Civil Action 06-588 (JJF)

                  Appellees.

**DEBTORS' (A) MOTION TO DISMISS APPEAL FILED BY REGAL WARE INC. OF ORDER APPROVING MOTION OF THE DEBTORS FOR AN ORDER: (I) APPROVING SALE BY THE WEAREVER DEBTORS OF SUBSTANTIALLY ALL OF THE WEAREVER DEBTORS' OPERATING ASSETS FREE AND CLEAR OF ALL LIENS, CLAIMS, ENCUMBRANCES AND OTHER INTERESTS PURSUANT TO SECTIONS 363(B), (F) AND (M) OF THE BANKRUPTCY CODE, (II) ASSUMING AND ASSIGNING CERTAIN EXECUTORY CONTRACTS AND UNEXPIRED LEASES, AND (III) GRANTING RELATED RELIEF; OR, ALTERNATIVELY, (B) ANSWERING BRIEF TO OPENING BRIEF OF APPELLANT REGAL WARE, INC.**

December 1, 2006                        PACHULSKI STANG ZIEHL YOUNG JONES &
                                        WEINTRAUB LLP
                                        Laura Davis Jones (Bar No. 2436)
                                        David M. Bertenthal (CA Bar No. 167624)
                                        Bruce Grohsgal (Bar No. 3583)
                                        Joshua M. Fried (CA Bar No. 181541)
                                        919 North Market Street, 17th Floor
                                        P.O. Box 8705
                                        Wilmington, DE  19899-8705 (Courier 19801)
                                        Telephone:  (302) 652-4100
                                        Facsimile:  (302) 652-4400

                                        Counsel to Debtors, Global Home Products LLC, et al.

---

[1] The Debtors are the following entities:  Global Home Products LLC; GHP Holding Company LLC; GHP Operating Company LLC; Anchor Hocking Acquisition Inc.; Anchor Hocking Inc.; AH Acquisition Puerto Rico, Inc.; Anchor Hocking Consumer Glass Corporation; Anchor Hocking CG Operating Company LLC; Anchor Hocking Operating Company LLC; Burnes Acquisition Inc.; Intercraft Company; Burnes Puerto Rico, Inc.; Picture LLC; Burnes Operating Company LLC; Mirro Acquisition Inc.; Mirro Puerto Rico, Inc.; Mirro Operating Company LLC.

**Table of Contents**

Page

I.    Nature and Stage of Proceeding.................................................................................. 1

II.   Summary of Argument ................................................................................................ 2

III.  Statement of Relevant Facts....................................................................................... 4

      A.   The Sale Hearing Conducted by the Bankruptcy Court......................................... 7

      B.   Regal's Failure to Obtain a Stay Pending Appeal of the Sale Order. .................... 9

IV.   Argument ................................................................................................................... 12

      A.   The Appeal Should Be Dismissed as Moot Under Governing Third
           Circuit Law. .................................................................................................... 12

           (i)   The Sublicense Agreement was Sold to SEB Pursuant to
                 11 U.S.C. §363(b) and Is Entitled to the Protections of
                 Bankruptcy Code §363(m)..................................................................... 12

           (ii)  The Appeal Should Be Dismissed Because it Is Statutorily Moot .......... 17

      B.   Even if the Appeal is Not Dismissed as Moot, the Appeal Should
           be Denied on the Merits Because the Bankruptcy Court Correctly
           Concluded that the Sublicense Was an Exclusive License that Could
           be Assumed and Assigned Without Regal's Consent............................................ 24

      C.   Both the Bankruptcy Court and this Court Correctly Concluded that
           the Exclusive Sublicense Agreement Was Freely Assignable As a
           Matter of Law ................................................................................................... 27

V.    Conclusion ................................................................................................................. 32

# Table of Authorities

Page

## CASES

*Cinicola v. Scharffenberger,*
  248 F.3d 110, 128 (3d Cir. 2001) ........................................................................... 3

*Days Inns of America v. Regency Manor, Ltd,*
  94 F. Supp. 2d 1200 (D. Kan. 2000) ...................................................................... 24

*In re Abbotts Dairies of Pa., Inc.,*
  788 F.2d 143 (3d Cir. 1986) ................................................................................... 13

*In re Buildnet, Inc.,*
  2002 WL 31103235 (Bank. M.D.N.C. Sept. 20, 2002) .......................................... 28

*In re Golden Books Family Entertainment, Inc.,*
  269 B.R. 311 (D. Del. 2001) ................................................................................... 28

*In re Joshua Slocum Ltd.,*
  922 F.2d 1081 (3d Cir. 1990) ................................................................................. 15

*In re Luce* 14 B.R. 529 (S.D.N.Y. 1981) ................................................................. 24, 25

*In re Patient Education Media,*
  210 B.R. 237 (Bankr. S.D.N.Y. 1997) .................................................................... 29

*In re Pioneer Ford Sales, Inc.,* 729 F.2d 27 (1st Cir. 1984) ...................................... 24

*In re Rooster, Inc.*
  100 B.R. 228 (Bankr. E.D. Pa 1989) ...................................................................... 26

*In re Swedeland Dev. Group., Inc.,*
  16 F.3d 552 (3d Cir. 1994) ..................................................................................... 19

*In re the IT Group, Inc.,* 350 B.R. 166, 171 (Bank. D. Del. 2006) ............................... 14

*In re Travelot Co.,* 286 B.R. 447, 455 (Bankr. S.D. Ga. 2002) .................................... 24

*In re Van Ness Auto Plaza, Inc.,* 120 B.R. 545, 551 (Bankr. N.D. Cal. 1990) ............. 24

*In re West Elecs., Inc.,*
  852 F.2d 79 (3d Cir. 1988) ..................................................................................... 26

*Krebs Chrysler-Plymouth, Inc. v. Valley Motors, Inc. (In re Valley Motors Inc.),*
  141 F.3d 490 (3d Cir. 1998) ............................................................................. passim

*L.R.S.C. Co. v. Rickel Home Ctrs. (L.R.S.C. Co. v. Rickel Home Ctrs.)*
  *In re Rickel Home Ctrs., Inc.*, 209 F.3d 291 (3d Cir. 2000) ............................................. passim

*N.C.P. Marketing Group v. Blanks (In re N.C.P. Marketing Group),*
  337 B.R. 230, 237 (Bankr. D. Nev. 2005) ................................................................................ 24

*National Iranian Oil Co. v. Mapco Int'l,*
  983 F.2d 485,  (3d Cir. 1992) ................................................................................................. 20

*New Rock Asset Partners, L.P. v. Preferred Entity Advancements, Inc.,*
  101 F.3d 1492 (3d Cir. 1996) ................................................................................................. 20

*Ste. Pierre Smirnoff, FLS v. Hirsch,*
  109 F.Supp. 10 (S.D. Cal. 1952)............................................................................................. 26

*Tap Publications, Inc. v. Chinese Yellow Pages (New York) Inc.,*
  925 F. Supp. 212 (S.D.N.Y. 1996) ......................................................................................... 25

*United States v. Munsingwear, Inc.,*
  340 U.S. 36 (1950)............................................................................................................. 19, 20

**STATUTES**

11 U.S.C. § 363(m).................................................................................................................... 13

The above-captioned appellee debtors and debtors in possession in the above-referenced chapter 11 cases and appellees in this matter (the "Debtors") hereby file *Debtors' (A) Motion to Dismiss Appeal Filed by Regal Ware Inc. of Order Approving Motion of the Debtors for an Order (I) Approving Sale by the WearEver Debtors of Substantially All of the WearEver Debtors' Operating Assets Free and Clear of All Liens, Claims, Encumbrances and Other Interests Pursuant to Sections 363(b), (f) and (m) of the Bankruptcy Code, (II) Assuming and Assigning Certain Executory Contracts and Unexpired Leases, and (III) Granting Related Relief; or, Alternatively (B) Answering Brief to Opening Brief of Appellant Regal Ware, Inc.* (the "Motion").  In support of the Motion, the Debtors state as follows:

## I.

## Nature and Stage of Proceeding[2]

This matter is before the Court pursuant to the appeal (the "Appeal") filed by Regal Ware Inc. (the "Appellant" or "Regal") of that certain *Order Approving Motion of Debtors for the Entry of an Order (I) Approving Sale by the WearEver Debtors of Substantially All of WearEver Debtors' Assets Free and Clear of all Liens, Claims, Encumbrances and Other Interests Pursuant to Sections 363(b)(f) and (m) of the Bankruptcy Code, (II) Assuming and Assigning Certain Executory Contracts and Unexpired Leases, and (III) Granting Related Relief* (the "Sale Order").  The Appellant appeals the Sale Order solely with respect to the assumption and assignment of that certain exclusive *Trademark Sublicense Agreement* between Newell

---

[2] On October 10, 2006, Regal filed an Index of documents [District Court Docket No. 10] (the "Joint Appendix") that, along with the record of pleadings docketed in the above-captioned district court case, constitute the record of this Appeal.  The Joint Appendix includes those documents and pleadings designated by the appellee Debtors, appellee SEB and appellant Regal.  Citations to the record of pleadings contained in the Joint Appendix are denoted as "Joint Appendix No. ___"

Operating Company and Mirro Operating Company LLC (the "Sublicense Agreement") to SEB,

SA and Groupe SEB USA (together "SEB").[3] SEB was the successful bidder for substantially

all of the assets of Mirro Operating Company LLC and certain of its affiliates. The Sale Order

was entered by the United States Bankruptcy Court for the District of Delaware (the "Bankruptcy

Court") on August 14, 2006. The sale (the "Sale") to SEB closed on August 16, 2006 (the

"Closing Date"), at which time the Sublicense Agreement was assumed and assigned to SEB,

along with the other assets conveyed to SEB under the asset purchase agreement approved

pursuant to Sale Order (collectively, with the Sublicense Agreement, the "Property").

## II.

## Summary of Argument

As an initial matter, the Appeal is moot. The assignment of the Sublicense

Agreement to SEB pursuant to section 365(a) of title 11 of the United States Code (the

"Bankruptcy Code") constitutes the sale of property pursuant to Bankruptcy Code section 363(b)

and falls within the scope of the protections afforded under Bankruptcy Code section 363(m).

The Third Circuit has repeatedly held that unexpired leases and executory contracts constitute

estate property that can be sold pursuant to Bankruptcy Code section 363(b), notwithstanding the

fact that the mechanism by which the agreement is actually assigned to a buyer is pursuant to

Bankruptcy Code section 365(a). *See e.g. Krebs Chrysler-Plymouth, Inc. v. Valley Motors, Inc.*

*(In re Valley Motors Inc.)*, 141 F.3d 490 (3d Cir. 1998)*; L.R.S.C. Co. v. Rickel Home Ctrs.*

*(L.R.S.C. Co. v. Rickel Home Ctrs.) In re Rickel Home Ctrs., Inc.*, 209 F.3d 291 (3d Cir. 2000).

---

[3] Regal objected to the Sale Motion and filed the Appeal in its capacity as the assignee of Newell Operating Company.

Because the Sublicense Agreement was sold pursuant to section 363(m) of the Bankruptcy Code, the Appeal is moot under Third Circuit law because (1) the Sale of the Property was not stayed pending this Appeal, and (2) the reversal of the Sale Order would affect the validity of the sale of the Sublicense Agreement to SEB. *See Cinicola v. Scharffenberger*, 248 F.3d 110, 128 (3d Cir. 2001).

Both prongs of the mootness test under Bankruptcy Code 363(m) are satisfied here. The Sublicense Agreement was assigned to SEB on the Closing Date as part of the sale of the Property. The Bankruptcy Court made unappealed findings of fact that the sale of the Property to SEB was in good faith pursuant to 11 U.S.C. § 363(m). Furthermore, the Bankruptcy Court and this Court each independently denied Regal's motions for a stay pending this Appeal of the Sale Order with respect to the assignment of the Sublicense Agreement and in doing so, each Court specifically found that the assumption and assignment of the Sublicense Agreement was correctly approved over the objections of Regal and of Lifetime Brands, Inc., the stalking horse purchaser of the Property. The second prong of the mootness test is also satisfied because, among other reasons set forth more fully below, the Debtors are informed that SEB is currently engaged in the retail sale of Regal products pursuant to the Sublicense Agreement, continues to perform under the Sublicense Agreement and has compensated Regal for legal expenses in connection with the protection of the trademarks in accordance with the terms of the Sublicense Agreement. The Debtors have also indefeasibly received the full amount of the purchase price for the sale of the Property by obtaining an unstayed Sale Order by the Closing Date. Thus, even if the Bankruptcy Court's legal conclusion regarding the assumption and assignment of the

Sublicense agreement were subject to reversal (which it is not), such reversal would affect the validity of the sale of the Sublicense Agreement to SEB pursuant to 11 U.S.C. § 363(m).

Even if the Appeal were not moot, Regal's substantive contentions are erroneous. In fact, this Court has already found that the Bankruptcy Court correctly concluded that the Sublicense Agreement could be assigned to SEB without Regal's consent as a matter of law:

> In the Court's view, the Bankruptcy Court correctly concluded that the Sublicense Agreement was not a personal services contract and was freely assignable as an exclusive license that places no restriction on assignments. The Bankruptcy Court's reliance on *In re Golden Books*, 269 B.R. 311 (D. Del. 2001), and *In re Rooster, Inc.*, 100 B.R. 228 (Bankr. E.D. Pa. 1989) was not misplaced, and the cases cited by Regal Ware involve non-exclusive licenses or particular circumstances that are different from the circumstances here.

Joint Appendix No. 84 at pages 2-3.

Thus, the Debtors submit that the Appeal should be dismissed as moot or alternatively, denied on the merits.

## III.

## Statement of Relevant Facts

1.    On July 14, 2006, the Debtors filed their *Motion of the Debtors for an Order: (I) Approving Sale by the WearEver Debtors of Substantially All of the WearEver Debtors' Operating Assets Free And Clear of All Liens, Claims, Encumbrances and Other Interests Pursuant to Sections 363(b), (f) and (m) of the Bankruptcy Code, (II) Assuming and Assigning Certain Executory Contracts and Unexpired Leases; and (III) Granting Related Relief* (the "Sale Motion"). Joint Appendix No. 17.

2.    The Sale Motion sought approval for the sale of the Property to either

Lifetime Brands, Inc. ("Lifetime"), the stalking horse purchaser of the Property, or alternatively,

to the highest and best purchaser of such assets. Joint Appendix No. 17.

3.    The asset purchase agreement for the sale of the Property included the

assumption and assignment of the Sublicense Agreement. Joint Appendix No. 17 at Exhibit A.

4.    Newell Operating Company ("Newell") previously licensed the

Sublicense Agreement to Mirro Operating Company LLC ("Mirro")[4] in connection with Global

Home Products LLC's acquisition of the business of the WearEver Debtors from Newell and

certain of its related affiliates.[5] Joint Appendix No. 31 at Exhibit B. The Sublicense Agreement

granted Mirro an exclusive, worldwide royalty-free sublicense to use certain trademarks denoted

in the Sublicense Agreement (the "Trademarks") in connection with the manufacture and

distribution of certain of its products. Joint Appendix No. 31 at Exhibit B, pages 1-2.

5.    Section 1.3 of the Sublicense Agreement provides that Mirro may not

sublicense the use of the Trademarks or assign the Sublicense Agreement without the written

consent of Newell, "which consent will not be unreasonably withheld or delayed." Joint

Appendix No. 31 at Exhibit B, page 2.

6.    The Sublicense Agreement derives from a *Trademark License Agreement*,

dated as of October 29, 1999 (the "License Agreement"), pursuant to which Regal granted

Newell an exclusive, worldwide royalty-free sublicense of the Trademarks, in connection with

---

[4] Mirro, along with its debtor affiliates, Mirro Puerto Rico and Mirro Acquisition Inc. are collectively referred to as the "WearEver Debtors". The WearEver Debtors, along with their non-debtor affiliate, 690649 BC Ltd., are collectively referred to as the "WearEver Sellers"

[5] Global Home Products LLC, one of the Debtors herein, is the ultimate parent of Mirro.

Newell's purchase of Regal's business relating to non-electric aluminum cookware, bakeware and related accessories. Joint Appendix No. 31 at Exhibit A, pages 1-2.

      7.      Section 1.3 of the License Agreement allows Newell the unrestricted discretion to freely sublicense the use of the Trademarks to other parties. Joint Appendix No. 31 at Exhibit A page 2. Section 1.3 of the License Agreement also allows Newell the right to transfer the License Agreement, without Regal's consent, to an entity that acquires substantially all of Newell's business by merger, consolidation, sale of stock or assets, or otherwise, with respect to the Trademarks. Joint Appendix No. 31 at Exhibit A page 2.

      8.      Pursuant to an agreement effective as of August 1, 2006 – just seven days prior to the Sale Hearing – Newell purportedly assigned its rights, obligations, and interests under the Sublicense Agreement to Regal for no stated monetary consideration (the "Assignment Agreement"). Joint Appendix No. 31 at Exhibit C.

      9.      Pursuant to the Assignment Agreement, Regal claimed to have acquired Newell's rights and interests in the Sublicense Agreement and purported to be the sublicensor of the Sublicense Agreement with Mirro. It is in such capacity that Regal objected to the Sale Motion on August 3, 2006 (the "Regal Sale Motion Objection"). Joint Appendix No. 31, page 3, paragraphs 7-8. The Regal Sale Motion Objection states "Regal Ware does not consent to, and indeed objects to, *any* assumption or assignment of the Sublicense Agreement. Regal Ware also does not consent to *any* sublicensing of the Sublicense Agreement should the Debtors seek to do so." Joint Appendix No. 31, page 4 (emphasis added).

      10.     Regal also filed an amended supplement to the Regal Sale Motion Objection on August 7, 2006. Joint Appendix No. 43.

11.     The sole basis for Regal's objection to the Sale Motion was that Regal, in its capacity of having purportedly acquired Newell's interests under the Sublicense Agreement pursuant to the Assignment Agreement, refused to consent to the transfer of the Sublicense Agreement to either Lifetime or SEB. Joint Appendix No. 31 page 4, paragraph 9.

## A.     The Sale Hearing Conducted by the Bankruptcy Court.

12.     On August 7, 2006, in accordance with the approved bidding and sale procedures governing the sale of the Property approved by the Bankruptcy Court on July 14, 2006, the Debtors conducted an auction for the sale of the Property. Joint Appendix Nos. 15 and 70. At the end of the Auction, SEB was deemed the successful bidder for the purchase of the Property. Joint Appendix No. 52 page 2.

13.     On August 8, 2006, the Bankruptcy Court conducted the Sale Hearing to consider approval of the Sale Motion pursuant to which the Debtors, *inter alia*, moved to assume and assign the Sublicense Agreement to SEB. Joint Appendix Nos. 52 and 53. After considering substantial and lengthy testimony and evidence submitted by the Debtors, Regal, and other parties in interest, the Bankruptcy Court concluded, among other things, that the Sublicense Agreement could be assumed and assigned to SEB, without Regal's consent. Joint Appendix No. 52, pages 5-6. Specifically, the Bankruptcy Court determined:

> The Court determines as a matter of law that the Sublicense Agreement is assignable. First, the license to Newell and the Sublicense Agreement to Mirro were exclusive and did not restrict assignment to any particular entity. The cases cited by Regal in support of its objection involve non-exclusive licenses and/or special circumstances not present here. The court relies in its conclusion that the license is assignable on the decision of the United States District court for the District of Delaware in *In re Golden Books*, in which, with respect to a copyright license, the Court held that an exclusive licensee does acquire property rights

> and may freely transfer its rights. The Sublicense Agreement does
> not prohibit an assignment, Regal having given up control of the
> trademark license and has not regained that control. The case of *In
> re Rooster Inc.* also supports the Court's conclusion, wherein the
> Court held that an exclusive license for trademarks is freely
> assignable in that it does not constitute a personal services
> contract. Accordingly, the Sublicense Agreement is not subject to
> the limitations of Section 365(c)(1) of the Bankruptcy Code, and as
> such may be assumed and assigned to the Buyer pursuant to
> Section 365(b) and (f) of the Bankruptcy Code.

Joint Appendix No. 52 page 6 paragraph P.

14.     At the Sale Hearing, the Bankruptcy Court also stated that, while it did not

need to reach the issue of whether Regal had unreasonably withheld its consent, "but notes that

the testimony *that there were no circumstances under which Regal Ware would consent to the*

*assignment to SEB may be an unreasonable withholding of consent*." Joint Appendix No. 53 at

page 284, lines 24-25 and page 285, line 1 (emphasis added).

15.     Because Regal and Lifetime each objected to the Debtors' and SEB's

proposed form of order granting the Sale Motion, the Bankruptcy Court conducted a hearing

August 11, 2006, and entertained oral argument on the form of order that it would sign approving

the sale of the Property. Joint Appendix No. 67. The Bankruptcy Court signed the Sale Order

on August 11, 2006, and the Sale Order was entered on August 14, 2006. Joint Appendix No.

52.

16.     Sections 2.5.4 and 4.2.17 of the asset purchase agreement between the

WearEver Sellers and SEB (the "Purchase Agreement") provide, among other things, that if the

WearEver Sellers did not obtain, by the Closing Date of the sale of Property (and no later than

August 18, 2006), either (i) the consents of Regal and Newell to the assignment of the Sublicense

Agreement to SEB, or (ii) an unstayed order authorizing the assignment of the Sublicense

Agreement without such consents, SEB would be entitled to a purchase price reduction of $2 million. Joint Appendix 52 Exhibit A page 7 and pages 13-14.

      17.    The Sale Order provides:

> Upon the closing of the Sale, in accordance with Sections 363 and 365 of the Bankruptcy Code, the Buyer shall be fully and irrevocably vested in all right, title and interest of each Designated Contract (*including, but without limitation, the WearEver Debtors' interests in the Sublicense Agreement*). . . . As of the closing of the Sale, each Designated Contract will be in full force and effect and not subject to termination or cancellation by the non-Debtor party thereto based upon any act, omission or failure that my [sic] have occurred or arisen prior to thereto.

Joint Appendix No. 52 at page 17, paragraph 23 (emphasis added).

      18.    Pursuant to the Sale Order and the Purchase Agreement, the Sublicense Agreement was assumed and assigned to SEB at the Closing Date pursuant to the unstayed Sale Order and the Debtors indefeasibly received the Purchase Price to which they were entitled without any reduction. *See* Joint Appendix No. 52, Exhibit A, paragraph 8.1(b) pages 17-18.

## B.    Regal's Failure to Obtain a Stay Pending Appeal of the Sale Order.

      19.    On August 12, 2006, Regal filed a motion in the Bankruptcy Court seeking a stay of the Sale Order pending appeal (the "Bankruptcy Court Stay Motion"). Joint Appendix No. 50. The Bankruptcy Court Stay Motion was denied by the Bankruptcy Court on August 14, 2006, following a 4 ½ hour evidentiary hearing. Joint Appendix No. 60. The Bankruptcy Court received and considered testimony from witnesses offered by Regal, the Debtors and SEB, as well as the argument of counsel, and made factual findings on the record of the hearing and in its order denying the Bankruptcy Court Stay Motion. Joint Appendix Nos. 60 and 67.

> Here the facts and [sic] support of the sale order are irrefutable and
> the legal issues are not complex.  The trademark license was
> exclusive, it was not limited as to time, and it was non-royalty
> producing.  The original assignee, Newell, had assigned the license
> and there was no change in what Regal Ware once assigned or in
> its ability to monitor the use of the license that it had freely given
> up.  The Court is confident that the distinction between exclusive
> and nonexclusive trademark licenses is controlling.  And the fact
> that the license at issue is an exclusive license renders it
> assignable.  Regal Ware has cited no case in which exclusive
> trademark license was deemed not assignable.  And the absence of
> royalty payments is further significant because such absence means
> that the strength or weakness of the assignee to sell Regal Ware
> licensed product was irrelevant to Regal Ware . . . . The Court also
> finds that an assignment to SEB of the trademark which had been
> licensed and re-licensed will not constitute actual or economic
> irreparable harm.  There was speculation, but insufficient evidence
> presented by Regal Ware which would enable the Court to find
> that the trademark, in the hands of SEB, will damage Regal Ware
> economically.  Indeed, nothing will change, as Regal Ware
> testified, that its present intent is to use the trademark license
> precisely as Mirro did under the sub-license, selling product to
> Wal-Mart – Wal-Mart, although hopefully more successfully.

Joint Appendix No. 67 at pages 147 and 148.

      20.    Following the Bankruptcy Court's denial of the Bankruptcy Court Stay

Motion, Regal filed a motion in this Court on August 16, 2006, seeking a stay of the Sale Order

solely with respect to the assignment of the Sublicense Agreement to SEB pending the Appeal

(the "District Court Stay Motion").  Joint Appendix No. 71.  The Debtors [Joint Appendix No.

76], SEB [Joint Appendix No. 77], the Debtors' senior secured lenders, Wachovia Bank, N.A.

[Joint Appendix No. 78], and the Official Committee of Unsecured Creditors appointed in the

Debtors' chapter 11 cases [Joint Appendix 82] each filed oppositions to the District Court Stay

Motion.

21.    On August 16, 2006, the Sale closed and the Sublicense Agreement was assumed and assigned to SEB. Joint Appendix No. 83. The Debtors filed a supplement to their objection to the District Court Stay Motion notifying the Court of the closing of the Sale. Joint Appendix No. 83.

22.    On August 17, 2006, this Court issued a memorandum order denying the District Court Stay Motion (the "Memorandum Order"). Joint Appendix No. 84. In denying the District Court Stay Motion, the Court stated that it appeared that the District Court Stay Motion was moot because the sale had already closed. Joint Appendix No. 84 at page 2 ("As a result of the closing of the sale, it appears to the Court that Regal Ware's Motions are now moot."). The order denying the District Court Stay Motion further found:

> In the Court's view, the Bankruptcy Court correctly concluded that the Sublicense Agreement was not a personal services contract and was freely assignable as an exclusive license that places no restriction on assignments. The Bankruptcy Court's reliance on *In re Golden Books*, 269 B.R. 311 (D. Del. 2001), and *In re Rooster, Inc.*, 100 B.R. 228 (Bankr. E.D. Pa. 1989) was not misplaced, and the cases cited by Regal Ware involve non-exclusive licenses or particular circumstances that are different from the circumstances here.

Joint Appendix No. 84 pages 2-3.

# IV.

## Argument

### A.    The Appeal Should Be Dismissed as Moot Under Governing Third Circuit Law.

23.    The Debtors move for the dismissal of the Appeal because the Sublicense Agreement constitutes a sale of property under sections 363(b) and (m) of the Bankruptcy Code. Therefore, because the Sublicense Agreement is entitled to the protections of section 363(m) of the Bankruptcy Code, the Appeal must be dismissed under applicable Third Circuit law because (1) the Sale Order with respect to the Sale of the Sublicense Agreement was not stayed pending this Appeal, and (2) the reversal of the Sale Order would affect the validity of the sale of the Sublicense Agreement to SEB.

### (i)    The Sublicense Agreement was Sold to SEB Pursuant to 11 U.S.C. §363(b) and Is Entitled to the Protections of Bankruptcy Code §363(m)

24.    It is black letter law in the Third Circuit that executory contracts and leases constitute interests of property of a debtor's estate that may be sold by a debtor pursuant to section 363(b), notwithstanding that the method of conveyance of such property to the buyer is effectuated pursuant to section 365 of the Bankruptcy Code.

> For sales in bankruptcy, § 363 authorizes the trustee to use, sell or lease property of the estate outside the ordinary course of business after providing notice and hearing. The Bankruptcy Code broadly defines the property of the bankruptcy estate to include "all legal or equitable interests of the debtor in property as of the commencement of the case." Executory contracts and leases also fall under this definition.

*Cinicola v. Scharffenberger*, 248 F.3d 110, 121 (3d Cir. 2001) (citations omitted).

25.    In *Krebs Chrysler-Plymouth Inc. v. Valley Motors Inc. (In re Valley Motors, Inc.)*, 141 F.3d 490 (3d Cir. 1998), the Third Circuit held the sale of a franchise agreement by a debtor to a third party was a sale of an interest in property pursuant to 11 U.S.C. § 363(b), notwithstanding the fact that the mechanism of conveyance of the franchise agreement to the buyer was pursuant to 11 U.S.C. § 365. *Krebs*, 141 F.3d at 499. In *Krebs,* the buyer appealed a bankruptcy court order ordering it to close upon a purchase of franchise agreements sold to it by the debtor. *Id.* at 499. On appeal, the Third Circuit held that Krebs's appeal was moot under 363(m).[6] The Third Circuit rejected Krebs's argument that the bankruptcy court's 363(m) finding was not applicable to the sale of franchises simply because the franchises were assumed and assigned to Krebs under section 365 of the Bankruptcy Code. *Id.* at 498. Rather, the Third Circuit reasoned that the franchise agreements constituted property interests of the debtor's estate that were subject to sale pursuant to section 363(b). *Id.* at 497 ("Trademarks are property, and the franchises are licenses to use such property. Thus, under [state] law, these franchises are interests in property and, as such are property of the estate under section 541.") Therefore, "section 363(m) governs the sale of franchises here, notwithstanding that section 365 applies to the particular mechanism of conveyance." *Id.* at 498.

---

[6] Section 363(m) of the Bankruptcy Code provides:

> The reversal or modification on appeal of an authorization under subsection (b) or (c) of this section of a sale or lease of property does not affect the validity of a sale or lease under such authorization to an entity that purchased or leased such property in good faith, whether or not such entity knew of the pendency of the appeal, unless such authorization and such sale or lease were stayed pending appeal.

11 U.S.C. § 363(m). *See Cinicola*, 248 F.3d at 122 ("We have recognized that 'section 363(m) fosters the policy of not only affording finality to the judgment of the bankruptcy court, but particularly to give finality to close orders and judgment upon which third parties rely.'") (quoting *Pittsburgh Food & Beverage, Inc. v. Ronallo,* 112 F.3d 645, 647-48 (3d Cir. 1997); *In re Abbotts Dairies of Pa., Inc.,* 788 F.2d 143, 147 (3d Cir. 1986).

26.    Two years later, in *L.R.S.C. Co. v. Rickel Home Ctrs., Inc. (In re Rickel Home Ctrs.)*, 209 F.3d 291 (3d Cir. 2000), the Third Circuit expanded the *Krebs* definition of salable property under Bankruptcy Code sections 363(b) and (m) to include leases, notwithstanding the fact that, like executory contracts, the method their conveyance to a buyer is pursuant to section 365 of the Bankruptcy Code. In *Rickel*, a landlord appealed the district court's order authorizing the debtor's sale and assumption and assignment of 41 leases to Staples Inc. The district court found that Staples was entitled to the protections of section 363(m) with respect to the sale of leases. LRSC, one of the debtor's landlords, objected to the assignment of its lease with the debtor to Staples and appealed the district court's order. The landlord contended that even though the leases were sold to Staples pursuant to section 363(b), that code section was inapplicable to the transaction. *Id.* at 302.

27.    The Third Circuit rejected the landlord's argument that section 363(m) did not apply to the sale of the leases. Just like the executory contracts that were sold pursuant to sections 363(b) in *Krebs*, the Third Circuit held that the debtor's leases in *Rickel* constituted "property of the debtor's estate" pursuant to section 541 of the Bankruptcy Code and could be sold pursuant to sections 363(b) and 363(m). *Id.* at 303. The Third Circuit again differentiated the sale of a debtor's interests in property, which executory contracts and leases clearly are, versus the method of the conveyance and the sale of such interests through section 365(b). *See also In re the IT Group, Inc.*, 350 B.R. 166, 171 (Bank. D. Del. 2006) ("Contrary to Bechtel's assertions, executory contract rights *are* a form of "property" that is salable "free and clear" of interests under section 363(f)") (emphasis in original) (citing *In re Rickel*, 209 F.3d at 302).

28.    In this case, it is undisputed that the Sublicense Agreement constitutes a property interest of the WearEver Debtors' estates pursuant to section 541(a) of the Bankruptcy Code. *See Krebs,* 141 F.3d at 497-98; *Rickel* 209 F.3d at 302. It is also beyond dispute that the Sublicense Agreement was sold to SEB pursuant to Bankruptcy Code sections 363(b) and (m) as part of the sale of substantially all of the WearEver Debtors' assets pursuant to the Sale Motion. *See Krebs* 141 F.3d at 498; *Rickel,* 209 F.3d at 302-03. The fact that the "mechanism of conveyance" of the sale of the Sublicense Agreement was pursuant to section 365(a) does not change the fact that the Bankruptcy Court's 363(m) finding applied equally to the Sublicense Agreement as to the other Property sold to SEB under the Sale Order.

29.    Regal acknowledges the rule of law articulated by the Third Circuit in *Cinicola, Krebs* and *Rickel* that Bankruptcy Code section 363(m) is applicable to the sale of executory contracts and unexpired leases, but urges this Court to disregard these authorities for its self-serving reasons by arguing that a sale is "not necessary to convey all rights in the Trademark Sublicense Agreement to SEB". The only case cited by Regal for this extraordinary proposition, *In re Joshua Slocum Ltd.*, 922 F.2d 1081 (3d Cir. 1990), does not support Regal's argument and was distinguished in both *Krebs* and *Rickel*. Unlike the case at bar, *Slocum* did not address a situation in which the debtor attempted to sell a lease under section 363(b), thereby rendering section 363(m) inapplicable. As the *Krebs* court noted:

> Although we found that the appeal [in *Slocum*] was not moot, *Slocum* does not control our decision here. There, the Trustee requested and received "authorization to assume and assign the Lease pursuant to 11 U.S.C. § 365." However, *the Trustee never attempted to sell the Lease under section 363, and the parties conceded that section 363(m) did not apply in cases where the Trustee merely assigns a lease under section 365.* Unlike *Slocum*,

> the bankruptcy judge in this case authorized both an assumption under section 365 and a subsequent sale under section 363. The bankruptcy court also conducted an auction for the purposes of selling the franchise under the rules implementing section 363, which state that "all sales not in the ordinary course of business maybe by private sale or by public auction." There is no parallel provision under section 365 or its companion. For all these reasons, *Slocum* does not foreclose our conclusion that the sale of the franchises is covered by section 363(m).

*Krebs*, 141 F.3d at 499 (citations omitted emphasis added). *See also Rickel*, 209 F.3d at 301 ("Here, we are faced with the precise facts that *Krebs* noted were significant by their absence in *Slocum*. Rickel specifically requested authorization to *sell* the 41 Staples leases and the District Court explicitly authorized a *sale* of leases pursuant to section 363, despite LRSC's contention that section 363 was inapplicable to this transaction.") (citation omitted). Just as in *Krebs* and *Rickel*, the Mirro Sellers sought Bankruptcy Court authorization to sell the Sublicense Agreement pursuant to the Sale Motion and Bankruptcy Code section 363(b). The Bankruptcy Court explicitly authorized the sale of the Sublicense Agreement pursuant to section 363(b) and (m) of the Bankruptcy Code,[7] despite Regal's contention that section 363 is inapplicable to the sale of the Sublicense Agreement. *See* Rickel, 209 F.3d at 301.

Therefore, and in light of the foregoing authorities, section 363(m) is applicable to the sale of the Sublicense Agreement.

---

[7] Paragraph 23 of the Sale Order provides that "Upon the closing of the Sale, in accordance with Sections 363 and 365 of the Bankruptcy Code, the Buyer shall be fully and irrevocably vested in all right, title and interest of each Designated Contract (*including, but without limitation, the WearEver Debtors' interests in the Sublicense Agreement*)." (emphasis added). Joint Appendix No. 52 page 17 paragraph 13. The Bankruptcy Court also found that SEB was a good faith purchaser of the Property under section 363(m) of the Bankruptcy Code. Joint Appendix No. 52 page 7 paragraph T.

### (ii)    The Appeal Should Be Dismissed Because it Is Statutorily Moot

30.    An appeal becomes moot under Bankruptcy Code section 363(m) upon the occurrence of two conditions: (1) the underlying sale or lease must not have been stayed pending appeal, and (2) reversing or modifying the authorization to sell would affect the validity of the sale or lease. *Cinicola*, 288 F.3d 110 (quoting *In re Rickel*, 209 F.3d at 298).[8]

31.    Each of those conditions is satisfied in this case. First, the Bankruptcy Court and this Court each independently denied Regal's various motions for a stay of the Sale Order pending appeal. Thus, the Property was sold to SEB pursuant to an unstayed Sale Order notwithstanding the Appeal. Second, reversal of the Sale Order would affect the validity of the Sale of the Sublicense Agreement. As noted above, the Sale closed over two months ago and SEB is now the assignee of the Sublicense Agreement in lieu of Mirro. Joint Appendix No. 52 page 17 paragraph 23. SEB has indefeasibly paid the Debtors the full purchase price, including the $2 million as a result of the satisfaction of the condition of sections 2.5.4 and 4.2.17 of the Purchase Agreement by obtaining an unstayed Sale Order authorizing the assignment of the Sublicense Agreement. The Debtors are informed and believe that SEB has taken significant steps since the entry of the Sale Order to implement the terms of that order into SEB's business operations. First, the Debtors are informed that SEB has continued the retail sale of Regal products at Wal-Mart stores nationwide, has put into place distribution procedures to fulfill its commitments to Wal-Mart Stores, and has advised Wal-Mart stores that it will make every effort

---

[8] As noted above, the Bankruptcy Court found that SEB was entitled to the protections of Bankruptcy Code section 363(m) and made extensive findings in that regards. *See* Joint Appendix No. 52 pages 6-8. None of the Bankruptcy Court's findings, including the Bankruptcy Court's findings with respect to Bankruptcy Code section 363(m) were challenged by Regal.

to maintain a mutually beneficial relationship with respect to the sale of Regal products. Additionally, the Debtors are informed that SEB has developed and utilized procedures to address customer issues, including the return of Regal products, and performance on guaranties of Regal products. The Debtors are further informed that SEB has established an employee base sufficient to fulfill its obligations arising from the sale of Regal products, and has addressed numerous employment issues with such staff and workers. Furthermore, the Debtors are informed that SEB has taken a number of material steps to maintain the ongoing sale of Regal products at Wal-Mart. The Debtors are further informed that SEB also has handled technical and logistical matters relating to the online sale of Regal products and has forwarded payments directly to Regal to reimburse Regal for legal expenses arising out of the protection of the Trademarks. Thus, based on the degree of the SEB's placement of product orders, integration, and performance under the Sublicense Agreement, it is impossible to unscramble the egg at this point in time, (which is more than three months after the Closing Date), and restore Regal, SEB, SEB's customers, vendors and other parties impacted by SEB's use of the Trademarks under the Sublicense Agreement to the status quo ante. As such, reversal of the Sale Order would affect the validity of the sale of the Sublicense Agreement and the Appeal is statutorily moot.

32.    Regal misstates the legal standard concerning dismissal of an appeal under the grounds of mootness and the litany of cases cited by it are inapplicable to the case at bar. The cases cited by Regal do not address the Third Circuit's rule governing mootness of appeals of sales pursuant to 11 U.S.C. § 363(b) and (m). In its Opening Brief, Regal asserts that the because the Purchase Agreement provides "a carve-out" for the Sublicense Agreement, a reversal of the Sale Order on assignment of the Sublicense Agreement would not affect the

overall sale of the WearEver Debtors' business. Opening Brief page 10. While Regal is correct

that the Sale has closed and the purchase price has been indefeasibly paid to the Debtors, its

analysis is wrong. The Third Circuit's test for mootness under section 363(m) derives from its

holding in *In re Swedeland Dev. Group*, 16 F.3d 552 (3d Cir. 1994) in which the Third Circuit

concluded that section 363(e) did not moot an appeal of a financing order if the court could

"fashion any effective relief that would not violate section 363(e)." *Krebs*, 141 F.3d at 499;

*Cinicola*, 248 F.3d at 128. The test articulated for mootness under section 363(m) of the

Bankruptcy Code is viewed "through the prism of *Swedeland's* construction of section 364(e)."

*Krebs*, 141 F.3d at 499. Thus, whether or not this Appeal is moot does *not* depend on whether or

not the Purchase Agreement provided a "carve-out" for the sale of the Sublicense Agreement.

Rather, the issue is whether the Court can fashion relief *at this point in time* that would not

otherwise affect the validity of the sale. As set forth above, the Debtors are informed such relief

cannot be fashioned given the level of SEB's integration in manufacturing products under the

Trademarks as well as the degree of SEB's performance under the Sublicense Agreement in the

months following the closing of the Sale. In any event, and regardless of the outcome of this

Motion or the Appeal, the Debtors have satisfied the condition set forth in sections 2.5.4 and

4.2.17 of the Purchase Agreement by providing an unstayed Sale Order to SEB at Closing which

entitled the Debtors to indefeasibly receive the full amount of the Purchase Price without

reduction.

33.     Regal's reliance on *United States v. Munsingwear, Inc.*, 340 U.S. 36

(1950) and its progeny is also incorrect because it attempts to equate the potential mootness of a

pending *case* that becomes moot on appeal with the mootness of the appeal itself as a result of

the application of Bankruptcy Code section 363(m). In *Munsingwear*, the Supreme Court opined

that "[t]he established practice of the [Supreme] Court in dealing with a *civil case* from a court in

the federal system which has become moot while on its way here or pending our decision on the

merits is to reverse or vacate the judgment below and remand with a direction to dismiss."

*Munsingwear*, 340 U.S. at 39 (emphasis added). In other words, if a *case* has become moot on

its way to the appellate court, then the proper procedural mechanism is for the appellate court to

remand to the lower court with directions to reverse or vacate the judgment at the same time the

appeal is dismissed so that the appellant will be protected from the preclusive effect of an

unappealable order in subsequent litigation. *Munsingwear* is therefore factually and legally

inapplicable to the instant case. This is obviously not a instance where the Debtors' civil cases

or the Sale Order are moot. Rather, it is *the Appeal* of the Sale Order that has become moot

under Bankruptcy Code section 363(m) because Regal did not obtain a stay of the Sale Order and

reversal of the Sale Order would affect the validity of the sale of the Sublicense Agreement. *See*

*Krebs*, 141 F.3d at 499-500 ("Thus, under Section 363(m), Krebs' *appeal* is moot because it did

not receive a stay of the sale pending appeal, the sale has since been closed and the relief it seeks

would impact the validity of that sale") (emphasis added). [9]

34.    Regal's other arguments against dismissal of the Appeal on mootness

grounds are also devoid of merit. Regal states the fact that the Purchase Agreement was

---

[9] The other cases cited by Regal are factually distinguishable and do not address or analyze the test for mootness of sales under Bankruptcy Code section 363(m). *See, e.g, National Iranian Oil Co. v. Mapco Int'l*, 983 F.2d 485, (3d Cir. 1992) (Appellant moved to dismiss its own appeal of a district court order denying its petition to compel arbitration for alleged breach of crude oil contract petition to compel arbitration filed in district court; Court of Appeals held that the case was not moot); *New Rock Asset Partners, L.P. v. Preferred Entity Advancements, Inc.*, 101 F.3d 1492 (3d Cir. 1996) (appeal of district court granting summary judgment to foreclose on properties was not moot; if the district court lacked subject matter jurisdiction over the case, then effective relief could be granted).

modified and filed one week after the Sale Motion is evidence of an attempt to "manipulate"

section 363(m) in "an unfair manner."[10]  Opening Brief, pages 10-11.  As a preliminary matter,

the first amendment to the Purchase Agreement and the Purchase Agreement were filed and

served *concurrently with* the Sale Motion.  Joint Appendix Nos. 17 and 21.  Moreover, the

Sublicense Agreement was always included as Property for sale under the Purchase Agreement,

both before and after the amendment.  Thus, Sublicense Agreement was never subject to being

taken "out" of the transaction as Regal suggests in its Opening Brief.  The amendment to the

Purchase Agreement merely provided for a potential reduction in the purchase price if the

conditions set forth in amendment were not satisfied.  Furthermore at the time of the amendment

of the Purchase Agreement, Newell, not Regal, was the named party under the Sublicense

Agreement.  It was not until just seven days before the Sale Hearing that the Debtors learned of

Regal's purported acquisition of Newell's rights under the Sublicense Agreement (although the

Assignment Agreement does not state when such rights were allegedly acquired).  Given that

Newell (and not Regal) was the apparent counterparty to the Sublicense Agreement at the time

the Purchase Agreement was amended and filed with the Bankruptcy Court, Regal's suggestion

that the Debtors attempted to "manipulate" Regal's appellate rights with respect to an agreement

to which Regal was apparently not a party is not credible.  Moreover, Regal never objected to the

amendment to the Purchase Agreement, either before or after it acquired Newell's interests under

---

[10] It bears repeating that Regal requested and obtained from the Debtors several extensions of time to respond to the Sale Motion in order to apparently acquire Newell's rights under the Sublicense Agreement on the eve of the Sale Hearing and manufacture standing to oppose the Sale Motion and file this Appeal. Joint Appendix No. 31 at Exhibit C. It is therefore ironic that Regal is the party complaining of "deliberate actions" of the Appellees in consummating the terms of the unstayed Sale Order given the dubious circumstances in which Regal purportedly acquired Newell's rights under the Sublicense Agreement.

the Sublicense Agreement, despite having been served on July 14, 2006 with a copy of the Sale

Motion, the Purchase Agreement and the amendment of the Purchase Agreement.  Joint

Appendix No. 21 at page 2.  Thus, if Regal truly believed that its future appellate rights would

somehow be jeopardized by the amendment of the Purchase Agreement, it should have objected

to the Sale Motion on that basis at the Sale Hearing rather than raising it for the first time on

appeal.  The amendment to the Purchase Agreement filed with the Sale Motion (which provided

for a potential *reduction* of the Purchase Price) was entered into at the insistence of Lifetime, the

stalking horse buyer, and not the Debtors.  It is absurd to suggest that Debtors would attempt to

renegotiate the Purchase Agreement in order to create an outcome in which they might have lost

$2 million with no upside.  Thus, the amendment of the Purchase Agreement was not entered

into in order to anticipatorily affect any party's future appeal rights, especially the rights of entity

that was not a party to the Sublicense Agreement at that time.

35.    Regal also asserts in its Opening Brief that the Debtors did not provide

any evidence that they would "forever" lose the $2 million potential reduction and could have

"re-sold" the Sublicense Agreement to a third party "with the consent of Regal Ware" rather than

proceeding with the sale to SEB.  This argument is similarly off the mark.  As noted above,

Regal's consent to the sale of the Sublicense Agreement to SEB was not required as a matter of

law, as both the Bankruptcy Court and this Court have already concluded.  Moreover, under the

terms of the Purchase Agreement, the Debtors were required to close the sale of the Property to

SEB no later than August 18, 2006 (the "Outside Closing Date").  The Debtors were further

required to obtain an unstayed Sale Order by the Outside Closing Date in order to satisfy the

condition set forth in sections 2.5.4 and 4.2.17 of the Purchase Agreement and obtain the full

amount of the Purchase Price. By doing so, the WearEver Debtors indefeasibly received the full

amount of the Purchase Price, without reduction, for the benefit of their estates. Regal's

assertion that the Debtors could have re-sold the Sublicense with the "consent of Regal Ware" is

also not credible and contradicts Regal's previous position that it would not consent to the

assignment of the Sublicense Agreement to Lifetime, SEB or any third party. As set forth in the

Regal Sale Motion Objection filed with the Court on August 3, 2006, Regal brazenly asserted

that "Regal Ware does not consent to, and indeed objects to, *any* assumption or assignment of the

Sublicense Agreement. Regal Ware also does not consent to *any* sublicensing of the Sublicense

Agreement should the Debtors seek to do so." Joint Appendix No. 31 page 4 at paragraph 9

(emphasis added). As such, Regal's suggestion that it would consent to the assignment or the

sublicense of the Sublicense Agreement to any third party is belied by the statements in the

Regal Sale Motion Objection.

B.    **Even if the Appeal is Not Dismissed as Moot, the Appeal Should be Denied on the Merits Because the Bankruptcy Court Correctly Concluded that the Sublicense Was an Exclusive License that Could be Assumed and Assigned Without Regal's Consent**

36.    Even if the Appeal were not moot for the reasons described above, the

Bankruptcy Court correctly decided, as a matter of law, that the exclusive Sublicense Agreement

could be freely assigned to SEB without Regal's consent. Regal's argument that the Sublicense

Agreement cannot be assumed and assigned pursuant to section 365(c) of the Bankruptcy Code

was properly rejected by the Bankruptcy Court. Furthermore, Regal's argument is premised

entirely on out-of-circuit case law while the Debtors' legal position is supported by decisions

issued by courts from within the Third Circuit.

37.     As both this Court and the Bankruptcy Court each independently

concluded, the Sublicense Agreement is an exclusive trademark license agreement which may be

freely assigned under applicable nonbankruptcy law without the consent of the sublicensor.

Regal's Opening Brief cites several inapplicable out-of circuit cases in support of its legal theory

which are cases dealing with non-exclusive license agreements, cases in which no licenses were

found to exist at all, or cases that do not address the assignment of trademark agreements. *See,*

*e.g., N.C.P. Marketing Group v. Blanks (In re N.C.P. Marketing Group)*, 337 B.R. 230, 237

(Bankr. D. Nev. 2005) (non-exclusive license agreement); *Days Inns of America v. Regency*

*Manor, Ltd,* 94 F. Supp. 2d 1200 (D. Kan. 2000) (apparently non-exclusive license agreement for

defendant to operate Days Inn facility in Hutchinson, Kansas); *In re Travelot Co.*, 286 B.R. 447,

455 (Bankr. S.D. Ga. 2002) (no license between parties to use trademarks); *In re Van Ness Auto*

*Plaza, Inc.*, 120 B.R. 545, 551 (Bankr. N.D. Cal. 1990) (analyzing reasonableness of nonconsent

regarding assignment of Porsche automobile franchise agreement); *In re Pioneer Ford Sales,*

*Inc.*, 729 F.2d 27 (1st Cir. 1984) (analyzing reasonableness of nonconsent regarding assignment

of Ford automobile franchise agreement).

38.     Regal's reliance on *In re Luce* 14 B.R. 529 (S.D.N.Y. 1981), another out-

of-circuit case, is similarly misplaced. In *Luce*, a non-operating debtor attempted to assume an

agreement with Fruit of the Loom, Inc. with respect to the manufacture and sale of products

using the Fruit of the Loom trademark. *Id.* at 530-31. The debtor contracted with a discount

clothing manufacturer, Fashion House, to act as the debtor's "contractor" to manufacture

garments using the Fruit of the Loom name in return for a portion of the proceeds. *Id.* at 530-31.

The court noted that the debtor had "no assets, no employees, no office or showroom and no

sales force. . ." *Id.* at 531. The *Luce* court also reasoned, among other things, that there was no

adequate assurance of future performance that would protect the licensor as there was no

"assurance whatever of continued performance on the Debtor's side of the License Agreement."

*Id.* at 532. This is not the issue in the instant case. Further, although not expressly stated, it

appears that the trademark license at issue in *Luce* was a nonexclusive license because the

bankruptcy court concluded that if licensor "Fruit of the Loom, Inc. had wished to franchise

Fashion House as a licensee, it could have done so." *Id.* at 532. Similarly, *Tap Publications,*

*Inc. v. Chinese Yellow Pages (New York) Inc.*, 925 F. Supp. 212 (S.D.N.Y. 1996), another out-of-

circuit case, and also relied upon by Regal addressed a situation where a trademark owner

(ASM) agreed not to publish Chinese telephone directories or similar directories in the

metropolitan New York area so long as the initial licensor (Key) continued to publish

Chinese/English telephone directories in the same area. ASM's agreement not to publish phone

books in the New York metropolitan area was therefore conditioned on Key's publication of

phone books in the area. ASM therefore retained a reversionary right to publish phone books in

the New York metropolitan area if Key ceased publishing in that area. The *Tap* court noted that

agreement between Key and ASM did not state whether the agreement could be assigned or

whether Key could transfer its rights to a successor. *Id.* at 216. It is also not clear from *Tap* that

ASM's grant to Key amounted to an exclusive license to publish the trademarks in the phone

books; simply because ASM agreed not to publish phone books in the New York metropolitan

area did not mean that ASM could not have granted the right to another entity to publish phone

books in the New York metropolitan area using the same trademarks published by Key. This is

factually inapposite to the terms of the Sublicense Agreement, which is both an exclusive and

worldwide license to use the Trademarks for the duration of the term of the Sublicense

Agreement with no reversionary rights. No other party other than the sublicensee of the

Sublicense Agreement has the ability to use the Trademarks. Moreover, unlike in *Tap*, the

Sublicense Agreement expressly contemplates that the agreement may be assigned and expressly

provides that it shall be binding on the parties successors and assigns. Joint Appendix No. 31,

Exhibit B page 2 at para 1.3.

## C.    Both the Bankruptcy Court and this Court Correctly Concluded that the Exclusive Sublicense Agreement Was Freely Assignable As a Matter of Law

39.    As set forth above, both the Bankruptcy Court (Joint Appendix No. 52 at

page 6) and this Court (Joint Appendix No. 84 at pages 2-3) independently concluded that the

Sublicense Agreement was, as a matter of law, freely assignable as an exclusive license

agreement.

40.    Courts have recognized that exclusive trademark licenses may be freely

assigned. *See Ste. Pierre Smirnoff, FLS v. Hirsch*, 109 F. Supp. 10, 12 (S.D. Cal. 1952) ("[t]he

grant of an exclusive and irrevocable right to use a mark in a designated territory is an

assignment and not a mere license. . . . .[A]n exclusive license under trademarks is not  . . . a

mere license, but assigns the exclusive ownership and good-will in the trade-marks. . . . (citations

and quotations omitted)."). The free assignability of exclusive trademark licenses has also been

recognized by at least one bankruptcy court in this circuit. In *In re Rooster, Inc.* 100 B.R. 228

(Bankr. E.D. Pa 1989), decided almost one year *after* the Third Circuit issued its decision in *In re*

*West Elecs., Inc.*, 852 F.2d 79 (3d Cir. 1988), the bankruptcy court found that an exclusive

license for the use of trademarks may be freely assigned notwithstanding section 365(c) of the

Bankruptcy Code. In *Rooster*, the debtor entered into an exclusive sublicense with Pincus Bros.,

Inc. ("Pincus"), to use the Bill Blass trademark on its neckties for distribution and sales in the

United States, its territories and possessions. *Id.* at 229-30. Pincus was the sole and exclusive

licensee of the right to use the Bill Blass name and trademark in connection with the manufacture

and sale of men's apparel. *Id.* The debtor was subject to substantial supervision and control by

both Pincus and Bill Blass regarding the neckties that could be manufactured. *Id* at 233-34.

Pincus objected to Rooster's proposed assignment of the exclusive sublicense agreement. *Id.* at

231. The bankruptcy court reasoned that "applicable nonbankruptcy law" did not prevent the

assumption and assignment of the exclusive sublicense agreement because the agreement was

not a personal services agreement and could be assumed and assigned without Pincus' consent.

*Id.* at 233-35. The fact that the "applicable nonbankruptcy law" in *Rooster* happened to be state

law does not change the fact that the court held that an exclusive sublicense was nonetheless

assumable and assignable without the licensor's consent under section 365(c) of the Bankruptcy

Code.

        41.    Regal attempts to distinguish *Rooster* on the basis that the manufacture of

the Regal products involves "unique skill or talent" and argues that the facts in *Rooster* fail to

address Regal's concerns that the products manufactured by SEB may be of an inferior quality.

This argument also fails to hold water. As noted by the Bankruptcy Court, "there was

speculation, but insufficient evidence presented by Regal Ware which would enable the Court to

find that the trademark, in the hands of SEB, will damage Regal Ware economically." Regal

undisputedly granted Newell the right to freely sublicense the Trademarks to *any* third party

without first obtaining Regal's consent and expressly waived any opportunity to pass over the

qualifications of the proposed assignee. If Regal were genuinely concerned over the identity of

the sublicensee of the Sublicense Agreement and the manufacture of Regal products, it would

not have agreed to allow Newell the unrestricted ability to assign the Sublicense Agreement to

any third party. Joint Appendix No. 67 at page 148. Moreover, Regal's ability to enforce quality

controls over the use of the Trademarks is preserved by the terms of the Sublicense Agreement.

Just as Regal negotiated the License Agreement to permit the unrestricted sublicense of the

Trademarks, Regal retains the right to enforce quality control and monitoring oversight over the

Trademarks, including the ability to monitor and potentially suspend a sublicensee's right to use

the Trademarks in accordance with sections 4.4 and 4.6 of the Sublicense Agreement. As set

forth above, the Debtors are informed that SEB is currently manufacturing products under the

Sublicensing Agreement and has forwarded Regal payments in connection with the legal

expenses arising out of the protection of the Trademarks. Thus, it appears that Regal's concerns

over SEB's ability to manufacture products using the Regal Trademarks were indeed unfounded,

as stated by the Bankruptcy Court.

42.     In addition to decisions construing that exclusive patent licenses are freely

assignable, courts have similarly approved assignments of other exclusive intellectual property

licenses, such as copyright licenses. *See, e.g., In re Golden Books Family Entertainment, Inc.,*

269 B.R. 311, 319 (D. Del. 2001) (finding that, under applicable copyright law, exclusive license

conveyed an ownership interest that allows the licensee to freely transfer its rights and did not

prevent the assumption and assignment of an agreement pursuant to section 365 of the

Bankruptcy Code); *In re Buildnet, Inc.,* 2002 WL 31103235, *5 (Bank. M.D.N.C. Sept. 20,

2002) ("The Copyright Act distinguishes between exclusive and non-exclusive licenses. The

holder of the exclusive licenses has all of the rights of the copyright owner, to the extent of the license, and, as such, may freely transfer his rights (citation omitted)."); *In re Patient Education Media*, 210 B.R. 237, 240 (Bankr. S.D.N.Y. 1997) ("The holder of the exclusive license is entitled to all the rights and protections of the copyright owner to the extent of the license. Accordingly, the licensee under an exclusive license may freely transfer his rights, and moreover, the licensor cannot transfer the same rights to anyone else." (citations omitted)").

43.     Regal's argument that its ownership of the actual Trademarks prevents the free assignment of the exclusive Sublicense Agreement is inapposite. While Regal may own the Trademarks, it does not own the exclusive rights to use the Trademarks granted under the Sublicense Agreement. Those rights have been assigned to SEB. Under the Sublicense Agreement, Mirro had the exclusive worldwide rights to use the Trademarks. No other party (including Regal) could use the Trademarks pursuant to this exclusive grant. Mirro did not seek authority to transfer ownership of the Trademarks to SEB. Rather, Mirro assigned its exclusive rights to use the Trademarks that was granted to it under the Sublicense Agreement. Regal granted these exclusive rights in their entirety when it executed the License Agreement and, as such, such rights may be freely assigned.

**V.**

**Conclusion**

For the reasons stated above, the Debtors respectfully request that this Court

dismiss the Appeal as moot or alternatively, deny the Appeal on the merits and grant such other

and further relief as the Court deems just and proper.

Respectfully submitted,

Dated:  December 1, 2006                    PACHULSKI STANG ZIEHL YOUNG JONES
                                            & WEINTRAUB LLP

                                            _____
                                            Laura Davis Jones (Bar No. 2436)
                                            David M. Bertenthal (CA Bar No. 167624)
                                            Bruce Grohsgal (Bar No. 3583)
                                            Joshua M. Fried (CA Bar No. 181541)
                                            Sandra G. M. Selzer (Bar No. 4283)
                                            919 North Market Street, 17th Floor
                                            P.O. Box 8705
                                            Wilmington, DE  19899-8705 (Courier 19801)
                                            Telephone:  (302) 652-4100
                                            Facsimile:   (302) 652-4400

                                            Counsel for the Debtors
                                            Global Home Products LLC, et al.

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE

In re:                                          Chapter 11

GLOBAL HOME PRODUCTS LLC, et al.,[1]            Case No. 06-10340 (KG)
                                                (Jointly Administered)
                          Debtors.

---

REGAL WARE, INC.,

                          Appellant,

               v.                               Civil Action No. 06-588 (JJF)

GLOBAL HOME PRODUCTS LLC, et al.,

                          Appellees.

---

## CERTIFICATE OF SERVICE

I, Bruce Grohsgal, hereby certify that on the 1st day of December, 2006, I caused

a copy of the following document(s) to be served on the individuals on the attached service list(s)

in the manner indicated:

**DEBTORS' (A) MOTION TO DISMISS APPEAL FILED BY REGAL WARE INC. OF ORDER APPROVING MOTION OF THE DEBTORS FOR AN ORDER: (I) APPROVING SALE BY THE WEAREVER DEBTORS OF SUBSTANTIALLY ALL OF THE WEAREVER DEBTORS' OPERATING ASSETS FREE AND CLEAR OF ALL LIENS, CLAIMS, ENCUMBRANCES AND OTHER INTERESTS PURSUANT TO SECTIONS 363(B), (F) AND (M) OF THE BANKRUPTCY CODE, (II) ASSUMING AND ASSIGNING CERTAIN EXECUTORY CONTRACTS AND UNEXPIRED LEASES, AND (III) GRANTING**

---

[1] The Debtors are the following entities: Global Home Products LLC; GHP Holding Company LLC; GHP Operating Company LLC; Anchor Hocking Acquisition Inc.; Anchor Hocking Inc.; AH Acquisition Puerto Rico, Inc.; Anchor Hocking Consumer Glass Corporation; Anchor Hocking CG Operating Company LLC; Anchor Hocking Operating Company LLC; Burnes Acquisition Inc.; Intercraft Company; Burnes Puerto Rico, Inc.; Picture LLC; Burnes Operating Company LLC; Mirro Acquisition Inc.; Mirro Puerto Rico, Inc.; Mirro Operating Company LLC.

**RELATED RELIEF; OR, ALTERNATIVELY,(B) ANSWERING BRIEF TO OPENING BRIEF OF APPELLANT REGAL WARE, INC.**

_____
Bruce Grohsgal (Bar No. 3583)

GHP – Service List for 06-588 (JJF)
Case No. 06-10340 (KG)
Document No. 120548
08 – Hand Delivery
10 – Overnight Delivery
01 – Foreign Overnight Delivery

**Hand Delivery**
(Counsel to Regal Ware, Inc.)
Steven K. Kortanek, Esq.
Klehr, Harrison, Harvey, Branzburg & Ellers
LLP
919 North Market Street, Suite 1000
Wilmington, DE 19801

**Hand Delivery**
(Counsel to SEB S.A. and SEB USA)
Gregg M. Galardi, Esq.
Matthew P. Ward, Esq.
Skadden, Arps, Slate, Meagher & Flom LLP
One Rodney Square
Wilmington, DE 19801

**Hand Delivery**
(United States Trustee)
Mark Kenney, Esq.
Office of the United States Trustee
J. Caleb Boggs Federal Building
844 North King Street, Suite 2207
Lockbox 35
Wilmington, DE 19801

**Hand Delivery**
(Counsel to the Official Committee of
Unsecured Creditors)
David M. Fournier, Esq.
Pepper Hamilton LLP
1313 Market Street, Suite 5100
Wilmington, DE 19801

**Hand Delivery**
(Counsel to Wachovia Bank, National
Association)
Joseph H. Huston, Jr., Esq.
Thomas G. Whalen, Jr., Esq.
Stevens & Lee, P.C.
1105 North Market Street, 7th Floor
Wilmington, DE 19801

**Hand Delivery**
(Counsel to Madeleine, L.L.C.)
Robert J. Dehney, Esq.
Derek C. Abbott, Esq.
Morris, Nichols, Arsht & Tunnell LLP
Chase Manhattan Centre
1201 North Market Street, 18th Floor
Wilmington, DE 19801

**Hand Delivery**
(Counsel to Global Home Products Investors,
LLC)
Adam G. Landis, Esq.
Kerri K. Mumford, Esq.
Landis Rath & Cobb LLP
919 North Market Street, Suite 600
Wilmington, DE 19801

**Hand Delivery**
(Counsel to Lifetime Brands, Inc.)
Ronald S. Gellert, Esq.
Eckert Seamans Cherin & Mellott, LLC
300 Delaware Avenue, Suite 1360
Wilmington, DE 19801

**Overnight Delivery**
(Counsel to the Official Committee of
Unsecured Creditors)
Sharon Levine, Esq.
Bruce Buechler, Esq.
Lowenstein Sandler PC
65 Livingston Avenue
Roseland, NJ 07068-1791

**Overnight Delivery**
(Debtors)
Mark Eichhorn
Interim Chief Executive Officer
Global Home Products, LLC
519 North Pierce Avenue
Lancaster, OH 43130

**Overnight Delivery**
(Debtors)
Mark Eichhorn
Interim Chief Executive Officer
Global Home Products, LLC
519 North Pierce Avenue
Lancaster, OH 43130

**Overnight Delivery**
(Counsel to Wachovia Bank, National
Association)
Jonathan N. Helfat, Esq.
Matthew J. Miller, Esq.
Otterbourg, Steindler, Houston & Rosen, P.C.
230 Park Avenue
New York, NY 10169-0075

**Overnight Delivery**
(Counsel to Madeleine L.L.C.)
Jesse H. Austin, III, Esq.
Paul, Hastings, Janofsky & Walker LLP
600 Peachtree Street, N.E., Suite 2400
Atlanta, GA 30308

**Overnight Delivery**
(Counsel to Global Home Products Investors,
LLC)
Michael L. Cook, Esq.
Sophie S. Kim, Esq.
Schulte Roth & Zabel LLP
919 Third Avenue
New York, NY 10022

**Overnight Delivery**
(Counsel to Cerberus, L.P.)
Daniel V. Oshinsky, Esq.
Schulte Roth & Zabel LLP
919 Third Avenue
New York, NY 10022

**Overnight Delivery**
(Counsel to Lifetime Brands, Inc.)
Neil E. Herman, Esq.
Leonard Klingbaum, Esq.
Morgan, Lewis & Bockius LLP
101 Park Avenue
New York, NY 10178

**Overnight Delivery**
(Counsel to Regal Ware, Inc.)
Morton R. Branzburg, Esq.
Klehr, Harrison, Harvey, Branzburg & Ellers
LLP
260 South Broad Street, Suite 400
Philadelphia, PA 19102

**Overnight Delivery**
(Counsel to Regal Ware, Inc.)
Daniel R. Johnson, Esq.
Ryan Kromholz & Manion, S.C.
3360 Gateway Road
Brookfield, WI 53045

**Overnight Delivery**
(Counsel to Citigroup)
Joseph H. Smolinsky, Esq.
Chadbourne & Parke LLP
30 Rockefeller Plaza
New York, NY 10112

**Foreign Overnight Delivery**
(Counsel to SEB S.A. and SEB USA)
N. Lynn Hiestand, Esq.
Christian Pilkington, Esq.
Neil Devaney, Esq.
Skadden, Arps, Slate, Meagher & Flom (UK)
LLP
40 Bank Street
Canary Wharf, London E14 5DS
ENGLAND